## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR FIRST
COMMUNITY BANK

        Plaintiff,

v.

H. PATRICK DEE, PAUL D. DIPAOLA, V.
WILLIAM DOLAN, JR., JOHN E. FANNING,
MARSHALL G. MARTIN, BOBBY J.
NAFUS, RONALD R. SANCHEZ, AND
PAMELA J. SMITH

        Defendants.

NO. _____

DEMAND FOR JURY TRIAL

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for First

Community Bank ("FDIC-R"), for its Complaint, states as follows:

## I.      INTRODUCTION

1.     The FDIC-R brings this case in its capacity as Receiver for First Community

Bank of Taos, New Mexico ("First Community" or "Bank").  The FDIC-R seeks to recover its

damages of at least $14.8 million caused by Defendants' tortious conduct in approving six poorly

underwritten transactions – four commercial real estate ("CRE") and acquisition, development,

and construction ("ADC") transactions, one land transaction, and one commercial business

transaction (collectively, the "Subject Transactions") – from January 29, 2007 to February 16,

2010.  In this lawsuit, the FDIC-R does not seek to collect upon outstanding loans but, rather,

seeks to collect tort damages from Defendants for negligence, gross negligence, and breaches of

fiduciary duty.

2.      Defendants had a duty to engage in safe and sound banking practices.  Rather than act prudently, Defendants took unreasonable financial risks, violated internal policies and procedures when approving the Subject Transactions, knowingly permitted poor underwriting in contravention of internal policies and prudent lending standards, and ignored repeated regulatory warnings about violations of internal policies and procedures and the risks associated with high concentrations in CRE loans.

3.      In derogation of their duty to engage in safe and sound banking practices, Defendants approved the Subject Transactions in violation of the Bank's Loan Policy ("Loan Policy") and prudent lending standards.  For example, Defendants approved the Subject Transactions: (a) without adequate financial information or analysis on the borrowers and guarantors; (b) without verifying the reported assets and income of the borrower and guarantors; (c) with insufficient and/or incorrectly valued collateral; and (d) with no clear repayment source for the transactions.

4.      In approving the Subject Transactions as members of the Credit Committee ("CC"), Board of Directors ("Board"), and/or as individual officers and/or directors, Defendants had a duty to comply with the Loan Policy.  By repeatedly ignoring Loan Policy violations and other obvious underwriting deficiencies that were clear on the face of the Loan Approval Forms ("LAF") that they received prior to voting on loans, Defendants completely abdicated their responsibilities to ensure that loans were made in accordance with the Loan Policy and safe and sound banking practices.  Defendants each approved at least two of the six Subject Transactions.

5.      In committing numerous breaches of their duties, Defendants acted clearly unreasonably under the circumstances known to them at the time, and otherwise wholly abdicated their responsibilities by closing their eyes to known risks relating to each of the

2

Subject Transactions they voted to approve in violation of the Loan Policy and prudent lending practices.

6.     The FDIC-R seeks to recover damages exceeding $14.8 million as a result of the Defendants' negligence, gross negligence, and breaches of fiduciary duties in approving the Subject Transactions in violation of safe and sound banking principles and contrary to the Loan Policy.

## II.     THE PARTIES

### A.     Plaintiff

7.     The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a).  On January 28, 2011, the New Mexico Regulation & Licensing Department, Financial Institutions Division ("NMFID") appointed the FDIC as Receiver for First Community.  12 U.S.C. § 1821(c).  The FDIC-R is acting in its capacity as Receiver and is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R, by operation of law, succeeded to all rights, titles, powers, and privileges of the Bank and, among others, the depositors, accountholders, and stockholders of the Bank.  In this action, the FDIC-R seeks to recover damages resulting from the tortious conduct of the Defendants.

### B.     Defendants

8.     H. Patrick Dee ("Dee") was President from May 16, 2001 to January 28, 2011, Chief Executive Officer ("CEO") from December 31, 2009 to January 28, 2011, a member of the Board from January 9, 1992 to January 28, 2011, and a member of the CC from October 17, 2005 until January 28, 2011.

9.      Paul D. DiPaola ("DiPaola") was Regional President of New Mexico from 2003 to January 28, 2011, a member of the Board from March 28, 1994 to January 28, 2011, and a member of the CC from July 25, 2005 until January 28, 2011.

10.     V. William Dolan, Jr. ("Dolan") was a loan officer in the New Mexico territory from October 28, 1991 to September 16, 2009, head of the Special Assets Group from February 11, 2009 to September 16, 2009, a member of the Board from July 15, 1993 to August 4, 2009, and a member of the CC from July 25, 2005 to September 8, 2009.

11.     John E. Fanning ("Fanning") was Regional President for Southern New Mexico and Arizona from November 14, 2005 to October 21, 2008, Chief Credit Officer ("CCO") from October 27, 2008 to January 28, 2011, a member of the Board from January 23, 2006 to January 28, 2011, and a member of the CC from November 15, 2005 until January 28, 2011.

12.     Marshall G. Martin ("Martin") was corporate counsel from September 17, 2003 to January 28, 2011, a member of the Board from September 15, 2003 to August 4, 2009, an advisory director from August 5, 2009 to January 28, 2011, and a member of the CC from July 25, 2005 to October 20, 2009.

13.     Bobby J. Nafus ("Nafus") was a Senior Vice President and loan officer in the Northern New Mexico territory from June 17, 1991 to September 11, 2009.

14.     Ronald R. Sanchez ("Sanchez") was Regional President for Northern New Mexico and Utah from 2004 to October 5, 2009, a member of the Board from December 16, 1993 to September 11, 2009, and member of the CC from July 25, 2005 to September 8, 2009.

15.     Pamela J. Smith ("Smith") was a loan reviewer from July 12, 2004 to October 30, 2006, CCO from October 30, 2006 to October 27, 2008, Deputy CCO from October 27, 2008 to

January 28, 2011, and a member of the CC from July 25, 2005 to January 28, 2011, including

Chairman of the CC from November 21, 2006 to October 21, 2008.

### III.     JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this matter, as actions in which the

FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*; 12

U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.

17.     This Court has personal jurisdiction over Defendants who are residents of the

State of New Mexico and/or who at all times conducted business in the State of New Mexico.

18.     This Court has personal jurisdiction over each of the Defendants named in this

action pursuant to N.M. Stat. § 38-1-16 because, among other things, the FDIC-R's claims arise

from Defendants transacting business, committing tortious acts, and breaching fiduciary duties in

New Mexico.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the claims

and causes of action asserted in this Complaint arose in this district.

### IV.     FACTUAL ALLEGATIONS

**A.     Background**

20.     In 1922, the Bank opened for business as First State Bank of Taos and in 2005

changed its name to First Community Bank.  The Bank was located in Taos, New Mexico.

21.     Beginning in approximately 2002, First Community began to expand its

operations into unfamiliar markets and to promote a production-driven lending culture while

ignoring appropriate credit risk management practices.  As a result, CRE loan concentrations,

including ADC loans, rapidly escalated to dangerous levels.  By 2007, CRE and ADC loans

constituted more than 74 percent of First Community's loan portfolio, and the Bank's CRE-ADC

loan concentration from 2007 through 2010 placed it in the upper 90th percentile of its peer group.

22.     Additionally, throughout this time, Defendants focused on asset growth and ignored the proper credit risk management and underwriting practices necessary to ensure that growth was safe.  Defendants' disregard for underwriting standards was most clearly exemplified by their approval of the Subject Transactions despite numerous and obvious underwriting deficiencies.  The production-oriented attitude also was reflected in the incentive plan for loan officers, which rewarded them based almost solely on loan production.

23.     The reckless lending ultimately led to a significant increase in classified assets. First Community's classified assets increased sharply from $32 million in 2006 to $538 million in 2009.  And classified assets continued to climb through 2010, significantly eroding the Bank's capital.

24.     On January 28, 2011, the NMFID closed First Community and appointed the FDIC as Receiver.

**B.     The Loan Policy**

25.     At all relevant times, the Loan Policy required "senior management to instill a credit culture that fosters and actively supports the extension of credit on sound, fundamental lending principles.  The purpose of each credit [was supposed] to be logical, legal, constructive, and acceptable within policy guidelines.  Credit [was] only to be granted to reputable borrowers and only when supported by acceptable and reliable financial information."

26.     For each loan, the Loan Policy required, among other things, (a) that the loan comply "in all respects with the spirit and letter of all applicable laws and regulations;" (b) a loan write up that referenced the industry outlook, the borrower's position within the industry, and, if

applicable, the current concentration guideline, exposure, and control limits for each credit; (c) two years (three years, as of August 11, 2009) of financial information from the borrower and all guarantors, and a current interim financial statement if the loan request occurred more than 6 months after the borrower's last fiscal year end; (d) an accountant-prepared compilation statement for loans under $3 million, a CPA-prepared financial statement for loans between $3 and $5 million, or an audited financial statement for loans over $5 million; (e) an analysis of the adequacy and reliability of historic and anticipated cash flows; (f) financial spreads for operating companies with relationship amounts of $250,000 or more; (g) a maximum term of 2 years, or 3 years with supporting authority, for ADC loans; and a maximum term of 18 months for non-owner occupied commercial construction loans;  (h) a maximum loan-to-value ratio of the lesser of 75 percent of the appraised value or 85 percent of costs (75 percent of costs, as of January 1, 2009) for ADC loans; a maximum loan-to-value ratio of the lesser of 75 percent of the appraised value or 80 percent of costs (75 percent of costs, as of January 1, 2009) for non-owner occupied commercial construction loans and non-owner occupied CRE loans; and a maximum loan-to-value of the lesser of 65 percent of the appraised value or cost for loans to acquire unimproved land; and (i) an appraisal less than a year old from an independent source for all property taken as collateral.

### C.  Defendants Approved the Subject Transactions in Violation of the Loan Policy and Sound Banking Principles

27.  The six Subject Transactions consist of four CRE transactions, one land transaction, and one commercial business transaction.  The Subject Transactions were approved between January 29, 2007 and February 16, 2010.  No Defendant voted against any of the Subject Transactions.

28.     Certain Subject Transactions are described using the initials of the individual borrowers and guarantors for privacy reasons.  The full names of these individual borrowers and guarantors will be disclosed once an appropriate protective order is in place in this case.

### i.     Kitts Development, LLC

29.     On or about January 29, 2007, Defendant Nafus approved a $2.89 million loan to Kitts Development, LLC ("Kitts").  The purpose of the loan was to fund the acquisition and development of a 10.07 acre site into thirty-five lots containing one "four-plex" each, which was taken as collateral for the loan.  T.J., the principal of the borrower, guaranteed the loan.

30.     Defendant Nafus acted negligently, grossly negligently, and in breach of his fiduciary duties in approving this loan.  Defendant Nafus approved the loan despite lacking critical financial information on the borrower.  In particular, Defendant Nafus failed to analyze the financial strength of the borrower entity – Kitts – alone.  Instead, he relied on combined financial information for both Kitts and a related entity, Larkspur LLC ("Larkspur"), which was owned by the same principal.  In addition, the cash flow analysis presented on the LAF improperly double counted the income of Larkspur and T.J.  Although the LAF presented a rudimentary cash flow analysis for T.J., Defendant Nafus also failed to conduct a global cash flow analysis that included both the borrower and guarantor, or to verify their assets.

31.     The information Defendant Nafus did have contained substantial red flags indicating that this transaction should not be approved.  For example, Larkspur was the sole source of T.J.'s income, but did not guarantee the loan.  Furthermore, Larkspur's financial information indicated a heavy 25:1 debt-to-worth ratio.  The LAF also presented two dramatically conflicting debt service coverage ratios ("DCR"): 19:1 and 1.15:1.  The 19:1 DCR was improperly calculated using Larkspur's working capital, rather than income.  Moreover, the

DCR analysis was calculated on the basis of Larkspur's financial information, rather than that of the borrower, even though Larkspur, as neither the borrower nor a guarantor, was not obligated to meet any of Kitts' debt service obligations.

32.     On or around September 23, 2008, Defendants Dee, DiPaola, Dolan, and Smith approved a transaction that consolidated the $2.98 million loan described above with an unsecured line of credit and provided an additional $1.03 million to fund additional infrastructure and construction costs on the project.

33.     The Approving Defendants[1] acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this transaction, despite numerous violations of the Loan Policy and prudent lending practices and procedures.  In particular, the Approving Defendants approved the loan despite continued indications that the borrower and guarantor were not creditworthy, and their financial information unreliable.  For example, the borrower's reported income on its 2007 tax returns – the most recent available at the time of the approval – indicated gross revenues of $219,000 and a net loss of $1.375 million, but its reported income on its December 31, 2007 financial statement indicated revenues of $890,000 and net income of $799,000.  The borrower's December 31, 2007 financial statement also reported no liabilities, despite the fact that Kitts was obviously indebted for at least the amount outstanding on the prior loan from First Community.  The LAF relied on by the Approving Defendants failed to explain or question these discrepancies.

34.     Additionally, the loan-to-value ratio was reported as 103 percent, in excess of the 75 percent maximum permitted by the Loan Policy.  The LAF failed to explain why T.J., with a reported net worth of $6.619 million, was not required to contribute additional equity to keep the loan-to-value ratio below the Loan Policy maximum.

[1] Those Defendants approving a given transaction are referred to herein as the "Approving Defendants."

9

35.     As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $1.14 million.

### ii.     K&M Development, Inc.

36.     On or around March 27, 2007, Defendants Dolan and Nafus approved an $885,000 loan to K&M Development, Inc. ("K&M").  The purpose of the loan was to fund the acquisition of a lot containing a former Knights of Columbus facility and development into a community of 14 residential town homes.  The loan was guaranteed by the borrower's principal, M.D.

37.     The Approving Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this transaction, despite numerous violations of the Loan Policy and prudent lending practices and procedures.  For example, the Approving Defendants lacked critical information on the borrower and guarantor prior to approving the loan.  Despite the fact that the loan was approved in 2007, the latest tax returns provided by M.D. were from 2004.  Additionally, no financial information on K&M was presented or analyzed.  The LAF relied on by the Approving Defendants explained that K&M was newly formed and no financials were available.  However, elsewhere, the LAF explained that M.D. received the development company she co-owned with her husband – Cerami Building and Design – in her divorce settlement, and changed the name to K&M.  The LAF failed to analyze either financial information from Cerami Building and Design or projected financials for K&M.  The LAF also did not discuss M.D.'s experience as a developer except to state that she was a "principal" in her ex-husband's construction business.  Had the Approving Defendants required additional information on M.D.'s background and experience, they would have discovered that she had virtually no former commercial real estate development experience, and had never before

worked on a project of this size.  Finally, M.D. reported that her 2007 income was $9,000 per month.  However, there is no indication that the Approving Defendants ever attempted to verify the source of this income.

38.     The Approving Defendants ignored substantial red flags that this loan should not be approved.  For example, because there was no substantive analysis or verification of M.D.'s finances, there was not a reliable secondary source of repayment, making the transaction "undesirable" under the Loan Policy.  Additionally, the loan was approved (and ultimately funded) without ensuring that the developer had the necessary building permits.  The loan was also approved with a loan-to-value ratio of 75 percent, exactly the maximum permitted under the Loan Policy.  However, the appraisal used to value the collateral and calculate the loan-to-value ratio contained the extraordinary assumption that the necessary building permits would be issued and construction would not be delayed.  Because the necessary building permits had not been issued at the time of approval – and in fact were never issued – the actual loan-to-value ratio was in excess of the maximum allowed pursuant to the Loan Policy.  Finally, there was evidence suggesting that M.D. would have difficulty servicing the debt, if called upon to do so.  Her liquidity was very limited, with $160,000 in cash reported and $360,000 in liabilities.  The dangers of M.D.'s limited liquidity were further compounded by the fact that she also had taken out a $300,000 home equity line of credit to help fund the project, indicating her limited liquidity could be subject to additional debt service requirements beyond this loan.  The LAF also calculated her ability to service the debt based on income reported in her outdated 2004 tax returns.

39.     On or around January 11, 2008, Defendant Nafus approved five construction loans to K&M for $314,140 each, which totaled $1.571 million.  The purpose of each loan was

11

to fund the construction of a town home as part of the development project described above. Each transaction was identical, except each was separately collateralized by the town home being constructed.  Defendant Nafus acted negligently, grossly negligently, and in breach of his fiduciary duties in approving this transaction.  The LAFs did not reflect the loan-to-value ratio of the entire project, but with this additional funding, the loan-to-value ratio was approximately 86 percent – in excess of the 75 percent maximum loan-to-value ratio under the Loan Policy.  This was especially egregious because the LAFs indicated that the real estate market was "softening," suggesting there would be difficulty selling the town homes.

40.     On or around November 20, 2008, Defendant Dolan, and on or around November 21, 2008, Defendant Fanning approved a renewal and consolidation of the initial acquisition and development loan for $885,000 and the five construction loans totaling $1.571 million, and approved an additional $216,072.10 to cover interest and carrying costs for an additional year, for a total commitment of $1.526 million.

41.     The Approving Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan.  The Approving Defendants lacked key information that would have allowed them to make an informed decision.  In particular, M.D. did not provide current tax returns.  The lack of current financial information for M.D. caused the loan officer to rely on his own projections, which were presented in the LAF.

42.     The transaction was approved despite evidence that the borrower and guarantor were not creditworthy.  For example, the loan officer estimated M.D.'s liquid and personal assets at $0.  Any further liquid assets from M.D. depended on her ability to sell her illiquid water rights to the subject property, which were also taken as collateral for the loan.  This was especially egregious because the LAF noted "market conditions are very soft in the residential

real estate market."  Furthermore, the Loan Policy in effect at the time of the approval considered "[l]oans secured by collateral of uncertain marketability or [l]iquidity," such as water rights, undesirable.  Additionally, the LAF explicitly acknowledged that M.D. "ha[d] very nominal commercial development experience and has never completed a project of this size or nature."  The LAF also indicated that M.D. now planned to redesign the project from 14 town homes to 30 condominium units, which would require obtaining a variance from the Albuquerque City Council.  However, the necessary permits had not been obtained at the time of approval.

43.     As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $1.28 million.

### iii.     Katerina, Inc.

44.     On or around March 29, 2007, Defendants Fanning, Dolan, Sanchez, Martin, and Smith approved a $6.88 million loan to Katerina, Inc. ("Katerina") intended to fund a land swap deal with the state of New Mexico and refinance two land loans, one of which was from First Community in the amount of $1.056 million.  The loan was guaranteed by Katerina's principal, P.P, and Philippou LLC ("Philippou LLC").

45.     The Approving Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this transaction.  The loan was approved despite numerous departures from the Loan Policy and prudent lending practices.  The Approving Defendants, for example, failed to require sufficient financial information before approving the transaction.  In fact, the financial information was so lacking that the LAF explicitly acknowledged the "compiled quality of [the] financial statements" was a weakness of the loan.  Additionally, the LAF failed to adequately analyze the limited financial information on hand.  The LAF acknowledged that the income from the borrower came primarily from land and lot sales, yet the

13

cash flow analysis presented in the LAF did not consider the borrower's ability to service the debt if the borrower's revenues declined (*e.g.*, if the housing market slowed).

46. The Approving Defendants approved the loan despite considerable red flags regarding the valuation of the underlying collateral. The loan was approved with a loan-to-value ratio of 62 percent, within the Loan Policy's maximum loan-to-value ratio of 65 percent for raw land. However, the appraised value used to calculate the loan-to-value ratio did not take into account the costs that would have to be incurred if it became necessary to sell the collateral, such as holding costs, marketing costs, and entrepreneurial profit. In addition, the appraisals had not yet been reviewed at the time of the transaction's approval, and review of the appraisals was not a condition for funding of the loan.

47. Finally, the transaction was approved even though the LAF acknowledged that there was "no formal succession plan . . . in place" for P.P.'s businesses. Had the Approving Defendants required a succession plan as a condition to the loan's approval, P.P's businesses would have been able to avoid the substantial delays on its development projects that occurred after P.P. became incapacitated from illness shortly after the transaction was approved.

48. As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $4.96 million.

### iv.    Empire at Estrella Town Center, LLC

49. On or around July 16, 2007, Defendants DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith approved a $10.7 million loan to Empire at Estrella Town Center, LLC ("Empire") to refinance an acquisition and development loan from another financial institution and provide additional funds for development and construction of a retail shopping complex.

14

The loan was guaranteed by R.F. and K.F. (the "Fs"); G.J. and K.A.J. (the "Js"); ECD, LLC; and Meritage Investments.

50.     The Approving Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties by approving the transaction.  In particular, the Approving Defendants approved the loan despite lacking key financial information on the borrower and guarantors.  The 2006 financial statements for the Fs and Js showed "Investments in Closely Held Business" as a line-item asset, which was calculated on a "net equity" basis (*i.e.*, assets were shown net of any related debt), making it impossible for the Approving Defendants to know the extent to which the businesses were indebted and/or the Fs and Js had obligated themselves as guarantors.  The financial information on the Fs and Js also failed to show any of their other contingent liabilities.  Moreover, none of the financial statements were prepared by a certified public accountant, as required by the Loan Policy.  The Approving Defendants approved the transaction without verifying the financial information reported by the borrower and guarantors, obtaining a credit report or trade check for the borrower, or checking the borrower's credit with the prior lender, as required by the Loan Policy. Additionally, the Approving Defendants failed to conduct a global cash flow analysis of all of the principals' entities and debt service obligations.

51.     There were also a number of red flags and warning signs that this credit should not be approved.  Specifically, the cash flow analysis presented in the LAF relied on by the Approving Defendants showed that the project's cash flow would not be sufficient to service the debt.  Additionally, there were clear discrepancies in the reported financial information.  In particular, the principals reported contributing $2.186 million in cash equity to the project.  However, Empire's 2006 financial statement shows that the members had only $684,549 in equity in the project.

52.     The Approving Defendants also approved the loan based on an appraisal that failed to account for costs that would likely be incurred if it became necessary to sell the property, such as holding costs, marketing costs, or entrepreneurial profit.  These costs were not considered in the appraised value of the property, which was used to calculate the loan's loan-to-value ratio of 75 percent.  Because the loan was approved at the maximum loan-to-value ratio permitted by the Loan Policy, the actual loan-to-value ratio of the property (when using a value adjusted for holding costs, marketing costs, and entrepreneurial profit) exceeded the Loan Policy's maximum.

53.     On or around February 16, 2010, Defendants Dee, DiPaola, Fanning, and Martin approved a renewal of the loan and additional funds in the amount of $144,000, and restructured the debt into three separate notes.  The total outstanding amount of the loan after the approval was $8,084,686.18.

54.     The Approving Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving the transaction.  Most egregiously, there was no clear source to meet the loan's debt service requirements.  The project's cash flow remained insufficient to support a principal amortization and the guarantors had already refused to support the loan personally despite their obligations.  The loan was approved on an interest-only basis, despite the fact that the loan exceeded the Loan Policy's maximum term for interest-only payments by over a year.  By this time, the loan-to-value ratio had risen to 87.52 percent, far in excess of the maximum loan-to-value ratio of 75 percent permitted by the Loan Policy.  Finally, the LAF relied on by the Approving Defendants acknowledged that "[a]lternative financing is unlikely."

55.     As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $3.2 million.

### v.     La Cuentista I, LLC

56.     On or around October 26, 2007, Defendants Dolan and Nafus approved a $3,071,822 loan to La Cuentista I, LLC ("La Cuentista").  The purpose of the loan was to provide acquisition and development funds for purposes of developing a 140-lot subdivision. The seven partner developers and their corporate entities were guarantors for the loan.

57.     The Approving Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this transaction.  The Approving Defendants failed to require key financial information and analysis prior to approving the loan.  In particular, the loan was approved based on an inadequate global cash flow analysis.  The LAF inappropriately considered the guarantors' working capital as liquidity, and failed to take into consideration the guarantors' other debt service obligations.  Moreover, the financial information that was available indicated that the transaction was extremely risky.  Specifically, two of the guarantor limited liability corporations had negative working capital, and two of the individual guarantors had negative cash available to service the debt.  There was no evidence that the guarantors' assets were verified. Although the Loan Policy required the loan officer to "analyze the contractor's capabilities both in terms of finance and past performance," the Approving Defendants failed to require an evaluation of the contractors' capabilities.

58.     There were also additional indications that this transaction should not be approved.  Although the loan-to-cost ratio was reported on the LAF as within Loan Policy limits, the Bank had already previously granted La Cuentista a loan to provide 100 percent financing for the project, including interest reserves of $490,000 and cost overruns.  When compared to the

total development costs detailed in the Pro forma and Budget, the actual loan-to-cost ratio for the project was approximately 106 percent, far in excess of the maximum of 85 percent allowed by the Loan Policy.  In addition, the loan was structured so that each guarantor was responsible for only one seventh of the debt, despite the fact that the financial information clearly showed that some guarantors were more stronger financially than others.  Finally, the appraisal warned of a declining residential real estate market.  Specifically, the appraisal warned, "Albuquerque has not been immune to national softening" of the real estate market, and "between the end of the 2nd quarter 2006 and 2007 all market areas referenced show dramatic declines in permits issued with declines of 39% and 56% noted.  This decrease in permits is in direct response to the dramatic slowdown in the housing market due to a large number of foreclosures nationwide because of questionable mortgage practices."  Despite these red flags, the Approving Defendants chose to approve the transaction.

59.      As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R incurred damages in excess of $2.95 million.

### vi.     P.A.

60.      On or around January 10, 2008, Defendant Dolan approved a $2 million commercial revolving line of credit to P.A.  The purpose of the loan was to fund the purchase of trucks to retrofit with proprietary cleaning machinery for borrower's company, Blast N Clean LLC ("Blast N Clean").

61.      Defendant Dolan acted negligently, grossly negligently, and in breach of his fiduciary duties in approving the loan, despite violations of the Loan Policy and prudent lending practices.  Defendant Dolan lacked crucial financial information that would have allowed him to make an informed decision.  For example, there were no projected financial statements on file

18

for the guarantor and operating company, Blast N Clean.  Furthermore, there was no evidence that the Defendant Dolan attempted to verify the borrower's assets.  There was also no independent appraisal of the eight trucks taken as collateral.  Rather, it was assumed that the value of the trucks was their cost plus the cost of retrofitting them with cleaning equipment.  Besides not being valued by an independent appraiser, this value was in error because it was highly unlikely that each truck could be liquidated at full cost due to the proprietary nature of the cleaning equipment.

62.     There were additional indications that Defendant Dolan should not have approved this transaction.  For example, the last two years of tax returns for the borrower showed insufficient cash flow to service the debt.  In addition, the cash flow analysis for the borrower included the borrower and two of his other companies, even though neither of these companies was a guarantor of the transaction and could not be called upon to support the transaction if necessary.  Without these two companies, the borrower's cash flow was insufficient to support even his already existing debt, let alone the debt service requirements associated with the subject transaction.  Furthermore, the LAF assumed that at least 50 percent of the trucks would sell, and failed to analyze the financial strength of the borrower and guarantor, or their ability to service the debt if none of the trucks sold.  The value of the non-truck collateral, after accounting for all senior liens, was less than the principal of the loan.  Finally, the loan should have been considered inherently undesirable under the Loan Policy.  The Loan Policy classified "[l]oans with a unique industry, wherein the lender lacks specialized expertise to properly evaluate the risks, or manage the credit (e.g., high tech companies)" and "[l]oans secured by collateral of uncertain marketability of liquidity" as undesirable.  As a start-up business focused on a new, proprietary cleaning system, the loan should have been considered undesirable.

63.     As a direct and proximate result of the Approving Defendants' tortious conduct, FDIC-R incurred damages in excess of $1.27 million.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE AGAINST ALL DEFENDANTS

64.     Plaintiff FDIC-R realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 63 of this Complaint, as though fully set forth herein.

65.     Each of the Defendants owed a duty to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances. By their actions and inactions, Defendants were negligent in failing to perform their respective duties with the requisite degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances.

66.     Defendants owed a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to, the following: (a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those loans that conformed with the Loan Policy; (c) ensuring that any transactions they approved were underwritten in a safe and sound manner; (d) ensuring that any transactions they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) ensuring that any transactions they approved were made to creditworthy borrowers; (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations; and (g) ensuring that any transactions they approved did not create unsafe and unsound concentrations of credit.

67.     Defendants were negligent by their actions and inactions, including, but not limited to, the following: (a) failing to inform themselves about the Subject Transactions and

20

their risks before approving them; (b) approving the Subject Transactions on terms that violated

the Loan Policy; (c) failing to ensure that the Subject Transactions were underwritten in a safe

and sound manner before approving them; (d) failing to ensure that the Subject Transactions

were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize

risk; (e) approving Subject Transactions to borrowers who were not creditworthy; (f) failing to

ensure that the Subject Transactions did not violate applicable banking laws and regulations; (g)

failing to ensure that the Subject Transactions did not create unsafe and unsound concentrations

of credit; and (h) approving the Subject Transactions without proper analysis of the borrower's

ability to satisfy the debt.

68.     Defendants are not entitled to the application of the business judgment rule

because each of Defendant's actions or inactions that are the basis of this negligence claim were

made without Defendants being reasonably well-informed.

69.     As a direct and proximate result of the Defendants' negligence, the FDIC-R seeks

damages in an amount to be proven at trial in excess of $14.8 million.

**SECOND CLAIM FOR RELIEF**
**GROSS NEGLIGENCE AGAINT ALL DEFENDANTS**
**(IN THE ALTERNATIVE)**

70.      Plaintiff FDIC-R realleges and incorporates by reference each of the allegations

contained in paragraphs 1 through 63 of this Complaint, as though fully set forth herein.

71.     Section 1821(k) of Financial Institutions Reform, Recovery and Enforcement Act

holds directors or officers of financial institutions personally liable for damages caused by their

"gross negligence," as defined by applicable state law.

72.     Defendants had a duty to exercise the degree of diligence, care and skill that

ordinarily prudent persons in like positions would exercise under similar circumstances.  By their

actions and inactions, Defendants were grossly negligent in failing to perform their respective duties with the requisite degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances.

73.     Defendants owed a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to, the following: (a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those transactions that conformed with the Loan Policy; (c) ensuring that any transactions they approved were underwritten in a safe and sound manner; (d) ensuring that any transactions they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) ensuring that any transactions they approved were made to creditworthy borrowers; (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations; and (g) ensuring that any transactions they approved did not create unsafe and unsound concentrations of credit.

74.     Defendants were grossly negligent by their actions and inactions, including, but not limited to, the following: (a) failing to inform themselves about the Subject Transactions and their risks before approving them; (b) approving the Subject Transactions on terms that violated the Loan Policy; (c) failing to ensure that the Subject Transactions were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Transactions were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) approving Subject Transactions to borrowers who were not creditworthy; (f) failing to ensure that the Subject Transactions did not violate applicable banking laws and regulations; (g) failing to ensure that the Subject Transactions did not create unsafe and unsound concentrations

of credit; and (h) approving the Subject Transactions without proper analysis of the borrower's ability to satisfy the debt.

75.     As a direct and proximate result of the Defendants' gross negligence, the FDIC-R seeks damages in an amount to be proven at trial in excess of $14.8 million.

**THIRD CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTIES AGAINST ALL DEFENDANTS**
**(IN THE ALTERNATIVE)**

76.     Plaintiff FDIC-R realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 63 of this Complaint, as though fully set forth herein.

77.     As directors and officers, Defendants owed fiduciary duties, including the duties of loyalty, good faith, and inherent fairness in the performance of their responsibilities.

78.     Defendants breached their fiduciary duties by their actions and inactions, including, but not limited to, the following: (a) failing to inform themselves about the Subject Transactions and their risks before approving them; (b) approving the Subject Transactions on terms that violated the Loan Policy; (c) failing to ensure that the Subject Transactions were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Transactions were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) approving Subject Transactions to borrowers who were not creditworthy; (f) failing to ensure that the Subject Transactions did not violate applicable banking laws and regulations; (g) failing to ensure that the Subject Transactions did not create unsafe and unsound concentrations of credit; and (h) approving  the Subject Transactions without proper analysis of the borrower's ability to satisfy the debt.

79.     As a direct and proximate result of the Defendants' breach of their fiduciary duties, the FDIC-R seeks damages in an amount to be proven at trial in excess of $14.8 million.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, the FDIC as Receiver for First Community Bank, requests entry of judgment in its favor against Defendants as follows:

    a.   For compensatory damages of at least $14.8 million, and any excess amount as may be proved at trial;

    b.   For its cost of suit against all Defendants;

    c.   For prejudgment interest;

    d.   For attorneys' fees and costs for the investigation and litigation;

    e.   For such other and further relief as this Court deems just and proper.

## VII.    <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 28, the FDIC-R requests a trial by jury on all claims.

DATED: January 23, 2014                    Respectfully submitted,

_____

Mary Torres
Beall and Biehler Law Firm
6715 Academy Blvd NE
Albuquerque, NM 87109
Telephone: (505) 828-3600
Fax: (505) 828-3900
mtorres@beall-biehler.com


_____

Dennis S. Klein
201 South Biscayne Boulevard
Miami, Florida 33131-4332
United States of America
Telephone: (305) 358-1666
Fax: (305) 371-8759
klein@hugheshubbard.com

***Counsel for the Federal Deposit Insurance
Corporation as Receiver for First
Community Bank***

25