# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

FEDERAL DEPOSIT INSURANCE
CORP., as Receiver for First Community Bank,

      Plaintiff,

vs.                                No. CIV 14-0066 JB/KBM

H. PATRICK DEE, PAUL D. DIPAOLA,
V. WILLIAM DOLAN, JR., JOHN E.
FANNING, MARSHALL G. MARTIN,
BOBBY J. NAFUS, RONALD R.
SANCHEZ and PAMELA J. SMITH,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Certain Defendants' Motion to Dismiss, filed March 3, 2014 (Doc. 15)("MTD 1"); and (ii) Defendant Bobby J. Nafus's Motion to Dismiss, filed March 3, 2014 (Doc. 18)("MTD 2"). The Court held a hearing on November 5, 2014. The primary issue is whether Plaintiff Federal Deposit Insurance Corporation ("FDIC") has standing to sue Defendants H. Patrick Dee, Paul D. DiPaola, V. William Dolan, Jr., John E. Fanning, Marshall G. Martin, Bobby J. Nafus, Ronald R. Sanchez, and Pamela J. Smith under Article III of the Constitution of the United States of America. The FDIC lacks constitutional standing to assert its claims against any of the Defendants. Accordingly, the Court will grant the MTD 1 and the MTD 2, and dismiss the Complaint without prejudice to the FDIC moving to amend the Complaint to properly allege Article III's injury-in-fact and causation requirements.[1] The Court will not decide, at this time, either the MTD 1's or the MTD 2's merits.

---

[1]The Court does not conclude that the FDIC cannot demonstrate standing, but that the FDIC has thus far failed to do so. The Court will, therefore, allow the FDIC to move to amend the Complaint to properly allege injury in fact and causation rather than dismissing the case in its

## FACTUAL BACKGROUND

This case arises out of a series of loans that First Community Bank of Taos, New Mexico, issued between January 29, 2007, and February 16, 2010.   The Court takes its facts from the Complaint, as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure.   The Court has reorganized the Complaint's allegations to explain the facts more clearly.

### 1.   The Parties.

The FDIC is a corporation and an instrumentality of the United States of America that Congress established in the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a). Complaint ¶ 7, at 3.   On January 28, 2011, the New Mexico Regulation & Licensing Department, Financial Institutions Division ("NMFID") appointed the FDIC as the Receiver[2]  for First Community.    Complaint ¶ 7, at 3.

---

entirety.   See, e.g., In re LinkedIn User Privacy Litigation, 932 F. Supp. 2d 1089, 1095 (N.D. Cal. 2013)(Davila, J.)("Accordingly, Plaintiffs' FAC will be DISMISSED WITH LEAVE TO AMEND.   Any amended complaint shall be file within 30 days of this filing of this Order.")(capitalization in original); In re FEMA Trailer Formaldehyde Prods. Liab. Litig., 570 F. Supp. 2d 851, 857 (D. La. 2008)(Englehardt, J.)("The court may allow plaintiffs to amend or provide affidavits in order to further particularize the allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, plaintiffs' standing "does not adequately appear from all materials of record, the complaint must be dismissed."); Access 4 All, Inc. v. 539 Absecon Blvd., LLC, No. CIV 05-5624 FLW (D.N.J. 2006)(Wolfson, J.)("Plaintiff's Complaint does not specifically allege the nature of Spalluto's disability or various other factors that are relevant to this Court's standing analysis including information regarding Plaintiff's connections to the South Jersey area. . . .   Therefore, as noted above, the Court will deny Defendant's Motion to Dismiss without prejudice and give Plaintiffs leave to file an Amended Complaint . . . .").

[2]The FDIC's website explains:

> When an insured institution fails, the FDIC is ordinarily appointed as receiver.   In that capacity, it assumes responsibility for efficiently recovering the maximum amount possible from the disposition of the receivership's assets and the pursuit of the receivership's claims.   Funds collected from the sale of assets and

Dee was First Community's President from May 16, 2001, to January 28, 2011, and Chief Executive Officer ("CEO") from December 31, 2009, to January 28, 2011.   Complaint ¶ 8, at 3.   He was also a member of First Community's Board of Directors from January 9, 1992, to January 28, 2011, and a member of First Community's Credit Committee from October 17, 2005, to January 28, 2011.   See Complaint ¶ 8, at 3.

DiPaola was First Community's Regional President of New Mexico from 2003 to January 28, 2011.   See Complaint ¶ 9, at 4.   DiPaola was a Board member from March 28, 1994, to January 28, 2011, and a Credit Committee member from July 25, 2005, to January 28, 2011.   See Complaint ¶ 9, at 4.

Dolan was a First Community loan officer from October 28, 1991, to September 16, 2009, and head of First Community's Special Assets Group from February 11, 2009, to September 16, 2009.   See Complaint ¶ 10, at 4.   Dolan was a Board member from July 15, 1993, to August 4, 2009, and a Credit Committee member from July 25, 2005, to September 8, 2009.   See Complaint ¶ 10, at 4.

Fanning was First Community's Regional President for Southern New Mexico and Arizona from November 14, 2005, to October 21, 2008, and Chief Credit Officer ("CCO") from

---

the disposition of valid claims are distributed to the receivership's creditors in accordance with the priorities set by law.

    The FDIC seeks to terminate receiverships in an orderly and expeditious manner.   Once the FDIC has completed the disposition of the receivership's assets and has resolved all obligations, claims, and other legal impediments, the receivership is terminated, and a final distribution is made to its creditors. Receivership creditors may include secured creditors, unsecured creditors (including general trade creditors), subordinate debt holders, shareholders of the institution, uninsured depositors, and the DIF (as subrogee).   The FDIC is often the largest creditor of the receivership.

Receivership Management Program: Program Description, Federal Deposit Insurance Corporation, https://www.fdic.gov/about/strategic/strategic/receivership.html (last visited Dec. 6, 2014).

October 27, 2008, to January 28, 2011.   Complaint ¶ 11, at 4.   Fanning was a Board member from January 23, 2006, to January 28, 2011, and a Credit Committee member from November 15, 2005, to January 28, 2011.   See Complaint ¶ 11, at 4.

Martin was corporate counsel at First Community from September 17, 2003, to January 28, 2011.   See Complaint ¶ 12, at 4.   Martin was a Board member from September 15, 2003, to August 4, 2009, an advisory director from August 5, 2009, to January 28, 2011, and a Credit Committee member from July 25, 2005, to October 20, 2009.   See Complaint ¶ 12, at 4.

Nafus was a senior vice president and a loan officer in First Community's "Northern New Mexico territory" from June 17, 1991, to September 11, 2009.   Complaint ¶ 13, at 4.   Sanchez was First Community's Regional President for Northern New Mexico and Utah from 2004 to October 5, 2009.   See Complaint ¶ 14, at 4.   Sanchez was a Board member from December 16, 1993, to September 11, 2009, and a Credit Committee member from July 25, 2005, to September 8, 2009.   See Complaint ¶ 14, at 4.

Smith was a loan reviewer at First Community from July 12, 2004, to October 30, 2006, CCO from October 30, 2006, to October 27, 2008, and Deputy CCO from October 27, 2008, to January 28, 2011.   See Complaint ¶ 15, at 4-5.   Smith was a Credit Committee member from July 25, 2005, to January 28, 2011, and served as its Chairwoman from November 21, 2006, to October 21, 2008.   See Complaint ¶ 15, at 5.

### 2.     Background.

In or about 2002, First Community began to expand its operations into unfamiliar markets and promote a production-driven lending culture while ignoring appropriate credit-risk management practices.   See Complaint ¶ 21, at 5.   As a result, First Community's commercial real estate ("CRE") loan concentrations -- including acquisition, development, and construction

loans ("ADC") -- rapidly increased "to dangerous levels."   Complaint ¶ 21, at 5.   By 2007, those loans constituted more than seventy-four percent of First Community's loan portfolio -- placing it in the upper ninetieth percentile of its peer group from 2007 to 2010.   See Complaint ¶ 21, at 5-6.   This "reckless lending" ultimately led to a significant increase in classified assets,[3] which increased sharply from $32 million in 2006 to $538 million in 2009.   Complaint ¶ 23, at 6.

At all relevant times, First Community's Loan Policy ("Loan Policy") required senior management to "instill a credit culture that fosters and actively supports the extension of credit on sound, fundamental lending principles."   Complaint ¶ 25, at 6 (internal quotation marks omitted).   The Loan Policy mandated that "[c]redit was only to be granted to reputable borrowers and only when supported by acceptable and reliable financial information."   Complaint ¶ 25, at 6.

For each loan, the Loan Policy required, among other things:

(a) that the loan comply in all respects with the spirit and letter of all applicable laws and regulations; (b) a loan write up that referenced the industry outlook, the borrower's position within the industry, and, if applicable, the current concentration guideline, exposure, and control limits for each credit; (c) two years (three years, as of August 11, 2009) of financial information from the borrower and all guarantors, and a current interim financial statement if the loan request occurred more than 6 months after the borrower's last fiscal year end; (d) an accountant-prepared compilation statement for loans under $3 million, a CPA-prepared financial statement for loans between $3 million and $5 million, or an audited financial statement for loans over $5 million; (e) an analysis of the adequacy and reliability of historic and anticipated cash flows; (f) financial spreads for operating companies with relationship amounts of $250,000 or more; (g) a maximum term of 2 years, or 3 years with supporting authority, for ADC loans; and a maximum term of 18 months for non-owner occupied commercial

---

[3]"Classified loans have unpaid interest and principal outstanding, and it is unclear whether the bank will be able to recoup the loan proceeds from the borrower."   Classified Loan. Investopedia.org, http://www.investopedia.com/terms/c/classified-loan.asp (last visited Feb. 25, 2015).

construction loans; (h) a maximum loan-to-value ratio[4] of the lesser of 75 percent of the appraised value or 85 percent of costs (75 percent of costs, as of January 1, 2009) for ADC loans; a maximum loan-to-value ratio of the lesser of 75 percent of the appraised value or 80 percent of costs (75 percent of costs, as of January 1, 2009) for non-owner occupied commercial construction loans and non-owner occupied CRE loans; and a maximum loan-to-value of the lesser of 65 percent of the appraised value or cost for loans to acquire unimproved land; and (i) an appraisal less than a year old from an independent source for all property taken as collateral.

Complaint ¶ 26, at 6-7 (internal quotation marks omitted).

### 3.      The Kitts Development, LLC, Loans.

On or about January 29, 2007, Nafus approved a $2.89 million loan to Kitts Development, LLC, to fund the acquisition and development of a 10.07-acre site.   See Complaint ¶ 29, at 8.   Kitts Development's principal, T.J.,[5] served as the loan's guarantor. See Complaint ¶ 29, at 8.

Nafus made a number of mistakes in approving the loan.   See Complaint ¶ 30, at 8. First, Nafus failed to analyze Kitts Development's financial strength alone, but instead relied on the combined financial information of Kitts Development and Larkspur, LLC -- both of which T.J. owned.   See Complaint ¶ 30, at 8.   Second, Nafus relied on the cash-flow analysis in Kitts Development's Loan Approval Form ("LAF") that improperly double-counted T.J.'s and Larkspur, LLC's income.   Complaint ¶ 30, at 8.   Third, although the LAF presented a rudimentary cash flow analysis for T.J., Nafus failed either to conduct a global cash-flow analysis that included both Kitts Development and T.J., or to verify either party's assets.   See

---

[4]The loan-to-value ratio is used "to express the ratio of a loan to the value of an asset purchased."   Loan-to-Value Ratio, Wikipedia.org,  en.wikipedia.org/wiki/Loan-to-value_ratio (last visited Dec. 6, 2014).

[5]The Complaint states that certain transactions "are described using the initials of the individual borrowers and guarantors for privacy reasons."   Complaint ¶ 28, at 8.   T.J. is one of those guarantors.

Complaint ¶ 30, at 8.    Fourth, Nafus ignored a number of red flags in the financial information that he received which indicated that the loan should not be approved: (i) Larkspur, LLC was the sole source of T.J.'s income, but did not guarantee the loan; (ii) Larkspur, LLC's financial information indicated a heavy 25:1 debt-to-worth ratio; (iii) the LAF calculated Kitts Development's debt-service-coverage ratio using only Larkspur, LLC's financial information -- even though Larkspur, LLC was neither a borrower nor a guarantor; (iv) the LAF presented two dramatically conflicting debt-service-coverage ratios[6]: 19:1 and 1.15:1; and (vi) the 19:1 ratio was improperly calculated using Larkspur, LLC's working capital rather than its income.    See Complaint ¶ 31, at 8-9.

On or about September 23, 2009, Dee, DiPaola, Dolan, and Smith approved a transaction that consolidated Kitts Development's initial $2.98 million loan with an unsecured line of credit and an additional $1.03 million to fund additional construction costs on the project.    See Complaint ¶ 32, at 9.    Dee, DiPaola, Dolan, and Smith approved the transaction despite numerous violations of the Loan Policy, and of prudent lending practices and procedures.    See Complaint ¶ 33, at 9.    Specifically, they ignored continued indications that Kitts Development and T.J. were not creditworthy and that their financial information was unreliable.    See Complaint ¶ 33, at 9.    For example, Kitts Development reported on its 2007 tax returns -- the most recent available at the time of the loan's approval -- $219,000.00 in gross revenue, and a net loss of $1.375 million.    See Complaint ¶ 33, at 9.    By contrast, Kitts Development reported in its December 31, 2007, financial statement $890,000.00 in gross revenue, and a net gain of $799,000.00.    See Complaint ¶ 33, at 9.    The December 31, 2007, financial statement also

---

[6]The debt service coverage ratio is "the ratio of cash available for debt servicing to interest, principal, and lease payments. . . .   The higher this ratio is, the easier it is to obtain a loan."   Debt Service Coverage Ratio, Wikipedia.org,   en.wikipedia.org/wiki/Debt_service_ coverage_ratio (last visited Dec. 6, 2014).

reported no liabilities, despite that Kitts Development was indebted for at least the amount outstanding on the prior First Community loan.   See Complaint ¶ 33, at 9.   The LAF on which Dee, DiPaola, Dolan, and Smith relied to approve the loan failed either to explain or to question these discrepancies.   See Complaint ¶ 33, at 9.   Moreover, the Kitts Development loan's loan-to-value ratio was reported as 103% -- well beyond the maximum seventy-five percent that the Loan Policy permitted.   See Complaint ¶ 33, at 9.   The LAF also failed to explain why T.J., with a reported net worth of $6.619 million, was not required to contribute additional equity to keep the loan-to-value ratio below seventy-five percent.   See Complaint ¶ 33, at 9.

### 4.   The K&M Development, Inc., Loans.

On or about March 27, 2007, Dolan and Nafus approved an $885,000.00 loan to K&M Development, Inc. to fund the purchase and development of a lot containing a former Knights of Columbus facility into fourteen townhomes.   See Complaint ¶ 36, at 10.   K&M Development's principal, M.D., guaranteed the loan.   See Complaint ¶ 36, at 10.   Dolan and Nafus approved the loan despite numerous violations of the Loan Policy and prudent lending practices and procedures.   See Complaint ¶ 37, at 10.

First, they approved the loan without sufficient financial information from M.D. or K&M Development.   The most recent tax returns that M.D. provided in support of the loan were from 2004 -- three years before the loan was approved.   See Complaint ¶ 37, at 10.   Although M.D. reported that her 2007 income was $9,000.00 per month, there is no indication that either Dolan or Nafus attempted to verify the source of her income.   See Complaint ¶ 37, at 10-11.   Dolan and Nafus neither analyzed nor received any financial information from K&M Development. See Complaint ¶ 37, at 10.   The LAF on which Dolan and Nafus relied explained that, because K&M Development was newly formed, none of its financials were available.   See Complaint

¶ 37, at 10.   The LAF also stated, however, that M.D. received the development company that she had co-owned with her ex-husband -- Cerami Building and Design -- through their divorce settlement, and changed the name to K&M Development.   See Complaint ¶ 37, at 10.   Despite this information, the LAF failed to analyze either financial information from Cerami Building and Design, or any projected financial information for K&M Development.   See Complaint ¶ 37, at 10.

Second, Dolan and Nafus relied on an LAF that failed to discuss M.D.'s experience -- or lack thereof -- as a developer aside from noting that she was a "principal" in her husband's construction business.   Complaint ¶ 37, at 10.   Had Nafus and Dolan required additional information on M.D.'s background, they would have discovered that she had virtually no commercial real estate development experience and had never worked on a project of this size. See Complaint ¶ 37, at 10-11.

Third, Nafus and Dolan ignored significant red flags indicating that the loan should not be approved.   See Complaint ¶ 38, at 11.   For example, because there was no analysis or verification of M.D.'s finances, there was not a reliable secondary source of repayment -- making the transaction "undesirable" under the Loan Policy.   Complaint ¶ 38, at 11.   M.D. also had not obtained the necessary building permits.   See Complaint ¶ 38, at 11.   Moreover, the proposed loan had a loan-to-value ratio of seventy-five percent -- the maximum that the Loan Policy permitted.   See Complaint ¶ 38, at 11.   The appraisal used to value the collateral and calculate the loan-to-value ratio, however, assumed that the necessary building permits would be issued and construction would not be delayed.   See Complaint ¶ 38, at 11.   Because the necessary building permits had not been issued at the time of the loan's approval -- and, in fact, were never issued -- the loan-to-value ratio was in excess of the Loan Policy's limit.   See

Complaint ¶ 38, at 11.   There was also evidence that M.D. would have difficulty paying off her debt.   See Complaint ¶ 38, at 11.   Her liquidity was very limited -- with $160,000.00 in cash and $360,000.00 in liabilities.   See Complaint ¶ 38, at 11.   That she had also taken out a $300,000.00 home equity line of credit to fund the project further compounded the dangers of her limited liquidity.   See Complaint ¶ 38, at 11.

On or about January 11, 2008, Nafus approved five $314,140.00 construction loans to K&M Development -- for a total of $1.571 million.   See Complaint ¶ 39, at 11.   Each loan funded the construction of one townhome as part of the development project described previously.   See Complaint ¶ 39, at 11-12.   Although the LAFs for these loans did not reflect entire project's the loan-to-value ratio, the ratio reached eighty-six percent with this additional funding -- above the seventy-five percent maximum ratio that the Loan Policy permitted.   See Complaint ¶ 39, at 12.   This ratio was "especially egregious," because the LAFs indicated that the real estate market was "softening" -- suggesting that First Community would have a difficult time selling the townhomes.   Complaint ¶ 39, at 12.

On or about November 20, 2008, Dolan, and on or about November 21, 2008, Fanning approved a renewal and consolidation of the initial loan and the five construction loans, and approved an additional $216,072.10 to cover interest and "carrying costs" for an additional year -- for a total loan commitment of $1.526 million.   Complaint ¶ 40, at 12.   In approving the loan, Dolan and Fanning ignored multiple warning signs that indicated the loan should not have been approved.   See Complaint ¶¶ 40-41, at 12-13.

First, as with the previous loans, M.D. did not provide current tax returns, which meant that Dolan and Fanning had to rely on First Community's projections to determine her current financial situation.   See Complaint ¶ 41, at 12.   Second, there was significant evidence that

neither K&M Development nor M.D. were creditworthy.   See Complaint ¶ 42, at 12.   For example, a First Community loan officer estimated M.D.'s liquid and personal assets at $0.00. See Complaint ¶ 42, at 12.   M.D.'s ability to repay the loans, thus, turned on whether she could sell her illiquid water rights to property that she was developing -- a situation that the Loan Policy considered "undesirable."   Complaint ¶ 42, at 12.   Third, the LAF acknowledged that M.D. "had very nominal commercial development experience and has never completed a project of this size or nature."   Complaint ¶ 42, at 13 (internal quotation marks omitted)(brackets omitted).   Fourth, although the LAF indicated that M.D. planned to alter the project from fourteen townhomes to thirty condominiums, she had not obtained the necessary permits to do so.   See Complaint ¶ 42, at 13.

###### 5.      The Katerina, Inc., Loans.

On or about March 29, 2007, Fanning, Dolan, Sanchez, Martin, and Smith approved a $6.88 million loan to Katerina, Inc. to fund a land-swap deal with the State of New Mexico and refinance two land loans -- one of which was from First Community in the amount of $1.056 million.   See Complaint ¶ 44, at 13.   Katerina, Inc.'s principal, P.P., and Philippou, LLC guaranteed the loan.   See Complaint ¶ 44, at 13.   Fanning, Dolan, Sanchez, Martin, and Smith approved the loan "despite numerous departures from the Loan Policy and prudent lending practices."   Complaint ¶ 45, at 13.

First, they failed to require sufficient financial information before approving the transaction.   See Complaint ¶ 45, at 13.   The financial information was so lacking that the loan's LAF acknowledged that the "compiled qualify of the financial statements" was a weakness of the loan.   Complaint ¶ 45, at 13.   Moreover, although the LAF acknowledged that Katerina, Inc.'s income came primarily from land and lot sales, its cash flow analysis did not

consider Katerina, Inc.'s ability to pay off its loan if a slumping housing market caused its revenues to decline.   See Complaint ¶ 45, at 13-14.   Fanning, Dolan, Martin, and Smith also did not review the appraisals of the loan's collateral before approving it.   See Complaint ¶ 46, at 14.

Second, Fanning, Dolan, Martin, and Smith approved the loan even though its LAF acknowledged there was no formal succession plan in place for P.P.'s businesses.   See Complaint ¶ 47, at 14 (alterations omitted)(internal quotation marks omitted).   Had these defendants required P.P. to submit a succession plan, his businesses could have avoided the substantial delays on its development projects that occurred after P.P. became incapacitated from illness.   See Complaint ¶ 47, at 14.

Third, Fanning, Dolan, Martin, and Smith approved the loan despite significant warning signs regarding the valuation of the loan's collateral.   See Complaint ¶ 46, at 14.   The loan had a loan-to-value ratio of sixty-two percent -- within the Loan Policy's sixty-five percent maximum loan-to-value ratio for raw land.   See Complaint ¶ 46, at 14.   The appraised value used to calculate this ratio, however, did not account for the costs of selling the collateral -- e.g., the holding costs, marketing costs, and "entrepreneurial profit."[7]   Complaint ¶ 46, at 14.

### 6.   The Empire at Estrella Town Center, LLC, Loans.

On or about July 16, 2007, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith approved a $10.7 million loan to Empire at Estrella Town Center, LLC ("Empire, LLC") to refinance an acquisition and development loan from another bank, and to provide additional funding for constructing and developing a shopping mall.   Complaint ¶ 49, at 14.   R.F., K.F., G.J., K.A.J., Meritage Investments, and ECD, LLC, ("Empire Guarantors") guaranteed the loan.

---

[7]The Complaint does not explain what constitutes "entrepreneurial profit" or how it differs from "marketing costs."

Complaint ¶ 49, at 15.   DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith made four mistakes in approving the loan.   See Complaint ¶¶ 50-52, at 15-16.

First, they approved the loan without sufficient financial information from either Empire, LLC, or the Empire Guarantors.   See Complaint ¶ 50, at 15.   The 2006 financial statements from R.F., K.F., F.J., and G.J. showed "Investments in Closely Held Business" as an asset, which was calculated on a "net equity" basis -- i.e., without accounting for any related debt. Complaint ¶ 50, at 15.   The financial statements, therefore, made it impossible for DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith to know the extent to which the closely held businesses were indebted to R.F., K.F., F.J., and G.J., and/or whether R.F., K.F., F.J., and G.J. served as those businesses' guarantors.   See Complaint ¶ 50, at 15.   DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith also did not: (i) verify Empire, LLC's, or the Empire Guarantors' financial information; (ii) obtain a credit report from Empire, LLC; (iii) check Empire, LLC's credit with its prior lender; or (iv) conduct a global cash-flow analysis of all of the "principals' entities and debt service obligations."[8]   Complaint ¶ 50, at 15.

Second, they approved the loan despite that certified public accountants did not prepare any of the Empire Guarantors' financial statements -- as the Loan Policy required.   See Complaint ¶ 50, at 15.   Third, they ignored a number of warning signs that the loan should not be approved.   See Complaint ¶ 51, at 15.   For example, the LAF's cash-flow analysis on which DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith relied in approving the loan showed that the project's cash flow would not be sufficient to service the loan.   See Complaint ¶ 51, at 15. There were also clear discrepancies in the reported financial information.   See Complaint ¶ 51, at 15.   Although the principals reported contributing $2.186 million in equity to the project,

_____

[8]The Complaint does not identify Empire, LLC's principals.

Empire, LLC's 2006 financial statements show that they had only $684,549.00 in equity in the project.   See Complaint ¶ 51, at 15.

Fourth, they approved the loan based on an appraisal of the loan's collateral that failed to account for the costs of selling the collateral -- e.g., holding costs, marketing costs, or "entrepreneurial profit."   Complaint ¶ 52, at 16.   This was problematic, because the property's appraised value was, in turn, used to calculate the loan's seventy-five percent loan-to-value ratio. See Complaint ¶ 52, at 16.   Because the loan was already at the maximum loan-to-value ratio that the Loan Policy permitted, the actual loan-to-value ratio -- adjusted for those costs -- exceeded the Loan Policy's maximum.   See Complaint ¶ 52, at 16.

On or about February 16, 2010, Dee, DiPaola, Fanning, and Martin approved a renewal of the loan, restructured the loan, and authorized $144,000.00 in additional funds.   See Complaint ¶ 53, at 16.   The total outstanding amount of the loan after the approval was $8,084,686.18.   See Complaint ¶ 53, at 16.   Dee, DiPaola, Fanning, and Martin approved the loan's renewal despite there not being a clear funding source to meet the debt's payments.   See Complaint ¶ 54, at 16.   The project's cash flow remained insufficient to pay off any of the principal, and the Empire Guarantors had already refused to pay the loan personally despite their obligations as guarantors.   See Complaint ¶ 54, at 16.   Dee, DiPaola, Fanning, and Martin approved the loan on an interest-only basis, despite the fact that it exceeded the Loan Policy's maximum term for interest-only payments by over a year.   See Complaint ¶ 54, at 16.   By this time, the loan's loan-to-value ratio had risen to 87.52% -- well beyond the seventy-five percent maximum ratio that the Loan Policy permitted.   See Complaint ¶ 54, at 16.   Moreover, Dee, DiPaola, Fanning, and Martin disregarded the LAF, which acknowledged that "alternative

- 14 -

financing is unlikely." Complaint ¶ 54, at 16 (brackets omitted)(internal quotation marks omitted).

### 7. The La Cuentista I, LLC, Loan.

On or about October 26, 2007, Dolan and Nafus approved a $3,071,822.00 loan to La Cuentista I, LLC to fund the acquisition and development of a 140-lot subdivision.   See Complaint ¶ 56, at 17.   "The seven partner developers and their corporate entities were guarantors for the loan."   Complaint ¶ 56, at 17.   Dolan and Nafus made three mistakes in approving this loan.   See Complaint ¶¶ 57-59, at 17-18.

First, they relied on faulty analyses of the guarantors' financial information.   See Complaint ¶ 57, at 17.   The LAF on which Dolan and Nafus relied improperly considered the guarantors' working capital as liquidity, and failed to account for the guarantors' pre-existing loan-payment obligations.   See Complaint ¶ 57, at 17.   Second, although the Loan Policy required the loan officer to "analyze the contractor's[9] capabilities both in terms of finance and past performance," Dolan and Nafus did not require such an evaluation.    Complaint ¶ 57, at 17.

Third, they ignored multiple warning signs indicating that the loan was "extremely risky."   Complaint ¶ 57, at 17.   For example, two of the guarantor limited liability corporations had negative working capital, and two of the individual guarantors had negative cash flow to make loan payments.   See Complaint ¶ 57, at 17.   Moreover, although the LAF reported that the loan-to-cost ratio was within Loan Policy limits, First Community had already granted La Cuentista, LLC, a loan to provide 100% financing for the project -- including interest reserves of $490,000.00 and cost overruns.   See Complaint ¶ 58, at 17.   Consequently, when compared to the total development costs, the actual loan-to-cost ratio for the project was approximately 106%

---

[9]The Complaint does not identify a contractor for the La Cuentista Loans.

-- far above the seventy-five percent maximum that the Loan Policy permitted.   See Complaint ¶ 58, at 17.   The loan was also structured so that each guarantor was responsible for only one-seventh of the debt -- despite that the financial information clearly showed that some guarantors were financially stronger than others.   See Complaint ¶ 58, at 17.   Furthermore, the collateral appraisal warned of a declining real estate market, stating:

> [B]etween the end of the 2nd quarter 2006 and 2007 all market areas referenced show dramatic declines in permits issued with declines of 39% and 56% noted. This decline in permits is in direct response to the dramatic slowdown in the housing market due to a large lumber of foreclosures nationwide because of questionable mortgage practices.

Complaint ¶ 58, at 18 (internal quotation marks omitted).

### 8.   The P.A. Loan.

On or about January 10, 2008, Dolan approved a $2 million commercial revolving line of credit to P.A. to fund the purchase of trucks that P.A. planned to retrofit with proprietary cleaning machinery for P.A.'s company, Blast N Clean.   See Complaint ¶ 60, at 18.   Dolan approved the loan despite multiple violations of the Loan Policy and prudent lending practices. See Complaint ¶ 61, at 18.

First, Dolan approved the loan without receiving financial statements for either P.A. or Blast N Clean.   See Complaint ¶ 61, at 18-19.   Second, there is no evidence that Dolan attempted to verify P.A.'s assets.   See Complaint ¶ 61, at 19.   Third, Dolan did not request or conduct an independent appraisal of the eight trucks put down as collateral, but assumed that their value was their cost plus the cost of retrofitting them with the cleaning equipment.   See Complaint ¶ 61, at 18-19.   Besides the failure to use an independent appraiser, this estimate was faulty, because it was "highly unlikely that each truck could be liquidated at full cost due to the proprietary nature of the cleaning equipment."   Complaint ¶ 61, at 19.

Fourth, Dolan disregarded a number of warning signs indicating that he should not approve the loan.   See Complaint ¶ 62, at 19.   For example, the last two years of P.A.'s tax returns showed an insufficient cash flow to make loan payments.   See Complaint ¶ 62, at 19. Moreover, P.A.'s cash-flow analysis included his two other companies -- neither of which was a guarantor of the loan.   See Complaint ¶ 62, at 19.   Without those two companies, P.A.'s cash flow was insufficient to support even his pre-existing debt, let alone the debt payments associated with the new First Community loan.   See Complaint ¶ 62, at 19.   Furthermore, the LAF assumed that at least fifty percent of P.A.'s trucks would sell and failed to analyze P.A.'s ability to make loan payments if none of the trucks sold.   See Complaint ¶ 62, at 19.   The value of P.A.'s non-truck collateral, after accounting for all senior liens, was less than the loan's principal.   See Complaint ¶ 62, at 19.   The loan also should have been considered "undesirable" under Loan Policy, which classified "loans with a unique industry, wherein the lender lacks specialized expertise to properly evaluate the risks, or manage the credit" and "loans secured by collateral of uncertain marketability" as undesirable.   Complaint ¶ 62, at 19 (internal quotation marks omitted)(brackets omitted).

## PROCEDURAL BACKGROUND

The FDIC alleges three claims against the Defendants: (i) negligence, see Complaint, ¶¶ 64-69, at 20-21; (ii) gross negligence, see Complaint ¶¶ 70-75, at 21-23; and (iii) breach of fiduciary duties, see Complaint ¶¶ 76-79, at 23-24.   Regarding the negligence and gross negligence claims, the FDIC alleges that the Defendants owed a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to, the following:

(a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those loans that conformed with the Loan

Policy; (c) ensuring that any transactions they approved were underwritten in a safe and sound manner; (d) ensuring that any transactions they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) ensuring that any transactions they approved were made to creditworthy borrowers; (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations; and (g) ensuring that any transactions they approved did not create unsafe and unsound concentrations of credit.

Complaint ¶ 66, at 20.   See id. ¶ 73, at 22.   The FDIC alleges that the Defendants were negligent, grossly negligent, and breached their fiduciary duties in their actions and inactions, including, but not limited to, the following:

(a) failing to inform themselves about the Subject Transactions and their risks before approving them; (b) approving the Subject Transactions on terms that violated the Loan Policy; (c) failing to ensure that the Subject Transactions were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Transactions were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) approving Subject Transactions to borrowers who were not creditworthy; (f) failing to ensure that the Subject Transactions did not violate applicable banking laws and regulations; (g) failing to ensure that the Subject Transactions did not create unsafe and unsound concentrations of credit; and (h) approving the Subject Transactions without proper analysis of the borrower's ability to satisfy the debt.

Complaint ¶ 67, at 20-21.   See id. ¶ 74, at 22-23; id. ¶ 78, at 23.

1.    **The MTD 1.**

Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith ("First Community Defendants") filed the MTD 1 on March 3, 2014.   See MTD 1 at 1.   The First Community Defendants begin the MTD 1 by explaining that N.M. Stat. Ann. § 53-11-35(B) and the common-law business judgment rule, define corporate officers' and directors' standard of care in New Mexico.   See MTD 1 at 13-14.   According to the First Community Defendants, § 53-11-35(B) states, in pertinent part:

A director shall perform his duties as a director, including his duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner the director believes to be in or not opposed to the best

> interests of the corporation, and with such care as an ordinarily prudent person
> would use under similar circumstances in a like position.

MTD 1 at 6 (quoting N.M. Stat. Ann. § 53-11-35(B))(internal quotation marks omitted).   The First Community Defendants assert that § 53-11-35 dictates that a director's or officer's liability is assessed individually and cannot be based on group decisions.   See MTD 1 at 13.   The First Community Defendants argue that § 53-11-35's plain text prohibits claims of ordinary negligence against directors and officers, because it states that they are not liable unless they subjectively believe their actions are not in the corporation's best interests.   See MTD 1 at 13. The First Community Defendants contend that the common-law business judgment rule also protects corporate directors and officers.   See MTD 1 at 13.   According to the First Community Defendants, the rule indicates that such individuals cannot be held liable for negligence unless the plaintiff also pleads fraud, conflict of interest, or waste in addition to any alleged violations of § 53-11-35(B).   See MTD 1 at 13.

The First Community Defendants argue that the Court should dismiss the Complaint for three reasons.   See MTD 1 at 16-20.   First, the First Community Defendants assert that the subjective element in § 53-11-35 indicates that allegations of ordinary negligence -- which involve a reasonable-person standard -- do not state a valid cause of action against corporate officers or defendants.   See MTD 1 at 16-17.   The First Community Defendants point out that, under the United States Court of Appeals for the Tenth Circuit's holding in FDIC v. Schuchmann, 235 F3d 1217 (10th Cir. 2000), the party seeking to impose liability must show "a lack of good faith and that each director or officer separately did not believe his or her actions were in the best interests of the corporation."   MTD 1 at 17.   According to the First Community Defendants, because the Complaint fails to satisfy either of these requirements, it does not state a claim for which relief can be granted.   See MTD 1 at 17.

Second, the First Community Defendants contend that "gang pleading" negligence is not permitted.   MTD 1 at 17.   The First Community Defendants point out that the Complaint alleges, for example, that "no Defendant voted against any of the Subject Transactions."   MTD 1 at 17 (quoting Complaint ¶ 27, at 7)(internal quotation marks omitted).   In the First Community Defendants' view, "[s]uch pleading is insufficient," because the relevant issue is whether a defendant voted for the subject loan.   MTD 1 at 17.   In support of this proposition, the First Community Defendants cite Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d 1231 (10th Cir. 2013), in which the Tenth Circuit, in an opinion that the Honorable Stephanie K. Seymour, United States Circuit Judge for the Tenth Circuit, authored, and Judges Lucero and Tymkovich joined, stated:

> Ms. Burnett's complaint is not just deficient because it attributes actions to a large group of collective "defendants," which includes fifty unknown Doe defendants in addition to MERS and Mr. Woodall, but also because it is a litany of diverse and vague alleged acts ("emails, faxes, correspondence, and/or meetings, and the like") with zero details or concrete examples.   From such broad allegations against a large and mostly anonymous group of people, this court cannot "draw the reasonable inference that the defendant [Mr. Woodall] is liable for the misconduct alleged," because **we cannot tell which defendant is alleged to have done what, nor can we tell what the misconduct was.**

MTD 1 at 4 (quoting Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d at 1240)(alterations in MTD 1 but not original)(emphasis in MTD 1 but not in original)(internal quotation marks omitted).

The First Community Defendants argue that, with few exceptions -- which themselves are insufficient to state a claim -- the FDIC makes no attempt to plead each individual director's or officer's specific failures in approving the subject loans.   See MTD 1 at 17.   Third, the First Community Defendants maintain that New Mexico law does not require them to be perfect in making their corporate decisions or to "apply the same microscope" to the subject loans'

applications that the FDIC has.   MTD 1 at 18.   Instead, the First Community Defendants assert, the focus in determining their liability "is on process, not results."   MTD 1 at 18.

The First Community Defendants state that they anticipate the FDIC will argue that they are entitled to § 53-11-35(B)'s protections only if they show that they were fully informed about the subject loans.   See MTD 1 at 18-19.   The First Community Defendants say that such an assertion is contrary to both § 53-11-35(B)'s plain language and FDIC v. Schuchmann, 235 F.3d 1217 (10th Cir. 2000).   The First Community Defendants point out that, in FDIC v. Schuchmann, in an opinion that the Honorable Carlos F. Lucero, United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, wrote, and Judges Anderson and Broby joined, the Tenth Circuit held that the FDIC bears the burden to prove the defendants' lack of good faith and lack of a subjectively honest belief that their actions were in the corporation's best interests.   See MTD 1 at 19.

The First Community Defendants say that the FDIC may also argue that, because its claims are fact-intensive, the Court should not dismiss the Complaint until it can develop the record.   See MTD 1 at 19.   The First Community Defendants assert that such a contention not only flies in the face of the FDIC's conduct preceding this case, but also runs afoul of the plausibility pleading standard.   See MTD 1 at 20.   The First Community Defendants point out that the FDIC has "unprecedented investigatory powers," and "more than ample time and opportunity," to develop facts showing the Defendants' lack of individual good faith.   MTD 1 at 20.   In the First Community Defendants' view, seeking further development of the record would indicate only that the FDIC has not pled sufficient facts to support a motion to dismiss. See MTD 1 at 20.

Taking up the FDIC's gross-negligence claim, the First Community Defendants assert that the Complaint makes no allegations that satisfy the elements of "individual bad faith and individualized subjective lack of honest belief that are necessary to support a claim of gross negligence under New Mexico law." MTD 1 at 20-21. In the First Community Defendants' view, the Complaint states only that there were violations of internal policies -- which boil down to allegations of bad judgment. See MTD 1 at 21. The First Community Defendants contend that such allegations are insufficient to state a claim for gross negligence. See MTD 1 at 21.

Last, the First Community Defendants address the FDIC's breach-of-fiduciary-duty claim. See MTD 1 at 21. The First Community Defendants assert that, unless the challenged action involves a conflict of interest, usurpation of a corporate opportunity, or similar breach of the duty of loyalty, no breach of fiduciary duty claim exists under New Mexico law. See MTD 1 at 21. The First Community Defendants say that the Complaint contains no allegations of "lying, cheating or stealing" -- the hallmarks of a breach-of-fiduciary-duty claim. MTD 1 at 22 (internal quotation marks omitted). Instead, the First Community Defendants point out, the Complaint alleges only "incorrect decisions and unstated losses." MTD 1 at 22.

The FDIC responded to the MTD 1 on April 23, 2014. See Plaintiff's Opposition to Certain Defendants' Motion to Dismiss (Document 15), filed April 23, 2014 (Doc. 23)("MTD 1 Response"). First, the FDIC contends that the Complaint sufficiently alleges claims for ordinary negligence. See MTD 1 Response at 8-12. The FDIC argues that § 53-11-35(B) imposes on officers and directors three separate duties to the corporation: (i) a duty of good faith; (ii) a duty of loyalty; and (iii) a duty of care. See MTD 1 Response at 8. The FDIC says that, accordingly, the Defendants are liable if they violated any one of these duties. See MTD 1 Response at 8. The FDIC points out that the Complaint alleges that the Defendants violated

their duty of care by, among other things: (i) failing to inform themselves about proposed loans and their risks before approving them; (ii) approving loans that did not comply with the Loan Policy; and (iii) failing to ensure that any loans they approved were underwritten in a safe and sound manner.   See MTD 1 Response at 8 (citations omitted).

The FDIC says that the New Mexico Business Corporation Act, N.M. Stat. Ann. § 53-12-2, sets forth certain provisions that a corporation can include in its articles of incorporation as a limitation on director liability.   See MTD 1 Response at 8.   The FDIC explains that § 53-12-2(E)(2)(a) states that articles of incorporation may provide that a director shall not be personally liable to the corporation for monetary damages for breach of fiduciary duty as a director "unless the breach of failure to perform constitutes: negligence, willful misconduct or recklessness in the case of a director who . . . receives as an employee of the corporation compensation of more than two thousand dollars ($2,000) from the corporation in any calendar year."   MTD 1 Response at 8-9 (internal quotation marks omitted).   The FDIC states that First Community's articles of incorporation do not, however, contain any such provision.   See MTD 1 Response at 9.   The FDIC points out that, even if the articles of incorporation included such a provision, it would not apply to these Defendants, because they were all First Community employees who received more than $2,000.00 in compensation per year.   See MTD 1 Response at 9.

The FDIC also notes that courts around the country have consistently upheld nearly identical complaints that the FDIC brought against former directors and officers of failed banks -- holding that similar allegations constitute not just ordinary negligence, but gross negligence. See MTD 1 Response at 9-12 (citing FDIC v. Switzer, No. CIV 13-03834 RS (N.D. Cal Apr. 9, 2014)(Seeborg, J.); FDIC v. Castro, No. CIV 13-80596 DMM (S.D. Fla. Mar. 31,

2014)(Middlebrooks, J.); <u>FDIC v. Dodson</u>, No. CIV 13-00416 MW/CAS (N.D. Fla. Feb. 27,

2014)(Walker, J.); <u>FDIC v. Aultman</u>, No. 2:13-CV-58-FTM-38UAM, 2013 WL 3357854, at *1

(M.D. Fla. July 3, 2013)(Chappell, J.); <u>FDIC v. Price</u>, No. CIV 12-0148 FTM/DNF, 2012 WL

3242316 (M.D. Fla. Aug. 8, 2012)(Presnell, J.); <u>FDIC v. Stahl</u>, 840 F. Supp. 124, 128 (S.D. Fla.

1993)(Ryskamp, J.)).   The FDIC argues that "[t]hese decisions indisputably demonstrate that

the Complaint in this case is sufficient to establish gross negligence -- let alone ordinary

negligence -- against each Defendant."   MTD 1 Response at 12.

Second, the FDIC asserts that the Complaint satisfies the gross-negligence standard.

<u>See</u> MTD 1 Response at 12-14.   The FDIC explains that the Defendants are liable for gross

negligence under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12

U.S.C. § 1821(k) ("FIRREA").   MTD 1 Response at 12.   The FDIC says that FIRREA does

not define gross negligence, but rather incorporates the definition that the relevant state law

provides.   <u>See</u> MTD 1 Response at 12.   The FDIC points out that the Supreme Court of New

Mexico has "formally abolished the distinction between ordinary and gross negligence, because

the concept of gross negligence is so nebulous as to have no generally accepted meaning."

MTD 1 Response at 12 (quoting <u>Paiz v. State Farm & Casualty Co.</u>, 1994-NMSC-079, ¶ 29, 880

P.2d 300, 309 (1994))(internal quotation marks omitted).   The FDIC contends that, even if it "is

required to show a standard of care higher than ordinary negligence for the director defendants,

the FDIC[]'s allegations in this case clearly satisfy any reasonable definition of gross

negligence."   MTD 1 Response at 12-13.   The FDIC says that, for example, the Defendants

personally approved the subject loans despite obvious and serious underwriting deficiencies.

<u>See</u> MTD 1 Response at 13.   The FDIC argues that, in particular, the Defendants approved the

loans despite: (i) inadequate repayment sources; (ii) missing tax returns and financial statements

from the borrower and guarantors; (iii) missing appraisals and appraisal reviews; (iv) inadequate analysis of the borrower's and guarantor's financial information and ability to service the debt; and (v) loan-to-value and loan-to-cost ratios that exceeded the maximum ratio that the Loan Policy prescribed.   See MTD 1 Response at 13.   The FDIC states that, while New Mexico law does not clearly distinguish gross negligence from ordinary negligence, courts in other jurisdictions have consistently upheld gross negligence claims premised on virtually identical allegations.   See MTD 1 Response at 13 (citing, e.g., FDIC v. Switzer; FDIC v. Castro).

The FDIC also notes that FIRREA preempts any state law that purports to require the FDIC to show conduct more culpable than gross negligence to establish the Defendants' liability. MTD 1 Response at 14 (citing FDIC v. Stahl, 89 F.3d 1510, 1516 (11th Cir. 1996)("[Section] 1821(k) permits claims against directors for gross negligence regardless of whether state law would require *greater* culpability.")(emphasis in FDIC v. Stahl)).   Responding to the First Community Defendants' contention that it must show bad faith to have a plausible claim, the FDIC argues that, even if New Mexico required a showing of bad faith -- "which it does not" -- FIRREA would preempt such a requirement.   MTD 1 Response at 14.

Third, the FDIC argues that the common-law business judgment rule does not apply in this case.   See MTD 1 Response at 14-15.   The FDIC points out that, as Judge Lucero explained in FDIC v. Schuchmann, the business judgment rule protects corporate officers and directors only if they satisfy certain prerequisites -- including acting with a "reasonable basis," and based on "their independent direction and judgment."   MTD 1 Response at 14 (quoting FDIC v. Schuchmann, 235 F.3d at 1228)(internal quotation marks omitted).   The FDIC says that, moreover, courts have consistently recognized that allegations of gross negligence overcome the business judgment rule.   See MTD 1 Response at 14 (citing In re Citigroup Inc.

S'holder Derivative Litig., 964 A.2d 106, 125 (Del. Ch. 2009)).   In the FDIC's view, the Complaint establishes gross negligence by demonstrating that, in approving the subject loans, the Defendants acted without a reasonable basis and without exercising independent judgment.   See MTD 1 Response at 14-15 (citations omitted).

Fourth, the FDIC asserts that the Complaint plausibly alleges a breach-of-fiduciary-duty claim.   See MTD 1 Response at 15.   Responding to the First Community Defendants' contention that a breach-of-fiduciary-duty claim rests on what would ordinarily be thought of as corporate loyalty claims, the FDIC states that directors also owe a fiduciary duty of care to the corporation.   See MTD 1 Response (citing RTC v. Foley, 829 F. Supp. 352, 355 (D.N.M. 1993)(Campos, J.)(denying motion to dismiss breach-of-fiduciary-duty claims, because the "complaint clearly alleges that defendants breached their duties of care . . . by, among other things, failing to change their loan policies in the face of repeated regulatory warnings and by approving six defective transactions")).   The FDIC points out that the Complaint alleges that the Defendants breached their fiduciary duties by approving the subject loans and that those breaches caused damages exceeding $14.8 million.   See MTD 1 Response at 15.   In the FDIC's view, RTC v. Foley dictates that the Court should not dismiss the breach-of-fiduciary-duty claim.   See MTD 1 Response at 15.

Fifth, responding to the First Community Defendants' argument that the Complaint impermissibly "gang plead[s]" the Defendants, the FDIC states that the Complaint details the material information for each loan -- including the loan's approval date, loan amount, loss amount, and the Defendants who approved it.   See MTD 1 Response at 16.   In the FDIC's view, it is, therefore, abundantly clear which defendants are being sued for which loans and the factual basis of the claims against them.   See MTD 1 Response at 16.

The First Community Defendants replied to the MTD 1 Response on May 23, 2014. See Reply in Support of Certain Defendants' Motion to Dismiss, filed May 23, 2014 (Doc. 28)("MTD 1 Reply").   In the MTD 1 Reply, the First Community Defendants offer four responses to the FDIC's contentions in the MTD 1 Response.   See MTD 1 Reply at 3-12. First, the First Community Defendants argue that New Mexico law provides the only relevant standard for judging their conduct -- cases from other jurisdictions applying the standards applicable in those states, therefore, provide no guidance in this case.   See MTD 1 Reply at 3. The First Community Defendants point out that FDIC v. Schuchmann provides the applicable standard of care.   See MTD 1 Reply at 3.   In the First Community Defendants' view, FDIC v. Schuchmann states that the FDIC bears the burden of proving that the Defendants did not "arrive at their decisions, within the corporation's powers and their authority, with a reasonable basis, *and* while acting in good faith, as the result of their independent discretion and judgment and uninfluenced by any consideration other than what they honestly believe to be in the best interests of the corporation."   MTD 1 Reply at 3-4 (quoting FDIC v. Schuchmann, 235 F.3d at 1228-29)(emphasis in MTD 1 Reply but not in FDIC v. Schuchmann)(internal quotation marks omitted).   According to the First Community Defendants, the Complaint's allegations do not satisfy this exacting standard.   See MTD 1 Reply at 4.

Second, the First Community Defendants assert that, contrary to the FDIC's contentions, Paiz v. State Farm Fire & Casualty Insurance Company is relevant to this case only insofar as it provides guidance on an element that the FDIC must prove -- that the First Community Defendants did not act in good faith.   See MTD 1 Reply at 5.   The First Community Defendants explain that, even if New Mexico no longer has a separate gross negligence claim, §1821(k) retains the term for cases that the FDIC brings.   See MTD 1 Reply at 6.   According

to the First Community Defendants, <u>Paiz v. State Farm Fire & Casualty Company</u> explains that gross negligence means "an entire want of care."   MTD 1 Reply at 6 (quoting <u>Paiz v. State Farm Fire & Cas. Co.</u>, 1994-NMSC-079, ¶ 26)(internal quotation marks omitted).   The First Community Defendants assert that <u>Paiz v. State Farm Fire & Casualty Company</u> is, therefore, relevant to this action, but not in the way which the FDIC argues.   <u>See</u> MTD 1 Reply at 6.

Third, the First Community Defendants challenge the FDIC's reliance on <u>RTC v. Foley</u>. <u>See</u> MTD 1 Reply at 10.   The First Community Defendants state that, although <u>RTC v. Foley</u> summarily states that it involves a claim for breach of fiduciary duty in approving loans, the "pre-<u>Iqbal</u> and pre-<u>Schuchmann</u> complaint does not address the contours of a claim for breach of fiduciary duty under New Mexico law that have developed since it was rendered."   MTD 1 Reply at 10.   The First Community Defendants conclude: "<u>Schuchmann</u> . . . and only <u>Schuchmann</u> applies here."   MTD 1 Reply at 10.

Fourth, the First Community Defendants argue that, by citing decisions from other jurisdictions, the FDIC "implicitly attempts to resuscitate an argument . . . that the United States Supreme Court rejected in <u>Atherton</u> [v. FDIC, 519 U.S. 213 (1997)]: that there is a need for a uniform standard of responsibility for bank officers and directors."   MTD 1 Reply at 11.   In the First Community Defendants' view, because those cases do not apply New Mexico law -- or something identical to it -- they provide no basis for denying the MTD 1.   <u>See</u> MTD 1 Reply at 11.

The First Community Defendants filed supplemental authority on October 23, 2014. <u>See</u> Notice of Supplemental Authority, filed October 23, 2014 (Doc. 40)("Notice 1").   In the Notice 1, the First Community Defendants called to the Court's attention a recent decision in <u>FDIC v. Wertheim</u>, No. CIV 13-0050 KG/KBM, Memorandum Opinion and Order, filed Oct.

20, 2014 (Doc. 41)("Wertheim MOO").   The First Community Defendants point out that, in the Wertheim MOO, the Honorable Kenneth J. Gonzales, United States District Judge for the District of New Mexico, denied the defendants' motion to dismiss.   See Wertheim MOO at 8. According to the First Community Defendants, Judge Gonzales reasoned that, because the FDIC alleged that the defendants violated § 53-11-35(B)'s first sentence, "the New Mexico common law business judgment rule would not apply" and that it was, therefore, unnecessary for the FDIC to "plead facts demonstrating the inapplicability of that rule."   Notice 1 at 1 (quoting Wertheim MOO at 8)(internal quotation marks omitted).   The First Community Defendants argue, without further explanation, that Judge Gonzales' decision "diverges from" FDIC v. Schuchmann, in which the Tenth Circuit upheld the district court's decision requiring the FDIC to prove that a director had violated the business judgment rule.   Notice 1 at 1-2.

The FDIC responded to the Notice on October 24, 2014.   See Plaintiff's Response to Defendants' Notice of Supplemental Authority (Document 40), filed October 24, 2014 (Doc. 41)("Notice 1 Response").   In the Response to Notice 1, the FDIC argues that the First Community Defendants disagree with the Wertheim MOO, because it "unambiguously rejects" their argument that they are not liable unless the FDIC establishes they acted in bad faith. Notice 1 Response at 1.   The FDIC states that the Wertheim MOO explains why the First Community Defendants are incorrect:

    a.     "Because the first sentence of Section 53-11-35(B) requires, *in the conjunctive*, that directors act in good faith, believe that they are acting in the best interests of the corporation, and act as ordinarily prudent persons, Plaintiff need only plead that the Director Defendants did not meet *one of those requirements*."

    b.     "If the director violates the first sentence of Section 53-11-35(B), then the New Mexico common law business judgment rule does not apply."

c.  "Since the New Mexico common law business judgment rule requires, *in the conjunctive*, that officers have a reasonable basis for their actions, act in good faith, and honestly believe that they acted in the best interests of the corporation, as with Section 53-11-35(B), Plaintiff need only plead that the Officer Defendants did not meet *one* of those requirements."

d.  The Complaint in the Wertheim case should not be dismissed as to director defendants because its, "factual allegations support a plausible claim that the Director Defendants did not perform their duties with the care ordinarily prudent persons would use under similar circumstances in like positions, and that they, thus, violated the first sentence of Section 53-11-35(B)."

e.  The Complaint in the Wertheim case should not be dismissed as to officer defendants because it "plausibly pled that the Officer Defendants did not have a reasonable basis for their actions and that, therefore, the Officer Defendants are not entitled to protection under the New Mexico common law business judgment rule."

Notice 1 Response ¶ 1, at 1-2 (quoting <u>Wertheim</u> MOO at 8-11)(emphases in Notice 1 Response but not in <u>Wertheim</u> MOO)(citations omitted)(internal quotation marks omitted).  The FDIC argues that, although the First Community Defendants attempt to escape Judge Gonzales' reasoning by arguing that it diverges from <u>FDIC v. Schuchmann</u>, Judge Gonzales stated that § 53-1135(B) "controls the pleading issue," and that <u>FDIC v. Schuchmann</u> "did not address the interplay between the first sentence of Section 53-11-35(B) and the New Mexico business judgment rule."   Notice 1 Response ¶ 2, at 2-3 (quoting <u>Wertheim</u> MOO at 8)(internal quotation marks omitted).

The FDIC also points out that the First Community Defendants' focus on <u>FDIC v. Schuchmann</u>'s holding that a plaintiff must "prove that a director had not satisfied the requirements of the business judgment rule" reflects their continued misunderstanding of officers' and directors' duties.   Notice 1 Response ¶ 3, at 3 (quoting Notice 1 at 1-2)(internal quotation marks omitted).   The FDIC says that, although the First Community Defendants argue that <u>FDIC v. Schuchmann</u> and § 53-11-35(B) require the FDIC to establish that the

- 30 -

Defendants breached all of their relevant duties, Judge Gonzales recognized that "the conjunctive" in both § 53-11-35(B) and <u>FDIC v. Schuchmann</u> require them to satisfy all of their relevant duties to avoid liability.   Notice 1 Response ¶ 3, at 3.   The FDIC asserts that, consequently, it need only prove that the Defendants breached one of their duties to establish liability.   <u>See</u> Notice 1 Response ¶ 3, at 3.

   2.   **MTD 2.**

   Nafus filed the MTD 2 on March 3, 2014.   <u>See</u> MTD 2 at 1.   In the MTD 2, Nafus asks the Court to dismiss the FDIC's claims of negligence, gross negligence, and breach of fiduciary duty as to him.   <u>See</u> MTD 2 at 4-12.   Nafus contends that the Court should dismiss the FDIC's negligence claim for two reasons.   First, Nafus asserts that the Complaint fails to state a claim for negligence under § 53-11-35 or the New Mexico common-law business judgment rule.   <u>See</u> MTD 2 at 6.   Nafus asserts that, under § 53-11-35, the FDIC must plead sufficient facts to demonstrate that he: (i) acted in bad faith; (ii) acted in a manner that he did not reasonably believe to be in First Community's best interests; and (iii) failed to use such care as an ordinarily prudent person would use under similar circumstances.   <u>See</u> MTD 2 at 6.   Moreover, Nafus contends that, under the business judgment rule, the FDIC must plead sufficient facts to demonstrate that he acted: (i) outside First Community's powers and his authority; (ii) without a reasonable basis; (iii) in bad faith; (iv) without independent judgment; and (v) under the influence of improper considerations -- <u>i.e.</u>, other than what he honestly believed to be in First Community's best interests.   <u>See</u> MTD 2 at 6.   Nafus argues that, because the Complaint does not contain any allegations of bad faith, lack of subjective reasonable belief, or conflict of interest, it fails to state a claim of ordinary negligence under either § 53-11-35 or the business judgment rule.   <u>See</u> MTD 2 at 6.

Second, Nafus maintains that the Complaint, in making undifferentiated and vague allegations against all of the Defendants collectively, fails to plausibly plead that Nafus is individually liable for negligence.   See MTD 2 at 7.   Nafus notes, for example, that the FDIC alleges that "no Defendant voted against any of the Subject Transactions."   MTD 2 at 7 (quoting Complaint ¶ 27, at 7).   Nafus explains that the Complaint alleges that he was involved in only three of the six loans -- making it impossible for him to have voted for or against all six loans.   See MTD 2 at 7.   Nafus states that, although the Complaint alleges that the Defendants' improper actions continued through February 16, 2010, it also alleges that Nafus left First Community by September 11, 2009.   See MTD 2 at 7.   Nafus points out that the Complaint does not clarify to what extent he is liable for loans which he approved that were later consolidated into new loans for which he played no role in the approval process.   See MTD 2 at 8.   Nafus argues that the Complaint's use of the "highly confusing and vague short-form 'Approving Defendants,'" makes it impossible to determine to which Defendants the Complaint is referring -- particularly with respect to the Kitts Development and K&M Development loans. MTD 2 at 8.   Nafus argues that, as a result, he cannot determine how the FDIC purports to attach liability for these loans and is severely limited in preparing his defenses.   See MTD 2 at 8.

Third, Nafus argues the Complaint does not plausibly allege either that the FDIC suffered damages, or that he was the proximate and actual cause of those damages -- which, Nafus points out, are essential elements of a negligence claim.   See MTD 2 at 9-11.   Nafus asserts that the Complaint does not allege, for example, that any of the loans that he approved are in default, that any of them had to be restructured on terms unfavorable to the FDIC, or that any of the debtors have had problems paying off their loans.   See MTD 2 at 9.   Nafus contends, moreover, that

the Complaint does not allege that any of the loans that he approved caused First Community's alleged insolvency.   See MTD 2 at 9.

Nafus next addresses the FDIC's gross negligence claim.   See MTD 2 at 11.   Nafus explains that, under New Mexico law, gross negligence requires allegations that the defendant committed "an act or omission with *conscious* indifference to harmful consequences and failed to exercise even slight care."   MTD 2 at 11 (quoting Smith v. Ingersoll-Rand Co., 214 F.3 1235, 1251 (10th Cir. 2000)(alterations omitted)(emphasis in MTD 2 but not in Smith v. Ingersoll-Rand Co.)(internal quotation marks omitted)).   Nafus contends that the Complaint fails to state a claim for gross negligence, because it does not allege any facts indicating that Nafus acted with conscious indifference to any alleged harmful consequences or that he failed to exercise even slight care in approving the subject loans.   See MTD 2 at 11.   Nafus asserts that the Complaint acknowledges that the loans which Nafus approved were secured by personal guarantees and collateral -- "negating any plausible inference of conscious indifference or failure to exercise even slight care."   MTD 2 at 11-12.

Nafus argues that the Complaint also fails to state a claim for breach of fiduciary duty. See MTD 2 at 12.   Nafus explains that a claim for breach of fiduciary duty must involve some conflict of interest or allegation of self-dealing at the corporation's expense.   See MTD 2 at 12 (citing Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 41, 40 P.3d 449 ("The duty between shareholders between shareholders of a close corporation is similar to that owed by directors, officers, and shareholders to the corporation itself; that is, loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of the corporation.")).   Nafus asserts that the Complaint lacks any such allegations.   See MTD 2 at 12.

Nafus also argues, in a footnote, that the Complaint's failure to allege concrete injury raises standing concerns.   See MTD 2 at 9 n.1.   Nafus points out that a plaintiff has standing only when: (i) he or she has suffered an injury in fact; (ii) there is a causal connection between the injury and the conduct of which the pleading complains, and (iii) it is likely that a favorable decision will redress the injury.   See MTD 2 at 9 n.1 (citing United States v. Colo. Sup. Ct., 87 F.3d 1161, 1164 (10th Cir. 1996)).   Nafus asserts that, even if the Complaint vaguely alleges that First Community's failure constitutes an "injury in fact," it does not allege any facts showing a causal connection between the three loans that Nafus approved and First Community's failure. MTD 2 at 9 n.1.

The FDIC responded to the MTD 2 on April 23, 2014.   See Plaintiff's Opposition to Defendant Bobby J. Nafus' Motion to Dismiss (Document 18), filed April 23, 2014 (Doc. 25)("MTD 2 Response").   The FDIC asks the Court to deny the MTD 2 for three reasons.   See MTD 2 Response at 4-8.   First, the FDIC argues that the Complaint sufficiently alleges negligence, gross negligence, and breach of fiduciary duty.   See MTD 2 Response at 4-5.   The FDIC explains that New Mexico applies an ordinary negligence standard to officers and directors.   See MTD 2 at 4 (citing N.M. Stat. Ann. § 53-11-35(B)).   In the FDIC's view, Nafus was negligent, because he approved the subject loans despite: (i) missing tax returns and financial statements from the borrowers and guarantors; (ii) missing appraisals and appraisal reviews; (iii) inadequate analysis of the borrower's and guarantor's financial information and ability to service the debt; and (iv) loan to-value and loan-to-cost ratios that exceeded the maximum that the Loan Policy prescribed.   See MTD 2 Response at 4 (citing ¶¶ 30-31, at 8-9; id. ¶¶ 37-39, at 10-12; id. ¶¶ 56-57, at 17).   Turning to its gross-negligence claim, the FDIC reiterates that numerous courts around the country have found that identical allegations exceed

ordinary negligence to sufficiently allege gross negligence.   See MTD 2 Response (citing MTD 1 Response at 9-12).   The FDIC asserts that, consequently, although New Mexico law does not distinguish between gross negligence and ordinary negligence, the Court should not dismiss its gross-negligence claim.   See MTD 2 Response at 4-5.

The FDIC asserts that the business judgment rule does not protect Nafus, because the Complaint alleges that he acted without a reasonable basis and without exercising independent judgment.   See MTD 2 Response at 5.   Moreover, the FDIC argues that Nafus' contention that a breach of fiduciary duty must involve some conflict of interest or allegation of self-dealing is incorrect.   See MTD 2 Response at 5.   Instead, according to the FDIC, "New Mexico law recognizes that directors and officers owe a duty of fiduciary care as well as of loyalty . . . ." MTD 2 Response at 5.

Second, the FDIC argues that the Complaint sufficiently alleges Nafus' personal involvement in the subject loans.   See MTD 2 Response at 5.   The FDIC asserts that the Complaint identifies precisely which of the subject loans Nafus approved and "more than adequately puts him on notice of the specific misconduct as to each transaction."   MTD 2 Response at 5.   Regarding the Kitts Development loans, the FDIC states:

> Paragraph 29 clearly states that Defendant Nafus initially approved a $2.89 million loan on January 29, 2007.   Paragraphs 30 and 31 explain the precise actions and inactions by Defendant Nafus that constitute negligence, gross negligence, and breaches of fiduciary duty.   Paragraph 35 estimates the damages directly and proximately caused by the tortious conduct of Defendant Nafus . . . .

MTD 2 Response at 6.   Regarding the K&M Development loans, the FDIC states:

> As with the Kitts Development Loan, the Complaint makes clear that both Defendant Nafus and Dolan approved the loan on March 27, 2007, (Complaint ¶ 36), and describes the specific underwriting deficiencies and departures from prudent lending principles by both defendants.   (Id. ¶¶ 36-38.)   The Complaint also clearly states that Defendant Nafus alone approved five related construction loans on January 11 2008, and described his specific tortious conduct in

approving those loans. (Id. ¶ 39)  Finally, the Complaint estimates the damages directly and proximately caused by the tortious conduct of Defendant Nafus . . .

MTD 2 Response at 6.  The FDIC concludes that, given these allegations, the Complaint gave Nafus fair and adequate notice of the loans that he approved, when he approved them, his tortious conduct in approving them, and the estimated damages that his conduct caused.  MTD 2 Response at 6-7.

Third, the FDIC contends that the Complaint sufficiently alleges damages.  See MTD 2 Response at 7-8.  The FDIC points to the Complaints' allegations that, "as a result" of Nafus' tortious conduct, it suffered damages from each loan.  MTD 2 Response (citing Complaint ¶ 35, at 10; id. ¶ 43, at 13; id. ¶ 59, at 18).  In the FDIC's view, such allegations are sufficient, because -- as Nafus recognizes -- the FDIC "need not plead each and every element of damages with specificity."  MTD 2 Response at 7 (quoting MTD 2 at 10)(internal quotation marks omitted).  Instead, the FDIC notes, it need plead only sufficient facts to make its claim "plausible."  MTD 2 Response at 7 (citation omitted)(internal quotation marks omitted).

The FDIC contends that the Complaint alleges that Nafus approved the subject loans despite underwriting deficiencies, violations of the Loan Policy, and in contravention of prudent lending practices.  See MTD 2 Response (citing Complaint ¶¶ 29-31, at 8-9).  In the FDIC's view, "it was therefore foreseeable that the loans would likely not be repaid and would in turn harm" First Community.  MTD 2 Response at 7.  The FDIC states that Nafus "cannot reasonably contend that his blind approval" of the subject loans -- "despite lacking critical information and ignoring evidence that the loans should not be approved" -- did not harm First Community when those loans were not repaid.  MTD 2 Response at 7-8.

Nafus replied to the MTD 2 Response on May 23, 2014.  See Defendant Bobby J. Nafus's Reply in Support of His Motion to Dismiss (Doc. 18), filed May 23, 2014 (Doc.

32)("MTD 2 Reply").   In the MTD 2 Reply, Nafus largely reiterates the arguments from the MTD 2.  See MTD 2 Reply at 5-8.   Nafus responds also responds to two of the FDIC's arguments in the MTD 2 Response.   See Reply at 5-8.

Responding to the FDIC's contention that breach of fiduciary duty can be premised on a general breach of the duty of care, Nafus argues that RTC v. Foley does not apply to this case for three reasons.   First, Nafus argues that, although Judge Campos stated in that case that "the complaint clearly alleges that defendants breached their duties of care to Sandia," it is unclear whether he was referring to the RTC's claims for breach of fiduciary duty, negligence, gross negligence, or all three.   MTD 2 Reply at 5 (quoting RTC v. Foley, 829 F. Supp. at 355)(internal quotation marks omitted).   Second, Nafus asserts that Judge Campos did not articulate the general breach of fiduciary duty claim that the FDIC proposes.   See MTD 2 Reply at 5 (citing RTC v. Foley, 829 F. Supp. at 355).   Third, Nafus contends that, because RTC v. Foley is a federal district court case, it cannot overrule or modify New Mexico law governing fiduciary duty claims, and especially cannot do so with respect to New Mexico cases decided after RTC v. Foley -- like Walta v. Gallegos Law Firm, P.C., and Moody v. Stribling.   See MTD 2 Reply at 5.   Nafus argues that, therefore, Walta v. Gallegos Law Firm, P.C. and Moody v. Stribling, rather than RTC v. Foley, govern the FDIC's breach-of-fiduciary duty claim.   See MTD 2 Reply at 5.

Turning to the FDIC's argument that the Complaint sufficiently alleges actual injury, Nafus points out that the cases which the FDIC cites in the MTD 1 Response are instructive on the allegations of injury required for a negligence claim.   See MTD 2 Reply at 7.   Nafus asserts that, in those cases, the injury element was met where the FDIC alleged that: (i) each of the loans at issue were subject to charge-offs of millions of dollars, see FDIC v. Switzer;

(ii) every borrower on the subject transactions defaulted, which resulted in a substantial unpaid balance owed to the bank on every transaction, see FDIC v. Castro; (iii) "as a direct and proximate result of the Defendants wrongful acts, the Bank was forced to foreclose on loans and sell the property at a substantial loss," FDIC v. Stahl, 840 F. Supp. at 126; and (iv) the defendants approved a series of loans that were not repaid -- costing the bank tens of millions of dollars, see FDIC v. Price.   See MTD 2 Reply at 7.   Nafus points out that the FDIC makes no such allegations here.   See MTD 2 Reply at 7.

Instead, according to Nafus, the Complaint alleges only that the Defendants' mistakes during the loan-approval process made it "foreseeable that the loans would likely not be repaid and would in turn harm the bank."   MTD 2 Reply at 8 7-8 (quoting MTD 2 Response at 7)(internal quotation marks omitted).   Nafus contends that a "potential eventuality, forseeable or not, is not an injury."   MTD 2 Reply at 8.   Nafus asserts that the FDIC, therefore, has neither adequately pled any cause of action in tort nor demonstrated that it has Article III standing.   See MTD 2 Reply at 8.   Nafus points out that the FDIC acknowledged in the MTD 2 Response that it does not seek damages for First Community's failure -- i.e., that First Community's failure is not the alleged injury for which it seeks relief.   See MTD 2 Reply at 8 (citing MTD 2 Response at 7).   Nafus states that the FDIC has also alleged in its Complaint that it "does not seek to collect upon [any of the aforementioned] outstanding loans."   MTD 2 Reply at 8 (quoting Complaint ¶ 1, at 1)(alterations in MTD 2 Reply but not in Complaint)(internal quotation marks omitted).   Nafus asserts that, given these two statements, there is no indication what injury the FDIC is claiming.   See MTD 2 Reply at 8.   Nafus concludes that the absence of any factual allegations in this regard renders the FDIC's tort claims deficient, and that the Court should, accordingly, dismiss them.   See MTD 2 Reply at 8.

3.      <u>The November 5, 2014, Hearing</u>.

The Court held a hearing on November 5, 2014.   <u>See</u> Transcript of Hearing (taken Nov.

5, 2014)("Tr.").   At the hearing, the parties largely reiterated the arguments from the briefing.

<u>See</u> Tr. at 5:1-87:16 (Court, Klein, Pino, Carroll).    The parties offered new arguments, however,

on Judge Gonzales' decision in <u>FDIC v. Wertheim</u>.    The First Community Defendants

contended that, implicit in Judge Gonzales' decision, is a conclusion that § 53-11-35(B)

preempts the common-law business judgment rule.   <u>See</u> Tr. at 6:2-6 (Carroll).   The First

Community Defendants argued that such a ruling is contrary to New Mexico law.   <u>See</u> Tr. at

6:10-11 (Carroll).   The First Community Defendants pointed out that the Supreme Court of

New Mexico stated in <u>Sims v. Sims</u>, 1996-NMSC-078, 930 P.2d 153 (1996), that a statute should

not be construed as supplanting the common law unless the Legislature of the State of New

Mexico specifically says it is.   <u>See</u> Tr. at 6:12-15 (Carroll).   The First Community Defendants

said that the Court reached the same conclusion in <u>Leon v. Kelly</u>, 618 F. Supp. 2d 1334 (D.N.M.

2008)(Browning, J.).   <u>See</u> Tr. at 6:15-17 (Carroll).

The First Community Defendants stated that Judge Gonzales relied on the Supreme Court

of Georgia's opinion in <u>FDIC v. Skow</u>, 763 S.E.2d 879 (Ga. 2014), which, in turn, relied on the

Supreme Court of Georgia's opinion in <u>FDIC v. Loudermilk</u>, 761 S.E.2d 332 (Ga. 2014).   The

First Community Defendants contend that, in <u>FDIC v. Loudermilk</u>, in an opinion that the

Honorable Robert Blackwell, Associate Justice of the Supreme Court of Georgia, authored, the

Supreme Court of Georgia said that "it is the process . . . by which the bank officers and directors

arrive at their decision and not the decision itself that can be questioned."   Tr. at 9:3-9

(Carroll)(citation omitted)(internal quotation marks omitted).   The First Community Defendants

point out that, in <u>FDIC v. Loudermilk</u>, Justice Blackwell said that "the standard that a bank

director is bound to exercise is not the same degree of care which a prudent man would exercise in his own business." Tr. at 9:15-18 (Carroll). The First Community Defendant's state that the business judgment rule, according to Justice Blackwell,

> would be that when a business is alleged to have been conducted negligently, the wisdom of the decision can't be challenged judicially. The officers and directors are presumed to have acted in good faith in applying the process. And the Court goes on to say that the burden of proof is on the plaintiff to establish that the common law business judgment rule requires them to prove that the process wasn't handled in that fashion.

Tr. at 10:1-9 (Carroll).

The Court asked the First Community Defendants what more they would want to see in the Complaint to overcome the business judgment rule. See Tr. at 13:5-10 (Court). The First Community Defendants replied that they would want to see an allegation addressing the director or officer's good faith in deciding whether to approve the subject loans. See Tr. at 13:11-15 (Carroll). The Court asked whether an allegation that Nafus knew that the necessary items were not in the file and made a bad-faith decision to leave them out would be enough. See Tr. at 13:16-20 (Court). The First Community Defendants responded that such an allegation would be more likely to overcome the business judgment rule. See Tr. at 13:21-23 (Carroll). The First Community Defendants argued that, to overcome the business judgment rule, there has to be something other than allegations that a file was missing documents; instead, the Complaint must include allegations about the officers' and/or directors' subjective beliefs in making those decisions. See Tr. at 13:24-14:10 (Carroll).

The Court asked Nafus what the FDIC needs to allege to establish injury. See Tr. at 30:22-24 (Court). Nafus replied that he wants to know more of a story of what happened with the loans -- such as, the subject loans were not repaid, the collateral was not sufficient to cover the loans, and/or the guarantors did not pay the amount that they guaranteed. See Tr. at 31:8-19

(Pino).   Nafus states that this lack of information is particularly important with regard to two of the three loans with which the Complaint alleges that he was connected -- the K&M Development loan and the Kitts Development loan.   See Tr. at 32:20-25 (Pino).   According to Nafus, although the Complaint alleges that he was involved in the initial approval of those loans, it also alleges that he was not involved in the other Defendants' consolidation of those loans and the other Defendants' issuance of new loans to those borrowers on the same projects.   See Tr. at 33:1-25 (Pino).   Nafus argues that the Complaint fails to explain either how he is liable for initially approving those loans, or how his liability survives the other Defendants' consolidation of those loans and issuance of new loans.   See Tr. at 33:13-17 (Pino).

The Court said that, in its understanding, standing under Article III of the Constitution of the United States of America requires that the plaintiff plead only injury-in-fact -- it does not require allegations of causation.   See Tr. at 34:21-6 (Court).   The Court asked Nafus whether the $14 million in losses that the Complaint alleges satisfies injury-in-fact for Article III purposes   See Tr. at 35:19-23 (Court).   Nafus replied that the Complaint needs something more specific, because alleging general damages is insufficient.   See Tr. at 35:24-36:6 (Pino).

The FDIC argued that § 53-11-35(B) provides directors' standard of care and the business judgment rule provides officers' standard of care.   See Tr. at 47:1-48:3 (Klein).   The FDIC explained that §§ 8.30 and 8.31 of the Model Business Corporation Act dictate such a conclusion.   See Tr. at 48:4-12 (Klein).   The FDIC explained that, in 1998, the Model Business Corporation Act ("MBCA") separated out § 8.30 -- "which is the standard of conduct" -- from § 8.31 -- "which is the standard of liability."   Tr. at 48:12-15 (Klein).   The FDIC asserted that § 8.31 codifies the business judgment rule.   See Tr. at 71:17-18 (Klein).   The FDIC stated that, before 1998, all that existed was § 8.30, and "the New Mexico statute that's in

place here essentially mirrors what the original § 8.30 was" -- in other words, New Mexico never adopted § 8.31. Tr. at 48:16-17 (Klein). In the FDIC's view, if it brought a case in a jurisdiction that had adopted § 8.31, it would have to plead that a director did not have a reasonable basis for making his decision. <u>See</u> Tr. at 71:18-22 (Klein). According to the FDIC, because New Mexico has not adopted § 8.31, it needs to allege only facts indicating that the directors were negligent and that the officers lacked a reasonable basis for their actions. <u>See</u> 49:3-17 (Klein).

The Court asked the FDIC why the New Mexico Legislature would include the duties of good faith and loyalty in § 53-11-35(B) if allegations of simple negligence alone constitute a valid claim against corporate directors. <u>See</u> Tr. 49:18-24 (Court). The Court said that, in its view, negligence is the lowest of the three standards, and, as a result, would engulf the other two. <u>See</u> Tr. at 49:24-50:1 (Court). The FDIC responded that § 53-11-35(B) provides three different bases for claims against corporate directors, because such directors have three separate duties. <u>See</u> Tr. at 50:2-3 (Klein). The FDIC explains that acting negligently violates the duty of care, acting in bad faith violates the duty of good faith, and failing to act in the corporation's best interests violates the duty of loyalty. <u>See</u> Tr. at 50:4-7 (Klein). Responding to the FDIC's contention that the business judgment rule does not apply to directors because New Mexico has not adopted § 8.31 of the MBCA, the First Community Defendants contended that the MBCA does not overrule the Supreme Court of New Mexico's or the Tenth Circuit's precedent -- which indicate that the business judgment rule protects both directors and officers. <u>See</u> Tr. at 75:11-23 (Carroll). At the end of the hearing, the Court said that it was inclined to deny the MTD 1 and MTD 2, but would take the matter under advisement, because it would have to

determine to what extent the business judgment rule protects both officers and directors.   <u>See</u> Tr. 82:20-24 (Court).

### 4. **Supplemental Authority**.

The First Community Defendants filed a notice of supplemental authority on November 12, 2014.   <u>See</u> Notice of Supplemental Authority, filed November 12, 2014 (Doc. 45)("Notice 2").   In the Notice 2, the First Community Defendants provided the Court with citations and copies of three opinions that they discussed at the November 5, 2014, Hearing: <u>Leon v. Kelly</u>, <u>FDIC v. Loudermilk</u>, and <u>Sims v. Sims</u>.   <u>See</u> Notice 2 at 1.   The FDIC responded to the Notice 2 on November 19, 2014.   <u>See</u> Plaintiff's Response to Defendants' Notice of Supplemental Authority (Document 45), filed November 19, 2014 (Doc. 47)("Notice 2 Response").   The FDIC states:

> In their Notice, Defendants rely on <u>Sims v. Sims</u> and <u>Leon v. Kelly</u> for the proposition that a "statute won't be construed as supplanting the common law unless the legislature specifically says it is."
>
> This conclusion is broader than the actual holdings.   <u>Sims</u>, for instance, merely holds that preexisting common law that does not conflict with statutory law remains to "fill in gaps not addressed by [the] statute."   Similarly, <u>Leon</u> holds that both the New Mexico Uniform Partnership Act ("UPA") and common law could apply to the formation of a partnership unless "some provision of the [UPA] displaces [the common law.]"   Furthermore, the UPA is distinguishable from the statutory business judgment rule that applies in this case because the UPA explicitly allows for common law to supplement its provisions.
>
> Neither case, therefore, contradicts this Court's recent holding in <u>FDIC v. Wertheim</u>.   In holding that "if the director violates the first sentence of Section 53-11-35(B), then the New Mexico common law business judgment rule does not apply, the <u>Wertheim</u> Order correctly applied the statutory standard first, allowing the common law to "fill in gaps not addressed by the statute."
>
> The third case cited by the Defendants is <u>FDIC v. Loudermilk</u>, which interprets the Georgia business judgment rule.   Defendants rely on this case for their argument that the FDIC-R must show the Defendants acted with a negligent decision making process.   This Court, however, has already resolved this issue by finding that "a director must first comply with the statutory mandate to act as

an ordinarily prudent person before the process by which he came to a decision can be protected by the business judgment rule."

Notice 2 Response ¶¶ 1-4, at 1-2 (footnotes omitted)(internal numbering omitted).

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress." Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).   A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.   See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").   Rule 12(b)(1) allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion.   Fed. R. Civ. P. 12(b)(1).   The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." Ruiz v. McDonnell, 299 F .3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981).   But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations.   A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).   In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

Hill v. Vanderbilt Capital Advisors, LLC, No. CIV 10-0133 JB/KBM, 2011 WL 6013025, at *8 (D.N.M. Sept. 30, 2011)(Browning, J.)(quoting Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *8-9).   The Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P.
> 56.   Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction
> -- its very power to hear the case -- there is substantial authority that the trial court
> is free to weigh the evidence and satisfy itself as to the existence of its power to
> hear the case.   In short, no presumptive truthfulness attaches to plaintiff's
> allegations, and the existence of disputed material facts will not preclude the trial
> court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed.

Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the

complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on

affidavits or other evidence properly before the court.   See New Mexicans for Bill Richardson

v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003

(10th Cir. 1995).   In those instances, a court's reference to evidence outside the pleadings does

not necessarily convert the motion to a rule 56 motion for summary judgment.   See Holt v.

United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir.

1987)).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."   Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).   The

sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a

court must accept as true all well-pleaded factual allegations in the complaint, view those

allegations in the light most favorable to the non-moving party, and draw all reasonable

inferences in the plaintiff's favor.   See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S.

308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)("To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that is plausible on its face."). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts

in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

The Tenth Circuit has held that "Iqbal establishes the importance of context to a plausibility determination." Gee v. Pacheco, 627 F.3d 1178, 1185 (10th Cir. 2010).

> "[P]lausibility" in th[e general pleading] context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue. Standing has two components. First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies. Second, standing has a prudential component. See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that, in addition to constitutional standing requirements, "the Supreme Court recognizes a set of 'prudential' standing concerns that may prevent judicial resolution of a case even where constitutional standing exists"). The burden of establishing standing rests on the plaintiff. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. at 104. The plaintiff must "allege . . . facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing." FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted). Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively

from the record."   Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).   "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."   Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

### 1. **Article III Standing.**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."   San Juan Cnty. v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).   See U.S. Const. art. III, § 2.   "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"   Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting Massachusetts v. EPA, 549 U.S. 497 (2007))(alterations in Wyoming ex rel. Crank v. United States but not in source)(internal quotation marks omitted).   "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."   San Juan Cnty. v. United States, 503 F.3d at 1171.   To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."   Smith v. U.S. Ct. of Appeals for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).   In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.   The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Systems v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.   Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova faced any imminent likelihood that it would lose some minor patients seeking abortions.   416 F.3d at 1155.   Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.   See 416 F.3d at 1155.

## 2.       Prudential Standing.

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).   Prudential standing consists of "a

judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers."   Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted). Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit."   Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d at 1112 (citations omitted)(internal quotation marks omitted).

A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."   Aid for Women v. Foulston, 441 F.3d 1101, 1111 (10th Cir. 2006)(quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).   There is an exception to this general rule, however, known as third-party standing or jus tertii. Third-party standing is allowed when: (i) "the party asserting the right has a close relationship with the person who possesses the right"; and (ii) "there is a hindrance to the possessor's ability to protect his own interests."   Aid for Women v. Foulston, 441 F.3d at 1111-12.

## ANALYSIS

The FDIC lacks constitutional standing to assert its claims against any of the Defendants. Accordingly, the Court will grant the MTD 1 and the MTD 2 and dismiss the Complaint without prejudice to the FDIC moving to amend the Complaint to properly allege the injury-in-fact and causation requirements of Article III standing.   The Court will not decide, at this time, the merits either of the MTD 1 or of the MTD 2.

## I.   THE FDIC LACKS CONSTITUTIONAL STANDING TO BRING THIS ACTION IN FEDERAL COURT.[10]

The FDIC lacks constitutional standing to bring this action in federal court.   Although the FDIC alleges three causes of action, it alleges the same injuries for each.   At the beginning of the Complaint, the FDIC states that it "seeks to recover damages exceeding $14.8 million as a result of the Defendants' negligence, gross negligence, and breaches of fiduciary duties in approving the Subject Transactions in violation of safe and sound banking principles and contrary to the Loan Policy."   Complaint ¶ 6, at 3.   The Complaint details the mistakes that Nafus, Dee, DiPaola, Dolan, and Smith made in approving the Kitts Development, Inc., Loan, and then says: "As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $1.14 million."   Complaint ¶ 35, at 10.   After describing the mistakes that Dolan, Nafus, and Fanning made in approving the K&M Development, Inc., Loan, the Complaint asserts: "As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $1.28 million." Complaint ¶ 43, at 13.   After explaining the mistakes that DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith made in approving the Katerina, Inc., Loan, the Complaint states: "As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $4.96 million."   Complaint ¶ 48, at 14.   After detailing the mistakes that DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith made in approving the Empire, LLC,

---

[10]The Defendants have not filed a formal motion to dismiss for lack of standing under rule 12(b)(1) of the Federal Rules of Civil Procedure.   Instead, Nafus raised the issue in a footnote in the MTD 2, see MTD 2 at 9 n.1, in his Reply, see Reply at 8, and at the hearing, see Tr. at 30:22-36:6 (Pino, Court).   Because the Court can raise the issue of standing on its own, however, it is unnecessary for parties to file a formal motion under rule 12(b)(1).   See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1126 (10th Cir. 2013)("A party that cannot present a case or controversy within the meaning of Article III does not have standing to sue in federal court.   And whenever standing is unclear, we must consider it sua sponte to ensure there is an Article III case or controversy before us.").

Loan, the Complaint says: "As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $3.2 million."   Complaint ¶ 53, at 17. The Complaint describes the mistakes that Dolan and Nafus made in approving the La Cuentista I, LLC, Loan, the Complaint alleges: "As a direct and proximate result of the Approving Defendants' tortious conduct, the FDIC-R incurred damages in excess of $2.95 million." Complaint ¶ 59, at 18.   Finally, after detailing the mistakes that Dolan made in approving the P.A. Loan, the Complaint says: "As a direct and proximate result of the Approving Defendants' tortious conduct, FDIC-R incurred damages in excess of $1.27 million."   Complaint ¶ 63, at 20.

Nafus asserts that the FDIC's failure to allege a concrete injury "raises standing concerns."   MTD 2 at 9 n.1.   Nafus asserts that, to establish injury in fact, a plaintiff "'must allege some concrete injury, whether actual or threatened.'"   MTD 2 at 10 n.1 (quoting United States v. Colo. Sup. Ct., 87 F.3d at 1164).   Nafus argues that, even if the FDIC adequately pled that First Community's failure constitutes an injury in fact -- which it has not -- it "utterly failed" to allege facts showing a causal connection between the Defendants' conduct in approving the subject transactions and First Community's failure.   See MTD 2 at 10 n.1.

The FDIC does not address Nafus' standing argument in its Response, but instead focuses on Nafus' argument that the Complaint does not sufficiently allege injury in fact for a negligence claim.   See MTD 2 Response at 7.   The FDIC points out that the Complaint alleges that, "as a result" of the Defendants' tortious conduct, it suffered damages with respect to each subject transaction.   MTD 2 Response at 7 (citing Complaint ¶ 35, at 10; id. ¶ 43, at 13; id. ¶ 59, at 18). The FDIC argues that it does not need to "plead each and every element of damages with specificity," but instead must only plead sufficient facts to make its claim "plausible."   MTD 2 Response at 7 (quoting Isengard v. N.M. Pub. Educ. Dep't, No. CIV 08-0300 JB/RLP, 2009 WL

5220371, at *7 (D.N.M. Dec. 9, 2009)(Browning, J.))(internal quotation marks omitted).   The FDIC argues that it cannot be disputed that its claim for damages is "plausible," because, in light of the Defendants' conduct in approving the subject transactions, "it was . . . foreseeable that the loans would likely not be repaid and would in turn harm the bank."   MTD 2 Response at 7. The Court agrees with Nafus.

To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."   Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).   The Complaint fails to establish injury in fact and causation.

First, the Complaint provides no information about what, if any, injuries the FDIC suffered.   The Tenth Circuit has said that "[e]stablishing injury in fact requires a factual showing of perceptible harm."   Bear Lodge Multiple Use Ass'n v. Babbitt, 175 F.3d 814, 821 (10th Cir. 1999)(citations omitted)(internal quotation marks omitted).   The Complaint contains no such allegations.   The Complaint does not contend, for example, that (i) any of the loans that the Defendants approved are in default; (ii) any of the loans that the Defendants approved have been restructured on terms unfavorable to the FDIC; (iii) any of the debtors have had problems servicing their debt or that such problems have not been adequately resolved by resorting to those loans' guarantors; or (iv) FDIC has had to reimburse or guarantee the loans that the Defendants approved.   Furthermore, the FDIC has acknowledged that it "does not seek to collect upon any of the outstanding loans," Complaint ¶ 1, at 1, and that it does not seek damages "from the failure of the Bank," MTD 2 Response at 7 n.1.   In fact, the Complaint contains no information about what happened to the loans after the Defendants approved them or what, if

any, affect approving those loans had on First Community.    The Complaint does not include the phrase "the FDIC was injured," or anything similar to it.    Instead, it explains for which transactions the FDIC seeks damages and the minimum amount of damages it hopes to obtain from this case.    Accordingly, the Complaint does not allege an injury in fact.    See Jebe v. Colo. Dep't of Corr., 316 F. App'x 774, 775 (10th Cir. 2009)("[A]ll litigants in federal court . . . must allege the facts constituting their injury or risk dismissal of their complaint."); Munoz-Mendoza v. Pierce, 711 F.2d 421, 425 (1st Cir. 1983)(explaining that, where an injury-in-fact is not obvious, "the plaintiff must plead their existence in his complaint with a fair degree of specificity" (citations omitted)).    The FDIC also has not offered any evidence beyond what it alleges in the Complaint to establish injury in fact.    See Swepi, LP v. Mora Cnty., N.M., No. CIV 14-0035 JB/SCY, 2015 WL 365923, at *34 (D.N.M. Jan. 19, 2015)(Browning, J.)("When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court.").

    Second, and relatedly, the Complaint does not explain how the Defendants' conduct in approving the subject transactions caused the FDIC an injury.    The Tenth Circuit has said that, "although the 'traceability' of a plaintiff's harm to the defendant's actions need not rise to the level of proximate causation, Article III does require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."    Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1225 (10th Cir. 2008)(citation omitted)(internal quotation marks omitted). Moreover, "[t]he plaintiff's burden of demonstrating causation is not satisfied when speculative inferences are necessary to connect its injury to the challenged actions."    Nova Health Sys. v. Gandy, 416 F.3d 1149, 1157 (10th Cir. 2005)(citation omitted)(internal quotation marks

omitted).    Aside from repeating the conclusory phrase "[a]s a direct and proximate result of the Approving Defendants' tortious conduct . . ." six times, the Complaint includes no facts from which the Court can reasonably infer causation.    Complaint ¶ 35, at 10; id. ¶ 43, at 13; ¶ 48, at 14; id. ¶ 53, at 17; id. ¶ 59, at 18; id. ¶ 63, at 20.    The Court has previously said -- in the context of a motion to dismiss for lack of standing -- that "a conclusory allegation, representing no more than a speculative inference . . . is not sufficient to demonstrate causation." Hill v. Vanderbilt Capital Advisors, LLC, 834 F. Supp. 2d 1228, 1253-54 (D.N.M. 2011)(Browning, J.)(citation omitted)(internal quotation marks omitted).    The Complaint includes conclusory allegations regarding causation and nothing more.    Without more details -- for example, an allegation that the Defendants' poor underwriting practices caused the loans they approved to fail or to have to be restructured on unfavorable terms, or that the Defendants' actions caused the FDIC to write those loans off or sell them at a loss -- the allegations in the Complaint do not show "a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." Habecker v. Town of Estes Park, Colo., 518 F.3d at 1225.    See Hill v. Vanderbilt Capital Advisors, LLC, 834 F. Supp. 2d at 1255-56 ("The Plaintiffs do not allege, and cannot demonstrate, that the loss of principal, loss of income, or fees and expenses caused any particularized injury to them . . . .")(emphasis in original).    Again, the FDIC has not offered any evidence beyond the pleadings to show that the Defendants caused any injury that the FDIC suffered.    Consequently, the FDIC fails to satisfy the causation requirement of constitutional standing.

      The closest analogy to this case is Hill v. Vanderbilt Capital Advisors.    Hill v. Vanderbilt Capital Advisors involved New Mexico's Educational Retirement Fund ("Retirement Fund"), which was a public pension plan that New Mexico established for the benefit of its public education employees.    See 834 F. Supp. 2d at 1233.    The Retirement Fund bought $40

million of shares in the Vanderbilt Financial Trust -- a portfolio of high-risk, speculative, and heavily leveraged collateralized debt obligations[11] that subprime mortgages backed.   See 834 F. Supp. 2d at 1234-35.   Vanderbilt Capital Advisors owned, organized, and operated, the Vanderbilt Trust.   See 834 F. Supp. 2d at 1234-35.   When the 2008 financial crisis hit and mortgage-backed securities defaulted at an unprecedented rate, the Retirement Fund lost its entire investment in the Vanderbilt Trust.   See 834 F. Supp. 2d at 1236.   The plaintiffs -- a class of 95,000 Retirement Fund defined-beneficiaries -- alleged eighteen causes of action against, among others, state employees and officials who approved the Retirement Fund's investment in the Vanderbilt Trust.   See 834 F. Supp. 2d at 1249.

The defendants moved to dismiss the plaintiffs' claims for lack of standing, arguing that the plaintiffs had not demonstrated injury in fact or causation.   See 834 F. Supp. 2d at 1249-50. The defendants contended that the complaint did not demonstrate that the plaintiffs' defined-benefit plans would not be paid in full.   See 834 F. Supp. 2d at 1251.   The plaintiffs argued that, because of the defendants' conduct, they faced contribution increases, diminished services, tax increases, and an increase in the number of years that they would have to work to obtain benefits from the Fund.   See 834 F. Supp. 2d at 1251.   The plaintiffs asserted that, because of the defendants' conduct, there was a substantial risk that "the Fund will have insufficient assets to satisfy its obligations to its Beneficiaries."   834 F. Supp. 2d at 1257.

---

[11]Collateralized Debt Obligations -- or CDOs -- are derivative investments valued by (i) their position or tranche; they are paid sequentially, from the most senior to the most subordinate; and (ii) the quality of the underlying assets represented by the instruments.   Stated differently, CDOs issue multiple classes of equity and debt that are tranched in order of seniority in bankruptcy and timing of repayment.   The equity tranche is the lowest tranche in the CDO's capital structure.   The equity tranche sustains the risk of payment delays and credit losses first, to make debt tranches less credit risky.   The equity tranche position receives what, if any, cash flows are left after the satisfaction of debt tranche claims.   See Collateralized Debt Obligation, Wikipedia.org,   http://en.wikipedia.org/wiki/Collateralized_debt_obligation   (last visited Mar. 2, 2015).

The Court concluded that the plaintiffs' lacked standing.   See 834 F. Supp. 2d at 1251-57.   The Court explained that the Complaint did not describe how: (i) investing in the Vanderbilt Trust caused the plaintiffs' taxes to increase or their services to decrease; or (ii) the Retirement Fund's decision to invest in the Vanderbilt Trust and the subsequent collapse of Vanderbilt Trust's value has affected or would affect their defined benefits.   See 834 F. Supp. 2d at 1251.   The Court said that, to establish an injury-in-fact, Retirement Fund beneficiaries must show that "the losses caused by the fiduciary breach were so grievous that the remaining pool of assets will be inadequate to pay for the plan's outstanding liabilities."   834 F. Supp. 2d at 1254 (citation omitted)(internal quotation marks omitted).   The Court explained that the Retirement Fund's $40 million investment in the Vanderbilt Trust represented only about .5% of the Retirement Fund's total value, and that the plaintiffs had not shown how such a minor loss would affect or even threaten their defined benefits.   See 834 F. Supp. at 1256.   The Court concluded that, consequently, the plaintiffs' allegations did not satisfy constitutional standing's injury-in-fact requirement.   See 834 F. Supp. 2d at 1255-57.   Regarding causation, the Court said:

> The Plaintiffs' Amended Complaint also fails to sufficiently allege causation. The Plaintiffs contend only that the VFT investment "exacerbated" problems that the Fund already faced; they do not allege that the VFT investment caused the Fund to be underfunded or the impact that the investment loss had on those problems. The Plaintiffs assert that there is a substantial risk that "due to such shortfalls the Fund will have insufficient assets to satisfy its obligations to its Beneficiaries," but connect this risk only to the shortfalls that the Fund already experienced and which the Legislature has apparently addressed. . . .   The forty-million dollar VFT investment represented only about .5% of the total value of the $8.5 billion fund. . . .   To establish causation, the Plaintiffs' must link that .5% loss to an actual and imminent threat of underfunding. . . .   Where the cause of alleged underfunding is unclear and multifaceted, the Plaintiffs must make some allegation that connects the VFT investment to the risk that their benefits will not be paid. Stating that the VFT investment and the Defendants' actions "exacerbated" already existing problems is not sufficient to establish this causal connection.

834 F. Supp. 2d at 1256-57.   Accordingly, the Court dismissed the plaintiffs' claims for lack of standing.   See 834 F. Supp. 2d at 1257

      Similar to the plaintiffs in Hill v. Vanderbilt Capital Advisors, the Complaint details the Defendants' allegedly tortious conduct and requests a minimum amount of damages, but does not allege that the FDIC suffered a specific injury or explain how the Defendants' conduct cause such an injury.   Instead, as in Hill v. Vanderbilt Capital Advisors, the FDIC asks the Court to find an injury that does not exist in the pleadings.   If anything, the Court has even less information upon which it can find standing in this case than it did in Hill v. Vanderbilt Capital Advisors, because, unlike the plaintiffs in that case -- who at least attempted to explain how the defendants' tortious conduct could affect the Retirement Fund and its benefits -- the FDIC has made no attempt to explain how the Defendants' tortious conduct affected the FDIC. Consequently, Hill v. Vanderbilt Capital Advisors demonstrates that the necessary elements of injury in fact and causation are lacking in this case.

      The complaints that the FDIC has filed in similar cases demonstrate the allegations of causation and injury that establish constitutional standing.   In FDIC v. Castro, for example, the FDIC alleged that, for each of the seven subject transactions, "each borrower defaulted, resulting in a substantial outstanding balance due to the Bank of unpaid principal and interest on each Transaction, even after accounting for the value of liquidated or unliquidated collateral and other recovery sources."   FDIC v. Castro, No. CIV 13-80596 DMM (S.D. Fla.), Complaint ¶ 98, at 28, filed June 10, 2013 (Doc. 1).   In FDIC v. Dodson, the FDIC alleged that the borrowers for each loan at issue defaulted.   See FDIC v. Dodson, No. CIV 13-0416 MW/CAS (N.D. Fla.), Complaint ¶ 47, at 13, filed July 31, 2013 (Doc. 1); id. ¶ 57, at 17; id. ¶ 63, at 18; id. ¶ 67, at 20; id. ¶ 75, at 23; id. ¶ 79, at 24.   Finally, in FDIC v. Switzer, the FDIC alleged that each of the

loans at issue were subject to charge-offs of millions of dollars.   See No. CIV 13-3834 (N.D. Cal.), Complaint ¶ 46, at 15, filed September 19, 2013 (Doc. 1-1)("Ultimately the Bank recorded charge-offs of $1.995 million on the first 132 Village Square loan, $2.409 million on the second 132 Village Square loan, and $100,000 on the line of credit to Menlo Oaks."); id. ¶ 62, at 19 ("By June 2010, the Bank charged off $1 million on each of the six Petaluma Loans."). Because the Complaint contains no such allegations, and because the FDIC has not offered any evidence beyond the pleadings to establish standing, the FDIC lacks standing to bring this case in federal court.

The only case that the FDIC cites -- Isengard v. New Mexico Public Education Department -- does not dictate a different result.   There, the plaintiff -- Chris Isengard -- sued the New Mexico Public Education Department ("NMPED") for, among other things, breach of contract.   See 2009 WL 5220371, at *1.   Isengard alleged that the NMPED unlawfully refused to pay him $25,000.00 for work he performed under their contract.   See 2009 WL 5220371, at *1.   The Court initially held that, because Isengard had not pled a separate allegation for the costs and expenses related to closing out his contract -- but had only plead his damages generally -- he did not have a separate claim for those close-out damages.   See 2009 WL 5220371, at *2.

After the Court issued its memorandum opinion and order, Isengard filed a motion to reconsider, arguing that the Court had erroneously applied the pleading standards that the Supreme Court announced in Bell Atlantic Corp. v. Twombly and in Ashcroft v. Iqbal.   See 2009 WL 5220371, at *7.   Specifically, Isengard argued that the Court's requirement that his failure to plead with specificity each and every element of damages foreclosed him from recovering such damages was in error and should be reversed.   See 2009 WL 5220371, at *7. Ruling on the motion to reconsider, the Court determined that Isengard was not attempting to

assert a separate claim of relief for consequential damages, but that his original $25,000.00 figure in the Complaint included both compensatory and consequential damages.   See 2009 WL 5220371, at *8.   Accordingly, the Court found that it was "not necessary for Isengard to parse out his damages figure in order to satisfy the pleading requirements under rule 8."   2009 WL 5220371, at *8.   Instead, the Court stated, "[t]he Supreme Court's decision[s] in Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal require only that a plaintiff plead sufficient facts to make his or her legal claim plausible."   2009 WL 5220371, at *7.

 Isengard v. New Mexico Public Education Department thus stands only for the proposition that a plaintiff does not have to spell out every component of its damages claim to assert obtain those damages at trial.   It says nothing about whether providing conclusory statements about causation and damages, alone, satisfies Article III's standing requirement. More significantly, the complaint in Isengard v. New Mexico Public Education Department clearly alleged injury in fact and causation when it stated: "Defendants DVR and Beene have refused and failed to pay the Plaintiff approximately $25,000 for work performed and billed for under Plaintiff's contract."   Complaint, filed March 20, 2008 (Doc. 1-1), Isengard v. N.M. Pub. Educ. Dep't, No Civ. 08-0300 JB/RLP (D.N.M.).   By contrast, the Complaint in this case includes no information about injury in fact or causation beyond its repeated conclusory assertion that, "[a]s a direct and proximate result of the Approving Defendants' tortious conduct . . . ," the FDIC seeks damages.   Complaint ¶ 35, at 10.   Given these differences, Isengard v. New Mexico Public Education Department is inapposite.

The Tenth Circuit has stated that, where a district court dismisses a case for lack of jurisdiction, "the dismissal must be without prejudice."   Berenton v. Bountiful City Corp., 434 F.3d 1213 (10th Cir. 2006).   See Martinez v. Richardson, 472 F.2d 1121, 1126 (10th Cir. 1973)

("It is fundamental . . . that a dismissal for lack of jurisdiction is not an adjudication of the merits and therefore . . . must be without prejudice."); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2373, at 406 (2d ed. 1995)("[D]ismissals that do not reach the merits because of a lack of jurisdiction, because the action was premature, or because it was brought by the wrong plaintiff, must be considered to have been dismissed without prejudice." (footnotes omitted)).   Accordingly, the Court will dismiss the Complaint without prejudice to the FDIC moving to amend the Complaint to properly allege the causation and injury-in-fact requirements of standing.

**IT IS ORDERED** that: (i) Certain Defendants' Motion to Dismiss, filed March 3, 2014 (Doc. 15), is granted; (ii) Defendant Bobby J. Nafus's Motion to Dismiss, filed March 3, 2014 (Doc. 18), is granted; and (iii) the Complaint, filed January 23, 2014 (Doc. 1)("Complaint"), is dismissed without prejudice to the Plaintiff Federal Deposit Insurance Corporation moving to amend the Complaint to properly allege injury in fact and causation sufficient to satisfy the standing requirement of Article III of the Constitution of the United States of America.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Mary T. Torres
Beall & Biehler Law Firm
Albuquerque, New Mexico

--and--

Dennis S. Klein
Hughes Hubbard
Miami, Florida

   *Attorneys for the Plaintiff*

Andrew G. Schultz
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

William Frank Carroll
Thomas B. Alleman
Aubrey Colvard Labanowski
Cox, Smith, Matthews Incorporated
Dallas, Texas

> *Attorneys for Defendants H. Patrick Dee, Paul D. DiPaola, V. William Dolan, Jr., John E. Fanning, Marshall G. Martin, Ronald R. Sanchez, and Pamela J. Smith*

Phil Krehbiel
Marian B. Hand
Nicholas L. Pino
Keleher & McLeod
Albuquerque, New Mexico

> *Attorneys for Defendant Bobby J. Nafus*