## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

FEDERAL DEPOSIT INSURANCE
CORP., as Receiver for First Community Bank,

      Plaintiff,

vs.                                                                    No. CIV 14-0066 JB/KBM

H. PATRICK DEE; PAUL D. DIPAOLA;
V. WILLIAM DOLAN, JR.; JOHN E.
FANNING; MARSHALL G. MARTIN;
BOBBY J. NAFUS; RONALD R.
SANCHEZ and PAMELA J. SMITH,

      Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on: (i) Plaintiff's Motion for Leave to Amend

its Complaint in Accordance with the Court's March 3, 2015 Order, filed March 10, 2015 (Doc.

67)("Motion for Leave to Amend Complaint"); (ii) Plaintiff's Motion to Stay Deadlines in this

Court's Scheduling Order, filed March 10, 2015 (Doc. 68)("Motion to Stay Deadlines"); (iii)

Notice of Adoption of Previously Filed Certain Defendants' Motion to Dismiss and Defendants'

Joint Response in Opposition to Plaintiff's Motion for Leave to Amend, filed March 31, 2016

(Doc. 97)("Notice of Adoption of Previously Filed Motion to Dismiss"); and (iv) Defendant

---

[1]This Memorandum Opinion follows the Court's order granting (i) Plaintiff's Motion for
Leave to Amend its Complaint in Accordance with the Court's March 3, 2015 Order, filed
March 10, 2015 (Doc. 67); and (ii) Plaintiff's Motion to Stay Deadlines in this Court's
Scheduling Order, filed March 10, 2015 (Doc 68).  This Memorandum Opinion and Order also
addresses: (i) Notice of Adoption of Previously Filed Certain Defendants' Motion to Dismiss and
Defendants' Joint Response in Opposition to Plaintiff's Motion for Leave to Amend, filed March
31, 2016 (Doc. 97)("Notice of Adoption of Previously Filed Motion to Dismiss"); (ii) Plaintiff's
Previously Filed Opposition to Certain Defendants' Motion to Dismiss, Response to Defendants'
Notice of Supplemental Authority, Motion for Leave to Amend the Complaint, and Reply in
Support of its Motion for Leave to Amend the Complaint in Opposition to Certain Defendants'
Notice of Adoption Filed March 31, 2016 (Dkt. No. 97), filed April 13, 2016 (Doc. 100); and
(iii) Defendant Nafus's Renewed Motion to Dismiss, filed March 31, 2016 (Doc. 98).

Nafus's Renewed Motion to Dismiss, filed March 31, 2016 (Doc. 98)("Nafus' Renewed Motion to Dismiss").   The primary issues are whether: (i) the Plaintiff Federal Deposit Insurance Corporation's Amended Complaint, filed March 10, 2015 (Doc. 67-1)("Amended Complaint"), sufficiently alleges an injury and causation to cure deficiencies in the original Complaint, filed January 23, 2014 (Doc. 1)("Complaint"); (ii) whether a stay of discovery deadlines in this case is appropriate; and (iii) whether the Amended Complaint contains sufficient factual allegations to plead negligence, gross negligence, and breach of fiduciary duty as to all, or some, of the Defendants.   The Court concludes (i) that the Amended Complaint sufficiently cures deficiencies in the original Complaint; (ii) granting a stay to the discovery deadlines would not unduly delay the case or prejudice the parties; and (iii) the Amended Complaint contains sufficient factual allegations to plead negligence, gross negligence, and breach of fiduciary duty as to all of the Defendants.   Accordingly, the Court will: (i) grant the FDIC's Motion for Leave to Amend; (ii) grant the FDIC's Motion to Stay Deadlines; (iii) deny the Notice of Adoption of Previously Filed Motion to Dismiss; and (iv) deny Nafus' Renewed Motion to Dismiss.

## FACTUAL BACKGROUND

This case arises out of a series of loans that First Community Bank of Taos, New Mexico, issued between January 29, 2007, and February 16, 2010.   The Court takes its facts from the Amended Complaint, as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure.   The Court has reorganized the Complaint's allegations to explain the facts more clearly.

### 1.    The Parties.

The FDIC is a corporation and an instrumentality of the United States of America that Congress established in the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-35(a).   See

Amended Complaint ¶ 7, at 3.  On January 28, 2011, the New Mexico Regulation & Licensing Department, Financial Institutions Division ("NMFID") appointed the FDIC as the Receiver[2] for First Community.  Amended Complaint ¶ 7, at 3.

Dee was First Community's President from May 16, 2001, to January 28, 2011, and Chief Executive Officer ("CEO") from December 31, 2009, to January 28, 2011.  See Amended Complaint ¶ 8, at 3.  He was also a member of First Community's Board of Directors from January 9, 1992, to January 28, 2011, and a member of First Community's Credit Committee from October 17, 2005, to January 28, 2011.  See Amended Complaint ¶ 8, at 3.

DiPaola was First Community's Regional President of New Mexico from 2003 to January 28, 2011.  See Amended Complaint ¶ 9, at 4.  DiPaola was a Board member from March 28, 1994, to January 28, 2011, and a Credit Committee member from July 25, 2005, to January 28, 2011.  See Amended Complaint ¶ 9, at 4.

---

[2]The FDIC's website explains:

When an insured institution fails, the FDIC is ordinarily appointed as receiver.  In that capacity, it assumes responsibility for efficiently recovering the maximum amount possible from the disposition of the receivership's assets and the pursuit of the receivership's claims.  Funds collected from the sale of assets and the disposition of valid claims are distributed to the receivership's creditors in accordance with the priorities set by law.

The FDIC seeks to terminate receiverships in an orderly and expeditious manner.  Once the FDIC has completed the disposition of the receivership's assets and has resolved all obligations, claims, and other legal impediments, the receivership is terminated, and a final distribution is made to its creditors.  Receivership creditors may include secured creditors, unsecured creditors (including general trade creditors), subordinate debt holders, shareholders of the institution, uninsured depositors, and the DIF (as subrogee).  The FDIC is often the largest creditor of the receivership.

Receivership Management Program: Program Description, Federal Deposit Insurance Corporation, https://www.fdic.gov/about/strategic/strategic/receivership.html (last visited Dec. 5, 2016).

Dolan was a First Community loan officer from October 28, 1991, to September 16, 2009, and head of First Community's Special Assets Group from February 11, 2009, to September 16, 2009.  See Amended Complaint ¶ 10, at 4.  Dolan was a Board member from July 15, 1993, to August 4, 2009, and a Credit Committee member from July 25, 2005, to September 8, 2009.  See Amended Complaint ¶ 10, at 4.

Fanning was First Community's Regional President for Southern New Mexico and Arizona from November 14, 2005, to October 21, 2008, and Chief Credit Officer ("CCO") from October 27, 2008, to January 28, 2011.  See Amended Complaint ¶ 11, at 4.  Fanning was a Board member from January 23, 2006, to January 28, 2011, and a Credit Committee member from November 15, 2005, to January 28, 2011.  See Amended Complaint ¶ 11, at 4.

Martin was corporate counsel at First Community from September 17, 2003, to January 28, 2011.  See Amended Complaint ¶ 12, at 4.  Martin was a Board member from September 15, 2003, to August 4, 2009, an advisory director from August 5, 2009, to January 28, 2011, and a Credit Committee member from July 25, 2005, to October 20, 2009.  See Amended Complaint ¶ 12, at 4.

Nafus was a senior vice president and a loan officer in First Community's "Northern New Mexico territory" from June 17, 1991, to September 11, 2009.  Amended Complaint ¶ 13, at 4. Sanchez was First Community's Regional President for Northern New Mexico and Utah from 2004 to October 5, 2009.  See Amended Complaint ¶ 14, at 4.  Sanchez was a Board member from December 16, 1993, to September 11, 2009, and a Credit Committee member from July 25, 2005, to September 8, 2009.  See Amended Complaint ¶ 14, at 4.

Smith was a loan reviewer at First Community from July 12, 2004, to October 30, 2006, CCO from October 30, 2006, to October 27, 2008, and Deputy CCO from October 27, 2008, to

January 28, 2011.  See Amended Complaint ¶ 15, at 4-5.  Smith was a Credit Committee member from July 25, 2005, to January 28, 2011, and served as its Chairwoman from November 21, 2006, to October 21, 2008.  See Amended Complaint ¶ 15, at 5.

2.     **Background.**

In or about 2002, First Community began to expand its operations into unfamiliar markets and promote a production-driven lending culture while ignoring appropriate credit-risk management practices.  See Amended Complaint ¶ 21, at 5.  As a result, First Community's commercial real estate ("CRE") loan concentrations -- including acquisition, development, and construction loans ("ADC") -- rapidly increased "to dangerous levels."  Amended Complaint ¶ 21, at 5.  By 2007, those loans constituted more than seventy-four percent of First Community's loan portfolio -- placing it in the upper ninetieth percentile of its peer group from 2007 to 2010.  See Amended Complaint ¶ 21, at 5-6.  This "reckless lending" ultimately led to a significant increase in classified assets,[3] which increased sharply from thirty-two million dollars in 2006 to $538 million in 2009.  Amended Complaint ¶ 23, at 6.

At all relevant times, First Community's Loan Policy ("Loan Policy") required senior management to "instill a credit culture that fosters and actively supports the extension of credit on sound, fundamental lending principles."  Amended Complaint ¶ 25, at 6 (internal quotation marks omitted).  The Loan Policy mandated that "[c]redit was only to be granted to reputable borrowers and only when supported by acceptable and reliable financial information."  Amended Complaint ¶ 25, at 6.

For each loan, the Loan Policy required, among other things:

---

[3]"Classified loans have unpaid interest and principal outstanding, and it is unclear whether the bank will be able to recoup the loan proceeds from the borrower."  Classified Loan. Investopedia.org,  http://www.investopedia.com/terms/c/classified-loan.asp (last visited Dec. 5, 2016).

(a) that the loan comply in all respects with the spirit and letter of all applicable laws and regulations; (b) a loan write up that referenced the industry outlook, the borrower's position within the industry, and, if applicable, the current concentration guideline, exposure, and control limits for each credit; (c) two years (three years, as of August 11, 2009) of financial information from the borrower and all guarantors, and a current interim financial statement if the loan request occurred more than 6 months after the borrower's last fiscal year end; (d) an accountant-prepared compilation statement for loans under $3 million, a CPA-prepared financial statement for loans between $3 million and $5 million, or an audited financial statement for loans over $5 million; (e) an analysis of the adequacy and reliability of historic and anticipated cash flows; (f) financial spreads for operating companies with relationship amounts of $250,000 or more; (g) a maximum term of 2 years, or 3 years with supporting authority, for ADC loans; and a maximum term of 18 months for non-owner occupied commercial construction loans; (h) a maximum loan-to-value ratio[4] of the lesser of 75 percent of the appraised value or 85 percent of costs (75 percent of costs, as of January 1, 2009) for ADC loans; a maximum loan-to-value ratio of the lesser of 75 percent of the appraised value or 80 percent of costs (75 percent of costs, as of January 1, 2009) for non-owner occupied commercial construction loans and non-owner occupied CRE loans; and a maximum loan-to-value of the lesser of 65 percent of the appraised value or cost for loans to acquire unimproved land; and (i) an appraisal less than a year old from an independent source for all property taken as collateral.

Amended Complaint ¶ 26, at 6-7 (internal quotation marks omitted).

### 3.    The Kitts Development, LLC, Loans.

On or about January 29, 2007, Nafus approved a $2.89 million loan to Kitts Development, LLC, to fund the acquisition and development of a 10.07-acre site. See Amended Complaint ¶ 29, at 8. Kitts Development's principal, T.J.,[5] served as the loan's guarantor. See Amended Complaint ¶ 29, at 8.

---

[4]The loan-to-value ratio is used "to express the ratio of a loan to the value of an asset purchased." Loan-to-Value Ratio, Wikipedia.org, en.wikipedia.org/wiki/Loan-to-value_ratio (last visited Dec. 5, 2016).

[5]The Amended Complaint states that certain transactions "are described using the initials of the individual borrowers and guarantors for privacy reasons." Amended Complaint ¶ 28, at 8. T.J. is one of those guarantors.

Nafus made a number of mistakes in approving the loan.  See Amended Complaint ¶ 30, at 8.  First, Nafus failed to analyze Kitts Development's financial strength alone, but instead relied on the combined financial information of Kitts Development and Larkspur, LLC -- both of which T.J. owned.  See Amended Complaint ¶ 30, at 8.  Second, Nafus relied on the cash-flow analysis in Kitts Development's Loan Approval Form ("LAF") that improperly double-counted T.J.'s and Larkspur, LLC's income.  See Amended Complaint ¶ 30, at 8.  Third, although the LAF presented a rudimentary cash flow analysis for T.J., Nafus failed either to conduct a global cash-flow analysis that included both Kitts Development and T.J., or to verify either party's assets.  See Amended Complaint ¶ 30, at 8.  Fourth, Nafus ignored a number of red flags in the financial information that he received which indicated that the loan should not be approved: (i) Larkspur, LLC was the sole source of T.J.'s income, but did not guarantee the loan; (ii) Larkspur, LLC's financial information indicated a heavy twenty-five to one debt-to-worth ratio; (iii) the LAF calculated Kitts Development's debt-service-coverage ratio using only Larkspur, LLC's financial information -- even though Larkspur, LLC was neither a borrower nor a guarantor; (iv) the LAF presented two dramatically conflicting debt-service-coverage ratios[6]: nineteen to one and 1.15:1; and (v) the nineteen to one ratio was improperly calculated using Larkspur, LLC's working capital rather than its income.  See Amended Complaint ¶ 31, at 8-9.

On or about September 23, 2009, Dee, DiPaola, Dolan, and Smith approved a transaction that consolidated Kitts Development's initial $2.98 million loan with an unsecured line of credit and an additional $1.03 million to fund additional construction costs on the project.  See Amended Complaint ¶ 32, at 9.  Dee, DiPaola, Dolan, and Smith approved the transaction

---

[6]The debt service coverage ratio is "the ratio of cash available for debt servicing to interest, principal, and lease payments. . . .  The higher this ratio is, the easier it is to obtain a loan."  Debt Service Coverage Ratio, Wikipedia.org, en.wikipedia.org/wiki/Debt_service_coverage_ratio (last visited Dec. 6, 2014).

despite numerous Loan Policy violations, and violations of prudent lending practices and procedures.  See Amended Complaint ¶ 33, at 9.  Specifically, they ignored continued indications that Kitts Development and T.J. were not creditworthy and that their financial information was unreliable.  See Amended Complaint ¶ 33, at 9.  For example, Kitts Development reported on its 2007 tax returns -- the most recent available at the time of the loan's approval -- $219,000.00 in gross revenue, and a net loss of $1.375 million.  See Amended Complaint ¶ 33, at 9.  By contrast, Kitts Development reported in its December 31, 2007, financial statement $890,000.00 in gross revenue, and a net gain of $799,000.00.  See Amended Complaint ¶ 33, at 9.  The December 31, 2007, financial statement also reported no liabilities, despite that Kitts Development was indebted for at least the amount outstanding on the prior First Community loan.  See Amended Complaint ¶ 33, at 9.  The LAF on which Dee, DiPaola, Dolan, and Smith relied to approve the loan failed either to explain or to question these discrepancies.  See Amended Complaint ¶ 33, at 9.  Moreover, the Kitts Development loan's loan-to-value ratio was reported as 103% -- well beyond the maximum seventy-five percent that the Loan Policy permitted.  See Amended Complaint ¶ 33, at 9.  The LAF also failed to explain why T.J., with a reported net worth of $6.619 million, was not required to contribute additional equity to keep the loan-to-value ratio below seventy-five percent.  See Amended Complaint ¶ 33, at 9.

   **4.**  **The K&M Development, Inc., Loans.**

On or about March 27, 2007, Dolan and Nafus approved an $885,000.00 loan to K&M Development, Inc. to fund the purchase and development of a lot containing a former Knights of Columbus facility into fourteen townhomes.  See Amended Complaint ¶ 36, at 10.  K&M Development's principal, M.D., guaranteed the loan.  See Amended Complaint ¶ 36, at 10.

Dolan and Nafus approved the loan despite numerous violations of the Loan Policy, and of prudent lending practices and procedures.  See Amended Complaint ¶ 37, at 10.

First, they approved the loan without sufficient financial information from M.D. or K&M Development.  See Amended Complaint ¶ 37, at 10.  The most recent tax returns that M.D. provided in support of the loan were from 2004 -- three years before the loan was approved.  See Amended Complaint ¶ 37, at 10.  Although M.D. reported that her 2007 income was $9,000.00 per month, there is no indication that either Dolan or Nafus attempted to verify the source of her income.  See Amended Complaint ¶ 37, at 10-11.  Dolan and Nafus neither analyzed nor received any financial information from K&M Development.  See Amended Complaint ¶ 37, at 10.  The LAF on which Dolan and Nafus relied explained that, because K&M Development was newly formed, none of its financials were available.  See Amended Complaint ¶ 37, at 10.  The LAF also stated, however, that M.D. received the development company that she had co-owned with her ex-husband -- Cerami Building and Design -- through their divorce settlement, and changed the name to K&M Development.  See Complaint ¶ 37, at 10.  Despite this information, the LAF failed to analyze either financial information from Cerami Building and Design, or any projected financial information for K&M Development.  See Amended Complaint ¶ 37, at 10.

Second, Dolan and Nafus relied on an LAF that failed to discuss M.D.'s experience -- or lack thereof -- as a developer aside from noting that she was a "principal" in her husband's construction business.  Amended Complaint ¶ 37, at 10.  Had Dolan and Nafus required additional information on M.D.'s background, they would have discovered that she had virtually no commercial real estate development experience and had never worked on a project of this size.  See Amended Complaint ¶ 37, at 10-11.

Third, Nafus and Dolan ignored significant red flags indicating that the loan should not be approved.  See Amended Complaint ¶ 38, at 11.  For example, because there was no analysis or verification of M.D.'s finances, there was not a reliable secondary source of repayment -- making the transaction "undesirable" under the Loan Policy.  Amended Complaint ¶ 38, at 11.  M.D. also had not obtained the necessary building permits.  See Amended Complaint ¶ 38, at 11.  Moreover, the proposed loan had a loan-to-value ratio of seventy-five percent -- the maximum that the Loan Policy permitted.  See Amended Complaint ¶ 38, at 11.  The appraisal used to value the collateral and calculate the loan-to-value ratio, however, assumed that the necessary building permits would be issued and construction would not be delayed.  See Amended Complaint ¶ 38, at 11.  Because the necessary building permits had not been issued at the time of the loan's approval -- and, in fact, were never issued -- the loan-to-value ratio was in excess of the Loan Policy's limit.  See Amended Complaint ¶ 38, at 11.  There was also evidence that M.D. would have difficulty paying off her debt.  See Amended Complaint ¶ 38, at 11.  Her liquidity was very limited -- with $160,000.00 in cash and $360,000.00 in liabilities.  See Amended Complaint ¶ 38, at 11.  That she had also taken out a $300,000.00 home equity line of credit to fund the project further compounded the dangers of her limited liquidity.  See Amended Complaint ¶ 38, at 11.

On or about January 11, 2008, Nafus approved five $314,140.00 construction loans to K&M Development -- for a total of $1.571 million.  See Amended Complaint ¶ 39, at 11.  Each loan funded the construction of one townhome as part of the development project described previously.  See Amended Complaint ¶ 39, at 11-12.  Although the LAFs for these loans did not reflect the entire project's the loan-to-value ratio, the ratio reached eighty-six percent with this additional funding -- above the seventy-five percent maximum ratio that the Loan Policy

permitted.  See Amended Complaint ¶ 39, at 12.  This ratio was "especially egregious," because the LAFs indicated that the real estate market was "softening" -- suggesting that First Community would have a difficult time selling the townhomes.  Amended Complaint ¶ 39, at 12.

On or about November 20, 2008, Dolan, and on or about November 21, 2008, Fanning approved a renewal and consolidation of the initial loan and the five construction loans, and approved an additional $216,072.10 to cover interest and "carrying costs" for an additional year -- for a total loan commitment of $1.526 million.  Amended Complaint ¶ 40, at 12.  In approving the loan, Dolan and Fanning ignored multiple warning signs that indicated the loan should not have been approved.  See Amended Complaint ¶¶ 40-41, at 12-13.

First, as with the previous loans, M.D. did not provide current tax returns, which meant that Dolan and Fanning had to rely on First Community's projections to determine her current financial situation.  See Amended Complaint ¶ 41, at 12.  Second, there was significant evidence that neither K&M Development nor M.D. were creditworthy.  See Amended Complaint ¶ 42, at 12.  For example, a First Community loan officer estimated M.D.'s liquid and personal assets at $0.00.  See Amended Complaint ¶ 42, at 12.  M.D.'s ability to repay the loans, thus, turned on whether she could sell her illiquid water rights to property that she was developing -- a situation that the Loan Policy considered "undesirable."  Amended Complaint ¶ 42, at 12.  Third, the LAF acknowledged that M.D. "had very nominal commercial development experience and has never completed a project of this size or nature."  Amended Complaint ¶ 42, at 13 (internal quotation marks and brackets omitted).  Fourth, although the LAF indicated that M.D. planned to alter the project from fourteen townhomes to thirty condominiums, she had not obtained the necessary permits to do so.  See Amended Complaint ¶ 42, at 13.

5.    __The Katerina, Inc., Loans__.

On or about March 29, 2007, Dolan, Fanning, Sanchez, Martin, and Smith approved a

$6.88 million loan to Katerina, Inc., to fund a land-swap deal with the State of New Mexico and

refinance two land loans -- one of which was from First Community in the amount of $1.056

million.  See Amended Complaint ¶ 44, at 13.  Katerina, Inc.'s principal, P.P., and Philippou,

LLC guaranteed the loan.  See Amended Complaint ¶ 44, at 13.  Dolan, Fanning, Sanchez,

Martin, and Smith approved the loan "despite numerous departures from the Loan Policy and

prudent lending practices."  Amended Complaint ¶ 45, at 13.

First, they failed to require sufficient financial information before approving the

transaction.  See Amended Complaint ¶ 45, at 13.  The financial information was so lacking that

the loan's LAF acknowledged that the "compiled quality of the financial statements" was a

weakness of the loan.   Amended Complaint ¶ 45, at 13.   Moreover, although the LAF

acknowledged that Katerina, Inc.'s income came primarily from land and lot sales, its cash flow

analysis did not consider Katerina, Inc.'s ability to pay off its loan if a slumping housing market

caused its revenues to decline.  See Complaint ¶ 45, at 13-14.  Fanning, Dolan, Martin, and

Smith also did not review the appraisals of the loan's collateral before approving the loan.  See

Amended Complaint ¶ 46, at 14.

Second, Fanning, Dolan, Martin, and Smith approved the loan even though its LAF

acknowledged there was no formal succession plan in place for P.P.'s businesses.   See

Complaint ¶ 47, at 14 (alterations and internal quotation marks omitted).  Had these defendants

required P.P. to submit a succession plan, his businesses could have avoided the substantial

delays on its development projects that occurred after P.P. became incapacitated from illness.

See Amended Complaint ¶ 47, at 14.

Third, Fanning, Dolan, Martin, and Smith approved the loan despite significant warning signs regarding the valuation of the loan's collateral.  See Complaint ¶ 46, at 14.  The loan had a loan-to-value ratio of sixty-two percent -- within the Loan Policy's sixty-five percent maximum loan-to-value ratio for raw land.  See Complaint ¶ 46, at 14.  The appraised value used to calculate this ratio, however, did not account for the costs of selling the collateral -- e.g., the holding costs, marketing costs, and "entrepreneurial profit."[7]  Amended Complaint ¶ 46, at 14.

### 6.    The Empire at Estrella Town Center, LLC, Loans.

On or about July 16, 2007, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith approved a $10.7 million loan to Empire at Estrella Town Center, LLC ("Empire, LLC") to refinance an acquisition and development loan from another bank, and to provide additional funding for constructing and developing a shopping mall.  Amended Complaint ¶ 49, at 14. R.F., K.F., G.J., K.A.J., Meritage Investments, and ECD, LLC, ("Empire Guarantors") guaranteed the loan.  Amended Complaint ¶ 49, at 15.  DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith made four mistakes in approving the loan.  See Amended Complaint ¶¶ 50-52, at 15-16.

First, they approved the loan without sufficient financial information from Empire, LLC, or the Empire Guarantors.  See Amended Complaint ¶ 50, at 15.  The 2006 financial statements from R.F., K.F., F.J., and G.J. showed "Investments in Closely Held Business" as an asset, which was calculated on a "net equity" basis -- i.e., without accounting for any related debt.  Amended Complaint ¶ 50, at 15.  The financial statements, therefore, made it impossible for DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith to know the extent to which the closely held businesses were indebted to R.F., K.F., F.J., and G.J., and/or whether R.F., K.F., F.J., and G.J.

---

[7]The Complaint does not explain what constitutes "entrepreneurial profit" or how it differs from "marketing costs."

served as those businesses' guarantors.  See Amended Complaint ¶ 50, at 15.  DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith also did not: (i) verify Empire, LLC's, or the Empire Guarantors' financial information; (ii) obtain a credit report from Empire, LLC; (iii) check Empire, LLC's credit with its prior lender; or (iv) conduct a global cash-flow analysis of all of the "principals' entities and debt service obligations."[8]  Amended Complaint ¶ 50, at 15.

Second, they approved the loan despite that certified public accountants did not prepare any of the Empire Guarantors' financial statements -- as the Loan Policy required.  See Amended Complaint ¶ 50, at 15.  Third, they ignored a number of warning signs that the loan should not be approved.  See Amended Complaint ¶ 51, at 15.  For example, the LAF's cash-flow analysis on which DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith relied in approving the loan showed that the project's cash flow would not be sufficient to service the loan.  See Amended Complaint ¶ 51, at 15.  There were also clear discrepancies in the reported financial information.  See Amended Complaint ¶ 51, at 15.  Although the principals reported contributing $2.186 million in equity to the project, Empire, LLC's 2006 financial statements show that they had only $684,549.00 in equity in the project.  See Amended Complaint ¶ 51, at 15.

Fourth, they approved the loan based on an appraisal of the loan's collateral that failed to account for the costs of selling the collateral -- e.g., holding costs, marketing costs, or "entrepreneurial profit."  Amended Complaint ¶ 52, at 16.  This approval was problematic, because the property's appraised value was, in turn, used to calculate the loan's seventy-five percent loan-to-value ratio.  See Amended Complaint ¶ 52, at 16.  Because the loan was already at the maximum loan-to-value ratio that the Loan Policy permitted, the actual loan-to-value ratio

---

[8]The Complaint does not identify Empire, LLC's principals.

-- adjusted for those costs -- exceeded the Loan Policy's maximum.  See Amended Complaint ¶ 52, at 16.

On or about February 16, 2010, Dee, DiPaola, Fanning, and Martin approved a renewal of the loan, restructured the loan, and authorized $144,000.00 in additional funds.  See Amended Complaint ¶ 53, at 16.   The total outstanding amount of the loan after the approval was $8,084,686.18.   See Amended Complaint ¶ 53, at 16.   Dee, DiPaola, Fanning, and Martin approved the loan's renewal despite there not being a clear funding source to meet the debt's payments.  See Amended Complaint ¶ 54, at 16.  The project's cash flow remained insufficient to pay off any of the principal, and the Empire Guarantors had already refused to pay the loan personally despite their obligations as guarantors.  See Amended Complaint ¶ 54, at 16.  Dee, DiPaola, Fanning, and Martin approved the loan on an interest-only basis, despite that it exceeded the Loan Policy's maximum term for interest-only payments by over a year.  See Complaint ¶ 54, at 16.  By this time, the loan's loan-to-value ratio had risen to 87.52% -- well beyond the seventy-five percent maximum ratio that the Loan Policy permitted.  See Amended Complaint ¶ 54, at 16.  Moreover, Dee, DiPaola, Fanning, and Martin disregarded the LAF, which acknowledged that "alternative financing is unlikely."  Amended Complaint ¶ 54, at 16 (brackets and internal quotation marks omitted).

### 7.    The La Cuentista I, LLC, Loan.

On or about October 26, 2007, Dolan and Nafus approved a $3,071,822.00 loan to La Cuentista I, LLC, to fund the acquisition and development of a 140-lot subdivision.   See Amended Complaint ¶ 56, at 17.  "The seven partner developers and their corporate entities were guarantors for the loan."  Amended Complaint ¶ 56, at 17.  Dolan and Nafus made three mistakes in approving this loan.  See Complaint ¶¶ 57-59, at 17-18.

First, they relied on faulty analyses of the guarantors' financial information.   See Amended Complaint ¶ 57, at 17.   The LAF on which Dolan and Nafus relied improperly considered the guarantors' working capital as liquidity, and failed to account for the guarantors' pre-existing loan-payment obligations.   See Amended Complaint ¶ 57, at 17.   Second, although the Loan Policy required the loan officer to "analyze the contractor's[9] capabilities both in terms of finance and past performance," Dolan and Nafus did not require such an evaluation. Amended Complaint ¶ 57, at 17.

Third, they ignored multiple warning signs indicating that the loan was "extremely risky."   Amended Complaint ¶ 57, at 17.   For example, two of the guarantor limited liability corporations had negative working capital, and two of the individual guarantors had negative cash flow to make loan payments.   See Amended Complaint ¶ 57, at 17.   Moreover, although the LAF reported that the loan-to-cost ratio was within Loan Policy limits, First Community had already granted La Cuentista, LLC, a loan to provide 100% financing for the project -- including interest reserves of $490,000.00 and cost overruns.   See Amended Complaint ¶ 58, at 17. Consequently, when compared to the total development costs, the actual loan-to-cost ratio for the project was approximately 106% -- far above the seventy-five percent maximum that the Loan Policy permitted.   See Amended Complaint ¶ 58, at 17.   The loan was also structured so that each guarantor was responsible for only one-seventh of the debt -- despite that the financial information clearly showed that some guarantors were financially stronger than others.   See Amended Complaint ¶ 58, at 17.   Furthermore, the collateral appraisal warned of a declining real estate market, stating:

> [B]etween the end of the 2nd quarter 2006 and 2007 all market areas referenced show dramatic declines in permits issued with declines of 39% and 56% noted.

---

[9]The Amended Complaint does not identify a contractor for the La Cuentista Loans.

> This decline in permits is in direct response to the dramatic slowdown in the housing market due to a large number of foreclosures nationwide because of questionable mortgage practices.

Amended Complaint ¶ 58, at 18 (internal quotation marks omitted).

### 8.     The P.A. Loan.

On or about January 10, 2008, Dolan approved a two-million-dollar commercial revolving line of credit to P.A. to fund the purchase of trucks that P.A. planned to retrofit with proprietary cleaning machinery for P.A.'s company, Blast N Clean.  See Amended Complaint ¶ 60, at 18.  Dolan approved the loan despite multiple violations of the Loan Policy and of prudent lending practices.  See Amended Complaint ¶ 61, at 18.

First, Dolan approved the loan without receiving financial statements either for P.A., or for Blast N Clean.  See Amended Complaint ¶ 61, at 18-19.  Second, there is no evidence that Dolan attempted to verify P.A.'s assets.  See Amended Complaint ¶ 61, at 19.  Third, Dolan did not request or conduct an independent appraisal of the eight trucks listed as collateral, but assumed that their value was their cost plus the cost of retrofitting them with the cleaning equipment.  See Amended Complaint ¶ 61, at 18-19.  Besides the failure to use an independent appraiser, this estimate was faulty, because it was "highly unlikely that each truck could be liquidated at full cost due to the proprietary nature of the cleaning equipment."  Amended Complaint ¶ 61, at 19.

Fourth, Dolan disregarded a number of warning signs indicating that he should not approve the loan.  See Amended Complaint ¶ 62, at 19.  For example, the last two years of P.A.'s tax returns showed an insufficient cash flow to make loan payments.  See Amended Complaint ¶ 62, at 19.  Moreover, P.A.'s cash-flow analysis included his two other companies -- neither of which was a guarantor of the loan.  See Amended Complaint ¶ 62, at 19.  Without those two

companies, P.A.'s cash flow was insufficient to support even his pre-existing debt, let alone the debt payments associated with the new First Community loan.  See Amended Complaint ¶ 62, at 19.  Furthermore, the LAF assumed that at least fifty percent of P.A.'s trucks would sell and failed to analyze P.A.'s ability to make loan payments if none of the trucks sold.  See Amended Complaint ¶ 62, at 19.  The value of P.A.'s non-truck collateral, after accounting for all senior liens, was less than the loan's principal.  See Amended Complaint ¶ 62, at 19.  The loan also should have been considered "undesirable" under Loan Policy, which classified "loans with a unique industry, wherein the lender lacks specialized expertise to properly evaluate the risks, or manage the credit," and "loans secured by collateral of uncertain marketability," as undesirable. Amended Complaint ¶ 62, at 19 (internal quotation marks and brackets omitted).

## PROCEDURAL BACKGROUND

The FDIC alleges three claims against the Defendants: (i) negligence, see Amended Complaint, ¶¶ 64-69, at 20-21; (ii) gross negligence, see Amended Complaint ¶¶ 70-75, at 21-23; and (iii) breach of fiduciary duties, see Amended Complaint ¶¶ 76-79, at 23-24.  Regarding the negligence and gross negligence claims, the FDIC alleges that the Defendants owed a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to, the following:

> (a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those loans that conformed with the Loan Policy; (c) ensuring that any transactions they approved were underwritten in a safe and sound manner; (d) ensuring that any transactions they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) ensuring that any transactions they approved were made to creditworthy borrowers; (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations; and (g) ensuring that any transactions they approved did not create unsafe and unsound concentrations of credit.

Amended Complaint ¶ 66, at 20.  See id. ¶ 73, at 22.  The FDIC alleges that the Defendants were

negligent, grossly negligent, and breached their fiduciary duties in their actions and inactions,

including, but not limited to, the following:

> (a) failing to inform themselves about the Subject Transactions and their risks
> before approving them; (b) approving the Subject Transactions on terms that
> violated the Loan Policy; (c) failing to ensure that the Subject Transactions were
> underwritten in a safe and sound manner before approving them; (d) failing to
> ensure that the Subject Transactions were secured by sufficiently valuable
> collateral and guarantees in order to prevent or minimize risk; (e) approving
> Subject Transactions to borrowers who were not creditworthy; (f) failing to
> ensure that the Subject Transactions did not violate applicable banking laws and
> regulations; (g) failing to ensure that the Subject Transactions did not create
> unsafe and unsound concentrations of credit; and (h) approving the Subject
> Transactions without proper analysis of the borrower's ability to satisfy the debt.

Amended Complaint ¶ 67, at 20-21.  See id. ¶ 74, at 22-23; id. ¶ 78, at 23.

### 1.  **The MTD 1.**

Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith ("First Community

Defendants") filed their Certain Defendants' Motion to Dismiss on March 3, 2014.  See Certain

Defendants' Motion to Dismiss at 1 (Doc. 15)("MTD 1").  The First Community Defendants

begin the MTD 1 by explaining that N.M. Stat. Ann. § 53-11-35(B) and the common-law

business judgment rule define corporate officers' and directors' standard of care in New Mexico.

See MTD 1 at 13-14.  According to the First Community Defendants, § 53-11-35(B) states, in

pertinent part:

> A director shall perform his duties as a director, including his duties as a member
> of any committee of the board upon which the director may serve, in good faith,
> in a manner the director believes to be in or not opposed to the best interests of
> the corporation, and with such care as an ordinarily prudent person would use
> under similar circumstances in a like position.

MTD 1 at 6 (quoting N.M. Stat. Ann. § 53-11-35(B))(internal quotation marks omitted).  The

First Community Defendants assert that § 53-11-35 dictates that a director's or officer's liability

is assessed individually and cannot be based on group decisions.  See MTD 1 at 13.  The First Community Defendants argue that § 53-11-35's plain text prohibits claims of ordinary negligence against directors and officers, because it states that they are not liable unless they subjectively believe their actions are not in the corporation's best interests.  See MTD 1 at 13. The First Community Defendants contend that the common-law business judgment rule also protects corporate directors and officers.  See MTD 1 at 13.  According to the First Community Defendants, the rule indicates that such individuals cannot be held liable for negligence unless the plaintiff also pleads fraud, conflict of interest, or waste in addition to any alleged violations of § 53-11-35(B).  See MTD 1 at 13.

The First Community Defendants argue that the Court should dismiss the Complaint for three reasons.  See MTD 1 at 16-20.  First, the First Community Defendants assert that the subjective element in § 53-11-35 indicates that allegations of ordinary negligence -- which involve a reasonable-person standard -- do not state a valid cause of action against corporate officers or defendants.  See MTD 1 at 16-17.  The First Community Defendants note that, under the United States Court of Appeals for the Tenth Circuit's holding in FDIC v. Schuchmann, 235 F.3d 1217 (10th Cir. 2000), the party seeking to impose liability must show "a lack of good faith and that each director or officer separately did not believe his or her actions were in the best interests of the corporation."  MTD 1 at 17.  According to the First Community Defendants, because the Complaint fails to satisfy either of these requirements, it does not state a claim for which relief can be granted.  See MTD 1 at 17.

Second, the First Community Defendants contend that "gang pleading" negligence is not permitted.  MTD 1 at 17.  The First Community Defendants note that the Complaint alleges, for example, that "no Defendant voted against any of the Subject Transactions."  MTD 1 at 17

(citing Complaint ¶ 27, at 7)(internal quotation marks omitted).   In the First Community

Defendants' view, "[s]uch pleading is insufficient," because the relevant issue is whether a

defendant voted for the subject loan.  MTD 1 at 17.  In support of this proposition, the First

Community Defendants cite Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d

1231 (10th Cir. 2013), in which the Tenth Circuit, in an opinion that the Honorable Stephanie K.

Seymour, United States Circuit Judge for the Tenth Circuit, authored, and Judges Lucero and

Tymkovich joined, stated:

> Ms. Burnett's complaint is not just deficient because it attributes actions to a large
> group of collective "defendants," which includes fifty unknown Doe defendants
> in addition to MERS and Mr. Woodall, but also because it is a litany of diverse
> and vague alleged acts ("emails, faxes, correspondence, and/or meetings, and the
> like") with zero details or concrete examples.  From such broad allegations
> against a large and mostly anonymous group of people, this court cannot "draw
> the reasonable inference that the defendant [Mr. Woodall] is liable for the
> misconduct alleged," because **we cannot tell which defendant is alleged to have
> done what, nor can we tell what the misconduct was.**

MTD 1 at 4 (quoting Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d at

1240)(alterations in MTD 1 but not original)(emphasis in MTD 1 but not in original)(internal

quotation marks omitted).

The First Community Defendants argue that, with few exceptions -- which themselves

are insufficient to state a claim -- the FDIC makes no attempt to plead each individual director's

or officer's specific failures in approving the subject loans.  See MTD 1 at 17.  Third, the First

Community Defendants maintain that New Mexico law does not require them to be perfect in

making their corporate decisions or to "apply the same microscope" to the subject loans'

applications that the FDIC has.  MTD 1 at 18.  Instead, the First Community Defendants assert,

the focus in determining their liability "is on process, not results."  MTD 1 at 18.

The First Community Defendants state that they anticipate the FDIC will argue that they are entitled to § 53-11-35(B)'s protections only if they show that they were fully informed about the subject loans.  See MTD 1 at 18-19.  The First Community Defendants say that such an assertion is contrary to both § 53-11-35(B)'s plain language and FDIC v. Schuchmann.  The First Community Defendants note that, in FDIC v. Schuchmann, in an opinion that the Honorable Carlos F. Lucero, United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, wrote, and Judges Anderson and Broby joined, the Tenth Circuit held that the FDIC bears the burden to prove the defendants' lack of good faith and lack of a subjectively honest belief that their actions were in the corporation's best interests.  See MTD 1 at 19.

The First Community Defendants say that the FDIC may also argue that, because its claims are fact-intensive, the Court should not dismiss the Complaint until it can develop the record.  See MTD 1 at 19.  The First Community Defendants assert that such a contention not only flies in the face of the FDIC's conduct preceding this case, but also runs afoul of the plausibility pleading standard.  See MTD 1 at 20.  The First Community Defendants point out that the FDIC has "unprecedented investigatory powers," and "more than ample time and opportunity," to develop facts showing the Defendants' lack of individual good faith.  MTD 1 at 20.  In the First Community Defendants' view, seeking further development of the record would indicate only that the FDIC has not pled sufficient facts to support a motion to dismiss.  See MTD 1 at 20.

Taking up the FDIC's gross-negligence claim, the First Community Defendants assert that the Complaint makes no allegations that satisfy the elements of "individual bad faith and individualized subjective lack of honest belief that are necessary to support a claim of gross negligence under New Mexico law."  MTD 1 at 20-21.  In the First Community Defendants'

view, the Complaint states only that there were violations of internal policies -- which boil down to allegations of bad judgment.  See MTD 1 at 21.  The First Community Defendants contend that such allegations are insufficient to state a claim for gross negligence.  See MTD 1 at 21.

Last, the First Community Defendants address the FDIC's breach-of-fiduciary-duty claim.  See MTD 1 at 21.  The First Community Defendants assert that, unless the challenged action involves a conflict of interest, usurpation of a corporate opportunity, or similar breach of the duty of loyalty, no breach of fiduciary duty claim exists under New Mexico law.  See MTD 1 at 21.  The First Community Defendants say that the Complaint contains no allegations of "lying, cheating or stealing" -- the hallmarks of a breach-of-fiduciary-duty claim.  MTD 1 at 22 (internal quotation marks omitted).  Instead, the First Community Defendants notes, the Complaint alleges only "incorrect decisions and unstated losses."  MTD 1 at 22.

The FDIC responded to the MTD 1 on April 23, 2014.  See Plaintiff's Opposition to Certain Defendants' Motion to Dismiss (Document 15), filed April 23, 2014 (Doc. 23)("MTD 1 Response").  First, the FDIC contends that the Complaint sufficiently alleges claims for ordinary negligence.  See MTD 1 Response at 8-12.  The FDIC argues that § 53-11-35(B) imposes on officers and directors three separate duties to the corporation: (i) a duty of good faith; (ii) a duty of loyalty; and (iii) a duty of care.  See MTD 1 Response at 8.  The FDIC says that, accordingly, the Defendants are liable if they violated any one of these duties.  See MTD 1 Response at 8. The FDIC notes that the Complaint alleges that the Defendants violated their duty of care by, among other things: (i) failing to inform themselves about proposed loans and their risks before approving them; (ii) approving loans that did not comply with the Loan Policy; and (iii) failing to ensure that any loans they approved were underwritten in a safe and sound manner.  See MTD 1 Response at 8 (citations omitted).

- 23 -

The FDIC says that the New Mexico Business Corporation Act, N.M. Stat. Ann. § 53-12-2, sets forth certain provisions that a corporation can include in its articles of incorporation as a limitation on director liability.  See MTD 1 Response at 8.  The FDIC explains that § 53-12-2(E)(2)(a) states that articles of incorporation may provide that a director shall not be personally liable to the corporation for monetary damages for breach of fiduciary duty as a director "unless the breach of failure to perform constitutes: negligence, willful misconduct or recklessness in the case of a director who . . . receives as an employee of the corporation compensation of more than two thousand dollars ($2,000) from the corporation in any calendar year."  MTD 1 Response at 8-9 (internal quotation marks omitted).  The FDIC states that First Community's articles of incorporation do not, however, contain any such provision.  See MTD 1 Response at 9.  The FDIC notes that, even if the articles of incorporation included such a provision, it would not apply to these Defendants, because they were all First Community employees who received more than $2,000.00 in compensation per year.  See MTD 1 Response at 9.

The FDIC also notes that courts around the country have consistently upheld nearly identical complaints that the FDIC brought against former directors and officers of failed banks -- holding that similar allegations constitute not just ordinary negligence, but gross negligence. See MTD 1 Response at 9-12 (citing FDIC v. Switzer, No. CIV 13-03834 RS (N.D. Cal April 9, 2014)(Seeborg, J.); FDIC v. Castro, No. CIV 13-80596 DMM (S.D. Fla. March 31, 2014)(Middlebrooks, J.); FDIC v. Dodson, No. CIV 13-00416 MW/CAS (N.D. Fla. Feb. 27, 2014)(Walker, J.); FDIC v. Aultman, No. 2:13-CV-58-FTM-38UAM, 2013 WL 3357854, at *1 (M.D. Fla. July 3, 2013)(Chappell, J.); FDIC v. Price, No. CIV 12-0148 FTM/DNF, 2012 WL 3242316 (M.D. Fla. Aug. 8, 2012)(Presnell, J.); FDIC v. Stahl, 840 F. Supp. 124, 128 (S.D. Fla. 1993)(Ryskamp, J.)).  The FDIC argues that "[t]hese decisions indisputably demonstrate that the

Complaint in this case is sufficient to establish gross negligence -- let alone ordinary negligence -- against each Defendant."  MTD 1 Response at 12.

Second, the FDIC asserts that the Complaint satisfies the gross-negligence standard.  See MTD 1 Response at 12-14.  The FDIC explains that the Defendants are liable for gross negligence under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 1821(k) ("FIRREA").  MTD 1 Response at 12.  The FDIC says that FIRREA does not define gross negligence, but rather incorporates the definition that the relevant state law provides.  See MTD 1 Response at 12.  The FDIC points out that the Supreme Court of New Mexico has "formally abolished the distinction between ordinary and gross negligence, because the concept of gross negligence is so nebulous as to have no generally accepted meaning."  MTD 1 Response at 12 (quoting Paiz v. State Farm & Casualty Co., 1994-NMSC-079, ¶ 29, 880 P.2d 300, 309)(internal quotation marks omitted).  The FDIC contends that, even if it "is required to show a standard of care higher than ordinary negligence for the director defendants, the FDIC[]'s allegations in this case clearly satisfy any reasonable definition of gross negligence."  MTD 1 Response at 12-13.  The FDIC says that, for example, the Defendants personally approved the subject loans despite obvious and serious underwriting deficiencies.  See MTD 1 Response at 13. The FDIC argues that, in particular, the Defendants approved the loans despite: (i) inadequate repayment sources; (ii) missing tax returns and financial statements from the borrower and guarantors; (iii) missing appraisals and appraisal reviews; (iv) inadequate analysis of the borrower's and guarantors' financial information and ability to service the debt; and (v) loan-to-value and loan-to-cost ratios that exceeded the maximum ratio that the Loan Policy prescribed. See MTD 1 Response at 13.  The FDIC states that, while New Mexico law does not clearly distinguish  gross  negligence  from  ordinary  negligence,  courts  in  other  jurisdictions  have

consistently upheld gross negligence claims premised on virtually identical allegations.  See MTD 1 Response at 13 (citing, e.g., FDIC v. Switzer; FDIC v. Castro).

The FDIC also notes that FIRREA preempts any state law that purports to require the FDIC to show conduct more culpable than gross negligence to establish the Defendants' liability.  MTD 1 Response at 14 (citing FDIC v. Stahl, 89 F.3d 1510, 1516 (11th Cir. 1996)("[Section] 1821(k) permits claims against directors for gross negligence regardless of whether state law would require *greater* culpability.")(emphasis in FDIC v. Stahl)).  Responding to the First Community Defendants' contention that it must show bad faith to have a plausible claim, the FDIC argues that, even if New Mexico requires a showing of bad faith -- "which it does not" -- FIRREA would preempt such a requirement.  MTD 1 Response at 14.

Third, the FDIC argues that the common-law business judgment rule does not apply in this case.  See MTD 1 Response at 14-15.  The FDIC notes that, as Judge Lucero explained in FDIC v. Schuchmann, the business judgment rule protects corporate officers and directors only if they satisfy certain prerequisites -- including acting with a "reasonable basis," and based on "their independent direction and judgment."  MTD 1 Response at 14 (quoting FDIC v. Schuchmann, 235 F.3d at 1228)(internal quotation marks omitted).  The FDIC says that, moreover, courts have consistently recognized that allegations of gross negligence overcome the business judgment rule.  See MTD 1 Response at 14 (citing In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 125 (Del. Ch. 2009)).  In the FDIC's view, the Complaint establishes gross negligence by demonstrating that, in approving the subject loans, the Defendants acted without a reasonable basis and without exercising independent judgment.  See MTD 1 Response at 14-15 (citations omitted).

Fourth, the FDIC asserts that the Complaint plausibly alleges a breach-of-fiduciary-duty claim. See MTD 1 Response at 15.  Responding to the First Community Defendants' contention that a breach-of-fiduciary-duty claim rests on what would ordinarily be thought of as corporate loyalty claims, the FDIC states that directors also owe a fiduciary duty of care to the corporation. See MTD 1 Response (citing RTC v. Foley, 829 F. Supp. 352, 355 (D.N.M. 1993)(Campos, J.)(denying motion to dismiss breach-of-fiduciary-duty claims, because the "complaint clearly alleges that defendants breached their duties of care . . . by, among other things, failing to change their loan policies in the face of repeated regulatory warnings and by approving six defective transactions")).  The FDIC points out that the Complaint alleges that the Defendants breached their fiduciary duties by approving the subject loans and that those breaches caused damages exceeding $14.8 million.  See MTD 1 Response at 15.  In the FDIC's view, RTC v. Foley dictates that the Court should not dismiss the breach-of-fiduciary-duty claim.  See MTD 1 Response at 15.

Fifth, responding to the First Community Defendants' argument that the Complaint impermissibly "gang plead[s]" the Defendants, the FDIC states that the Complaint details the material information for each loan -- including the loan's approval date, loan amount, loss amount, and the Defendants who approved it.  See MTD 1 Response at 16.  In the FDIC's view, it is, therefore, abundantly clear which Defendants are being sued for which loans and the factual basis of the claims against them.  See MTD 1 Response at 16.

The First Community Defendants replied to the MTD 1 Response on May 23, 2014.  See Reply in Support of Certain Defendants' Motion to Dismiss, filed May 23, 2014 (Doc. 28)("MTD 1 Reply").  In the MTD 1 Reply, the First Community Defendants offer four responses to the FDIC's contentions in the MTD 1 Response.  See MTD 1 Reply at 3-12.  First,

the First Community Defendants argue that New Mexico law provides the only relevant standard for judging their conduct -- cases from other jurisdictions applying the standards applicable in those states, therefore, provide no guidance in this case.  See MTD 1 Reply at 3.  The First Community Defendants note that FDIC v. Schuchmann provides the applicable standard of care. See MTD 1 Reply at 3.  In the First Community Defendants' view, FDIC v. Schuchmann states that the FDIC bears the burden of proving that the Defendants did not "arrive at their decisions, within the corporation's powers and their authority, with a reasonable basis, *and* while acting in good faith, as the result of their independent discretion and judgment and uninfluenced by any consideration other than what they honestly believe to be in the best interests of the corporation." MTD 1 Reply at 3-4 (quoting FDIC v. Schuchmann, 235 F.3d at 1228-29)(emphasis in MTD 1 Reply but not in FDIC v. Schuchmann)(internal quotation marks omitted).  According to the First Community Defendants, the Complaint's allegations do not satisfy this exacting standard. See MTD 1 Reply at 4.

Second, the First Community Defendants assert that, contrary to the FDIC's contentions, Paiz v. State Farm Fire & Casualty Insurance Company is relevant to this case only insofar as it provides guidance on an element that the FDIC must prove -- that the First Community Defendants did not act in good faith.  See MTD 1 Reply at 5.  The First Community Defendants explain that, even if New Mexico no longer has a separate gross negligence claim, §1821(k) retains the term for cases that the FDIC brings.  See MTD 1 Reply at 6.  According to the First Community Defendants, Paiz v. State Farm Fire & Casualty Company explains that gross negligence means "an entire want of care."  MTD 1 Reply at 6 (citing Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26)(internal quotation marks omitted).  The First Community

Defendants assert that <u>Paiz v. State Farm Fire & Casualty Company</u> is, therefore, relevant to this action, but not in the way which the FDIC argues.  <u>See</u> MTD 1 Reply at 6.

Third, the First Community Defendants challenge the FDIC's reliance on <u>RTC v. Foley</u>.  <u>See</u> MTD 1 Reply at 10.  The First Community Defendants state that, although <u>RTC v. Foley</u> summarily states that it involves a claim for breach of fiduciary duty in approving loans, the "pre-<u>Iqbal</u> and pre-<u>Schuchmann</u> complaint does not address the contours of a claim for breach of fiduciary duty under New Mexico law that have developed since it was rendered."  MTD 1 Reply at 10.  The First Community Defendants conclude: "<u>Schuchmann</u> . . . and only <u>Schuchmann</u> applies here."  MTD 1 Reply at 10.

Fourth, the First Community Defendants argue that, by citing decisions from other jurisdictions, the FDIC "implicitly attempts to resuscitate an argument . . . that the United States Supreme Court rejected in <u>Atherton [v. FDIC</u>, 519 U.S. 213 (1997)]: that there is a need for a uniform standard of responsibility for bank officers and directors."  MTD 1 Reply at 11.  In the First Community Defendants' view, because those cases do not apply New Mexico law -- or something identical to it -- they provide no basis for denying the MTD 1.  <u>See</u> MTD 1 Reply at 11.

The First Community Defendants filed supplemental authority on October 23, 2014.  <u>See</u> Notice of Supplemental Authority, filed October 23, 2014 (Doc. 40)("Notice 1").  In the Notice 1, the First Community Defendants call to the Court's attention a recent decision in <u>FDIC v. Wertheim</u>, No. CIV 13-0050 KG/KBM, Memorandum Opinion and Order, filed Oct. 20, 2014 (D.N.M.)(Doc. 41)("<u>Wertheim</u> MOO").  The First Community Defendants point out that, in the <u>Wertheim</u> MOO, the Honorable Kenneth J. Gonzales, United States District Judge for the District of New Mexico, denied the defendants' motion to dismiss.  <u>See Wertheim</u> MOO at 8.

According to the First Community Defendants, Judge Gonzales reasoned that, because the FDIC alleged that the defendants violated § 53-11-35(B)'s first sentence, "the New Mexico common-law business judgment rule would not apply," and that it was, therefore, unnecessary for the FDIC to "plead facts demonstrating the inapplicability of that rule." Notice 1 at 1 (quoting Wertheim MOO at 8)(internal quotation marks omitted). The First Community Defendants argue, without further explanation, that Judge Gonzales' decision "diverges from" FDIC v. Schuchmann, in which the Tenth Circuit upheld the district court's decision requiring the FDIC to prove that a director had violated the business judgment rule. Notice 1 at 1-2.

The FDIC responded to the Notice, on October 24, 2014. See Plaintiff's Response to Defendants' Notice of Supplemental Authority (Document 40), filed October 24, 2014 (Doc. 41)("Notice 1 Response"). In the Response to Notice 1, the FDIC argues that the First Community Defendants disagree with the Wertheim MOO, because it "unambiguously rejects" their argument that they are not liable unless the FDIC establishes they acted in bad faith. Notice 1 Response at 1. The FDIC states that the Wertheim MOO explains why the First Community Defendants are incorrect:

    a.    "Because the first sentence of Section 53-11-35(B) requires, *in the conjunctive*, that directors act in good faith, believe that they are acting in the best interests of the corporation, and act as ordinarily prudent persons, Plaintiff need only plead that the Director Defendants did not meet *one of those requirements*."

    b.    "If the director violates the first sentence of Section 53-11-35(B), then the New Mexico common-law business judgment rule does not apply."

    c.    "Since the New Mexico common-law business judgment rule requires*, in the conjunctive*, that officers have a reasonable basis for their actions, act in good faith, and honestly believe that they acted in the best interests of the corporation, as with Section 53-11-35(B), Plaintiff need only plead that the Officer Defendants did not meet *one* of those requirements."

d.      The Complaint in the Wertheim case should not be dismissed as to
director defendants because its, "factual allegations support a plausible
claim that the Director Defendants did not perform their duties with the
care ordinarily prudent persons would use under similar circumstances in
like positions, and that they, thus, violated the first sentence of Section 53-
11-35(B)."

e.      The Complaint in the Wertheim case should not be dismissed as to officer
defendants because it "plausibly pled that the Officer Defendants did not
have a reasonable basis for their actions and that, therefore, the Officer
Defendants are not entitled to protection under the New Mexico common-
law business judgment rule."

Notice 1 Response ¶ 1, at 1-2 (quoting Wertheim MOO at 8-11)(emphases in Notice 1 Response

but not in Wertheim MOO)(citations and internal quotation marks omitted).  The FDIC argues

that, although the First Community Defendants attempt to escape Judge Gonzales' reasoning by

arguing that it diverges from FDIC v. Schuchmann, Judge Gonzales stated that § 53-1135(B)

"controls the pleading issue," and that FDIC v. Schuchmann "did not address the interplay

between the first sentence of Section 53-11-35(B) and the New Mexico business judgment rule."

Notice 1 Response ¶ 2, at 2-3 (quoting Wertheim MOO at 8)(internal quotation marks omitted).

The FDIC also notes that the First Community Defendants' focus on FDIC v.
Schuchmann's holding that a plaintiff must "prove that a director had not satisfied the

requirements of the business judgment rule" reflects their continued misunderstanding of

officers' and directors' duties.  Notice 1 Response ¶ 3, at 3 (quoting Notice 1 at 1-2)(internal

quotation marks omitted).  The FDIC says that, although the First Community Defendants argue

that FDIC v. Schuchmann and § 53-11-35(B) require the FDIC to establish that the Defendants

breached all of their relevant duties, Judge Gonzales recognized that "the conjunctive" in both §

53-11-35(B) and FDIC v. Schuchmann require them to satisfy all of their relevant duties to avoid

liability.  Notice 1 Response ¶ 3, at 3.  The FDIC asserts that, consequently, it need prove only

that the Defendants breached one of their duties to establish liability.  See Notice 1 Response ¶ 3, at 3.

### 2.   <u>MTD 2.</u>

Nafus filed Defendant Bobby J. Nafus's Motion to Dismiss and Notice of Joinder Pursuant to D.N.M.L.R-CIV. 7.1(a) in Certain Defendant's Motion to Dismiss [Doc. 15] on March 3, 2014.  See Defendant Bobby J. Nafus's Motion to Dismiss and Notice of Joinder Pursuant to D.N.M.L.R-CIV. 7.1(a) in Certain Defendant's Motion to Dismiss [Doc. 15] at 1, (Doc. 18)("MTD 2").  In the MTD 2, Nafus asks the Court to dismiss the FDIC's claims of negligence, gross negligence, and breach of fiduciary duty as to him.  See MTD 2 at 4-12.  Nafus contends that the Court should dismiss the FDIC's negligence claim for two reasons.  First, Nafus asserts that the Complaint fails to state a claim for negligence under § 53-11-35 or the New Mexico common-law business judgment rule.  See MTD 2 at 6.  Nafus asserts that, under § 53-11-35, the FDIC must plead sufficient facts to demonstrate that he: (i) acted in bad faith; (ii) acted in a manner that he did not reasonably believe to be in First Community's best interests; and (iii) failed to use such care as an ordinarily prudent person would use under similar circumstances.  See MTD 2 at 6.  Moreover, Nafus contends that, under the business judgment rule, the FDIC must plead sufficient facts to demonstrate that he acted: (i) outside First Community's powers and his authority; (ii) without a reasonable basis; (iii) in bad faith; (iv) without independent judgment; and (v) under the influence of improper considerations -- i.e., other than what he honestly believed to be in First Community's best interests.  See MTD 2 at 6. Nafus argues that, because the Complaint does not contain any allegations of bad faith, lack of subjective reasonable belief, or conflict of interest, it fails to state a claim of ordinary negligence under either § 53-11-35 or under the business judgment rule.  See MTD 2 at 6.

- 32 -

Second, Nafus maintains that the Complaint, in making undifferentiated and vague allegations against all of the Defendants collectively, fails to plausibly plead that Nafus is individually liable for negligence.  See MTD 2 at 7.  Nafus notes, for example, that the FDIC alleges that "no Defendant voted against any of the Subject Transactions."  MTD 2 at 7 (quoting Complaint ¶ 27, at 7).  Nafus explains that the Complaint alleges that he was involved in only three of the six loans -- making it impossible for him to have voted for or against all six loans.  See MTD 2 at 7.  Nafus states that, although the Complaint alleges that the Defendants' improper actions continued through February 16, 2010, it also alleges that Nafus left First Community by September 11, 2009.  See MTD 2 at 7.  Nafus notes that the Complaint does not clarify to what extent he is liable for loans which he approved that were later consolidated into new loans for which he played no role in the approval process.  See MTD 2 at 8.  Nafus argues that the Complaint's use of the "highly confusing and vague short-form 'Approving Defendants,'" makes it impossible to determine to which Defendants the Complaint is referring -- particularly with respect to the Kitts Development and K&M Development loans.  MTD 2 at 8.  Nafus argues that, as a result, he cannot determine how the FDIC purports to attach liability for these loans and is severely limited in preparing his defenses.  See MTD 2 at 8.

Third, Nafus argues that the Complaint does not plausibly allege either that the FDIC suffered damages, or that he was the proximate and actual cause of those damages -- which, Nafus notes, are essential elements of a negligence claim.  See MTD 2 at 9-11.  Nafus asserts that the Complaint does not allege, for example, that any of the loans that he approved are in default, that any of them had to be restructured on terms unfavorable to the FDIC, or that any of the debtors have had problems paying off their loans.  See MTD 2 at 9.  Nafus contends,

moreover, that the Complaint does not allege that any of the loans that he approved caused First Community's alleged insolvency.  See MTD 2 at 9.

Nafus next addresses the FDIC's gross negligence claim.  See MTD 2 at 11.  Nafus explains that, under New Mexico law, gross negligence requires allegations that the defendant committed "an act or omission with *conscious* indifference to harmful consequences and failed to exercise even slight care."  MTD 2 at 11 (quoting Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1251 (10th Cir. 2000)(alterations omitted)(emphasis in MTD 2 but not in Smith v. Ingersoll-Rand Co.)(internal quotation marks omitted)).  Nafus contends that the Complaint fails to state a claim for gross negligence, because it does not allege any facts indicating that Nafus acted with conscious indifference to any alleged harmful consequences or that he failed to exercise even slight care in approving the subject loans.  See MTD 2 at 11.  Nafus asserts that the Complaint acknowledges that the loans which Nafus approved were secured by personal guarantees and collateral -- "negating any plausible inference of conscious indifference or failure to exercise even slight care."  MTD 2 at 11-12.

Nafus argues that the Complaint also fails to state a claim for breach of fiduciary duty. See MTD 2 at 12.  Nafus explains that a claim for breach of fiduciary duty must involve some conflict of interest or allegation of self-dealing at the corporation's expense.  See MTD 2 at 12 (citing Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 41, 40 P.3d 449 ("The duty between shareholders of a close corporation is similar to that owed by directors, officers, and shareholders to the corporation itself; that is, loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of the corporation.")).  Nafus asserts that the Complaint lacks any such allegations.  See MTD 2 at 12.

Nafus also argues, in a footnote, that the Complaint's failure to allege concrete injury raises standing concerns.  See MTD 2 at 9 n.1.  Nafus notes that a plaintiff has standing only when: (i) he or she has suffered an injury in fact; (ii) there is a causal connection between the injury and the conduct of which the pleading complains; and (iii) it is likely that a favorable decision will redress the injury.  See MTD 2 at 9 n.1 (citing United States v. Colo. Sup. Ct., 87 F.3d 1161, 1164 (10th Cir. 1996)).  Nafus asserts that, even if the Complaint vaguely alleges that First Community's failure constitutes an "injury in fact," it does not allege any facts showing a causal connection between the three loans that Nafus approved and First Community's failure. MTD 2 at 9 n.1.

The FDIC responded to the MTD 2 on April 23, 2014.  See Plaintiff's Opposition to Defendant Bobby J. Nafus' Motion to Dismiss (Document 18), filed April 23, 2014 (Doc. 25)("MTD 2 Response").  The FDIC asks the Court to deny the MTD 2 for three reasons.  See MTD 2 Response at 4-8.  First, the FDIC argues that the Complaint sufficiently alleges negligence, gross negligence, and breach of fiduciary duty.  See MTD 2 Response at 4-5.  The FDIC explains that New Mexico applies an ordinary negligence standard to officers and directors.  See MTD 2 at 4 (citing N.M. Stat. Ann. § 53-11-35(B)).  In the FDIC's view, Nafus was negligent, because he approved the subject loans despite: (i) missing tax returns and financial statements from the borrowers and guarantors; (ii) missing appraisals and appraisal reviews; (iii) inadequate analysis of the borrower's and guarantor's financial information and ability to service the debt; and (iv) loan-to-value and loan-to-cost ratios that exceeded the maximum that the Loan Policy prescribed.  See MTD 2 Response at 4 (citing Complaint ¶¶ 30-31, at 8-9; Complaint ¶¶ 37-39, at 10-12; Complaint ¶¶ 56-57, at 17).  Turning to its gross-negligence claim, the FDIC reiterates that numerous courts around the country have found that

identical allegations exceed ordinary negligence to sufficiently allege gross negligence.  See MTD 2 Response (citing MTD 1 Response at 9-12).  The FDIC asserts that, consequently, although New Mexico law does not distinguish between gross negligence and ordinary negligence, the Court should not dismiss its gross-negligence claim.  See MTD 2 Response at 4-5.

The FDIC asserts that the business judgment rule does not protect Nafus, because the Complaint alleges that he acted without a reasonable basis and without exercising independent judgment.  See MTD 2 Response at 5.  Moreover, the FDIC argues that Nafus' contention that a breach of fiduciary duty must involve some conflict of interest or allegation of self-dealing is incorrect.  See MTD 2 Response at 5.  Instead, according to the FDIC, "New Mexico law recognizes that directors and officers owe a duty of fiduciary care as well as of loyalty . . . ." MTD 2 Response at 5.

Second, the FDIC argues that the Complaint sufficiently alleges Nafus' personal involvement in the subject loans.  See MTD 2 Response at 5.  The FDIC asserts that the Complaint identifies which of the subject loans Nafus approved and "more than adequately puts him on notice of the specific misconduct as to each transaction."  MTD 2 Response at 5. Regarding the Kitts Development loans, the FDIC states:

> Paragraph 29 clearly states that Defendant Nafus initially approved a $2.89 million loan on January 29, 2007.  Paragraphs 30 and 31 explain the precise actions and inactions by Defendant Nafus that constitute negligence, gross negligence, and breaches of fiduciary duty.  Paragraph 35 estimates the damages directly and proximately caused by the tortious conduct of Defendant Nafus . . . .

MTD 2 Response at 6.  Regarding the K&M Development loans, the FDIC states:

> As with the Kitts Development Loan, the Complaint makes clear that both Defendant Nafus and Dolan approved the loan on March 27, 2007, (Complaint ¶ 36), and describes the specific underwriting deficiencies and departures from prudent lending principles by both defendants.  (Id. ¶¶ 36-38.)  The Complaint

- 36 -

also clearly states that Defendant Nafus alone approved five related construction loans on January 11 2008, and described his specific tortious conduct in approving those loans. (Id. ¶ 39)   Finally, the Complaint estimates the damages directly and proximately caused by the tortious conduct of Defendant Nafus . . .

MTD 2 Response at 6.   The FDIC concludes that, given these allegations, the Complaint gave Nafus fair and adequate notice of the loans that he approved, when he approved them, his tortious conduct in approving them, and the estimated damages that his conduct caused.   See MTD 2 Response at 6-7.

Third, the FDIC contends that the Complaint sufficiently alleges damages.   See MTD 2 Response at 7-8.   The FDIC points to the Complaints' allegations that, "as a result" of Nafus' tortious conduct, it suffered damages from each loan.   MTD 2 Response (citing Complaint ¶ 35, at 10; id. ¶ 43, at 13; id. ¶ 59, at 18).   In the FDIC's view, such allegations are sufficient, because -- as Nafus recognizes -- the FDIC "need not plead each and every element of damages with specificity."   MTD 2 Response at 7 (quoting MTD 2 at 10)(internal quotation marks omitted). Instead, the FDIC notes, it need plead only sufficient facts to make its claim "plausible."   MTD 2 Response at 7 (citation and internal quotation marks omitted).

The FDIC contends that the Complaint alleges that Nafus approved the subject loans despite underwriting deficiencies, violations of the Loan Policy, and in contravention of prudent lending practices.   See MTD 2 Response (citing Complaint ¶¶ 29-31, at 8-9).   In the FDIC's view, "it was therefore foreseeable that the loans would likely not be repaid and would in turn harm" First Community.   MTD 2 Response at 7.   The FDIC states that Nafus "cannot reasonably contend that his blind approval" of the subject loans -- "despite lacking critical information and ignoring evidence that the loans should not be approved" -- did not harm First Community when those loans were not repaid.   MTD 2 Response at 7-8.

- 37 -

Nafus replied to the MTD 2 Response on May 23, 2014.  See Defendant Bobby J. Nafus's Reply in Support of His Motion to Dismiss (Doc. 18), filed May 23, 2014 (Doc. 32)("MTD 2 Reply").  In the MTD 2 Reply, Nafus largely reiterates the arguments from the MTD 2.  See MTD 2 Reply at 5-8.  Nafus also responds to two of the FDIC's arguments in the MTD 2 Response.  See Reply at 5-8.

Responding to the FDIC's contention that breach of fiduciary duty can be premised on a general breach of the duty of care, Nafus argues that RTC v. Foley does not apply to this case for three reasons.  First, Nafus argues that, although Judge Campos stated in that case that "the complaint clearly alleges that defendants breached their duties of care to Sandia," it is unclear whether he was referring to the RTC's claims for breach of fiduciary duty, negligence, gross negligence, or all three.  MTD 2 Reply at 5 (quoting RTC v. Foley, 829 F. Supp. at 355)(internal quotation marks omitted).  Second, Nafus asserts that Judge Campos did not articulate the general breach of fiduciary duty claim that the FDIC proposes.  See MTD 2 Reply at 5 (citing RTC v. Foley, 829 F. Supp. at 355).  Third, Nafus contends that, because RTC v. Foley is a federal district court case, it cannot overrule or modify New Mexico law governing fiduciary duty claims, and especially cannot do so with respect to New Mexico cases decided after RTC v. Foley -- like Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, and Moody v. Stribling, 1999-NMCA-094.  See MTD 2 Reply at 5.  Nafus argues that, therefore, Walta v. Gallegos Law Firm, P.C. and Moody v. Stribling, rather than RTC v. Foley, govern the FDIC's breach-of-fiduciary duty claim.  See MTD 2 Reply at 5.

Turning to the FDIC's argument that the Complaint sufficiently alleges actual injury, Nafus notes that the cases which the FDIC cites in the MTD 1 Response are instructive on the allegations of injury required for a negligence claim.  See MTD 2 Reply at 7.  Nafus asserts that,

in those cases, the injury element was met where the FDIC alleged that: (i) each of the loans at issue were subject to charge-offs of millions of dollars, see FDIC v. Switzer; (ii) every borrower on the subject transactions defaulted, which resulted in a substantial unpaid balance owed to the bank on every transaction, see FDIC v. Castro, No. CIV 13-80596 DMM; (iii) "as a direct and proximate result of the Defendants wrongful acts, the Bank was forced to foreclose on loans and sell the property at a substantial loss," FDIC v. Stahl, 840 F. Supp. at 126; and (iv) the defendants approved a series of loans that were not repaid -- costing the bank tens of millions of dollars, see FDIC v. Price, 2012 WL 3242316 at *2 (M.D. Fla. 2012). See MTD 2 Reply at 7. Nafus notes that the FDIC makes no such allegations here. See MTD 2 Reply at 7.

Instead, according to Nafus, the Complaint alleges only that the Defendants' mistakes during the loan-approval process made it "foreseeable that the loans would likely not be repaid and would in turn harm the bank." MTD 2 Reply at 8 7-8 (quoting MTD 2 Response at 7)(internal quotation marks omitted). Nafus contends that a "potential eventuality, foreseeable or not, is not an injury." MTD 2 Reply at 8. Nafus asserts that the FDIC, therefore, has neither adequately pled any cause of action in tort nor demonstrated that it has Article III standing. See MTD 2 Reply at 8. Nafus notes that the FDIC acknowledges in the MTD 2 Response that it does not seek damages for First Community's failure -- i.e., that First Community's failure is not the alleged injury for which it seeks relief. See MTD 2 Reply at 8 (citing MTD 2 Response at 7). Nafus states that the FDIC has also alleged in its Complaint that it "does not seek to collect upon [any of the aforementioned] outstanding loans." MTD 2 Reply at 8 (citing Complaint ¶ 1, at 1)(alterations in MTD 2 Reply but not in Complaint)(internal quotation marks omitted). Nafus asserts that, given these two statements, there is no indication what injury the FDIC is asserting. See MTD 2 Reply at 8. Nafus concludes that the absence of any factual allegations in this regard

renders the FDIC's tort claims deficient, and that the Court should, accordingly, dismiss them. See MTD 2 Reply at 8.

>    **3.    The November 5, 2014, Hearing.**

The Court held a hearing on November 5, 2014.  See Transcript of Hearing (taken Nov. 5, 2014)("Tr.").[10]  At the hearing, the parties largely reiterated the arguments from the briefing. See Tr. at 5:1-87:16 (Court, Klein, Pino, Carroll).  The parties offered new arguments, however, on Judge Gonzales' decision in FDIC v. Wertheim.  The First Community Defendants contended that implicit in Judge Gonzales' decision is a conclusion that § 53-11-35(B) preempts the common-law business judgment rule.  See Tr. at 6:2-6 (Carroll).  The First Community Defendants argued that such a ruling is contrary to New Mexico law.  See Tr. at 6:10-11 (Carroll).  The First Community Defendants notes that the Supreme Court of New Mexico stated in Sims v. Sims, 1996-NMSC-078, 930 P.2d 153 (1996), that a statute should not be construed as supplanting the common-law unless the Legislature of the State of New Mexico specifically says it is.  See Tr. at 6:12-15 (Carroll).  The First Community Defendants said that the Court reached the same conclusion in Leon v. Kelly, 618 F. Supp. 2d 1334 (D.N.M. 2008)(Browning, J.).  See Tr. at 6:15-17 (Carroll).

The First Community Defendants stated that Judge Gonzales relied on the Supreme Court of Georgia's opinion in FDIC v. Skow, 763 S.E. 2d 879 (Ga. 2014), which, in turn, relied on the Supreme Court of Georgia's opinion in FDIC v. Loudermilk, 761 S.E. 2d 332 (Ga. 2014).  The First Community Defendants contend that, in FDIC v. Loudermilk, in an opinion that the Honorable Robert Blackwell, Associate Justice of the Supreme Court of Georgia, authored, the Supreme Court of Georgia said that "it is the process . . . by which the bank officers and directors

---

[10]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

arrive at their decision and not the decision itself that can be questioned."  Tr. at 9:3-9 (Carroll)(citation and internal quotation marks omitted).  The First Community Defendants point out that, in FDIC v. Loudermilk, Justice Blackwell said that "the standard that a bank director is bound to exercise is not the same degree of care which a prudent man would exercise in his own business."  Tr. at 9:15-18 (Carroll).  The First Community Defendant's state that the business judgment rule, according to Justice Blackwell,

> would be that when a business is alleged to have been conducted negligently, the wisdom of the decision can't be challenged judicially.  The officers and directors are presumed to have acted in good faith in applying the process.  And the Court goes on to say that the burden of proof is on the plaintiff to establish that the common-law business judgment rule requires them to prove that the process wasn't handled in that fashion.

Tr. at 10:1-9 (Carroll).

The Court asked the First Community Defendants what more they would want to see in the Complaint to overcome the business judgment rule.  See Tr. at 13:5-10 (Court).  The First Community Defendants replied that they would want to see an allegation addressing the director or officer's good faith in deciding whether to approve the subject loans.  See Tr. at 13:11-15 (Carroll).  The Court asked whether an allegation that Nafus knew that the necessary items were not in the file and made a bad-faith decision to leave them out would be enough to satisfy that element.  See Tr. at 13:16-20 (Court).  The First Community Defendants responded that such an allegation would be more likely to overcome the business judgment rule.  See Tr. at 13:21-23 (Carroll).  The First Community Defendants argued that, to overcome the business judgment rule, there has to be something other than allegations that a file was missing documents; instead, the Complaint must include allegations about the officers' and/or directors' subjective beliefs in making those decisions.  See Tr. at 13:24-14:10 (Carroll).

The Court asked Nafus what the FDIC needs to allege to establish injury.  See Tr. at 30:22-24 (Court).  Nafus replied that he wants to know more of a story of what happened with the loans -- such as, the subject loans were not repaid, the collateral was not sufficient to cover the loans, and/or the guarantors did not pay the amount that they guaranteed.  See Tr. at 31:8-19 (Pino).  Nafus stated that this lack of information is particularly important with regard to two of the three loans with which the Complaint alleges that he was connected -- the K&M Development loan and the Kitts Development loan.  See Tr. at 32:20-25 (Pino).  According to Nafus, although the Complaint alleges that he was involved in the initial approval of those loans, it also alleges that he was not involved in the other Defendants' consolidation of those loans and the other Defendants' issuance of new loans to those borrowers on the same projects.  See Tr. at 33:1-25 (Pino).  Nafus argues that the Complaint fails to explain either how he is liable for initially approving those loans, or how his liability survives the other Defendants' consolidation of those loans and issuance of new loans.  See Tr. at 33:13-17 (Pino).

The Court said that, in its understanding, standing under Article III of the Constitution of the United States of America requires that the plaintiff plead only injury-in-fact -- it does not require allegations of causation.  See Tr. at 34:21-6 (Court).  The Court asked Nafus whether the fourteen million dollars in losses that the Complaint alleges satisfies injury-in-fact for Article III purposes  See Tr. at 35:19-23 (Court).  Nafus replied that the Complaint needs something more specific, because alleging general damages is insufficient.  See Tr. at 35:24-36:6 (Pino).

The FDIC argued that § 53-11-35(B) provides directors' standard of care and the business judgment rule provides officers' standard of care.  See Tr. at 47:1-48:3 (Klein).  The FDIC explained that §§ 8.30 and 8.31 of the Model Business Corporation Act dictate such a conclusion.  See Tr. at 48:4-12 (Klein).  The FDIC explained that, in 1998, the Model Business

Corporation Act ("MBCA") separated § 8.30 -- "which is the standard of conduct" -- from § 8.31 -- "which is the standard of liability."  Tr. at 48:12-15 (Klein).  The FDIC asserted that § 8.31 codifies the business judgment rule.  See Tr. at 71:17-18 (Klein).  The FDIC stated that, before 1998, all that existed was § 8.30, and "the New Mexico statute that's in place here essentially mirrors what the original § 8.30 was" -- in other words, New Mexico never adopted § 8.31.  Tr. at 48:16-17 (Klein).  In the FDIC's view, if it brought a case in a jurisdiction that has adopted § 8.31, it would have to plead that a director did not have a reasonable basis for making his decision.  See Tr. at 71:18-22 (Klein).  According to the FDIC, because New Mexico has not adopted § 8.31, it needs to allege only facts indicating that the directors were negligent and that the officers lacked a reasonable basis for their actions.  See 49:3-17 (Klein).

The Court asked the FDIC why the New Mexico Legislature would include the duties of good faith and loyalty in § 53-11-35(B) if allegations of simple negligence alone constitute a valid claim against corporate directors.  See Tr. 49:18-24 (Court).  The Court said that, in its view, negligence is the lowest of the three standards.  See Tr. at 49:24-50:1 (Court).  The FDIC responded that § 53-11-35(B) provides three different bases for claims against corporate directors, because such directors have three separate duties.  See Tr. at 50:2-3 (Klein).  The FDIC explained that acting negligently violates the duty of care, acting in bad faith violates the duty of good faith, and failing to act in the corporation's best interests violates the duty of loyalty.  See Tr. at 50:4-7 (Klein).  Responding to the FDIC's contention that the business judgment rule does not apply to directors because New Mexico has not adopted § 8.31 of the MBCA, the First Community Defendants contended that the MBCA does not overrule the Supreme Court of New Mexico's or the Tenth Circuit's precedent -- which indicate that the business judgment rule protects both directors and officers.  See Tr. at 75:11-23 (Carroll).  At the end of the hearing, the

Court said that it was inclined to deny the MTD 1 and MTD 2, but would take the matter under advisement, because it would have to determine to what extent the business judgment rule protects both officers and directors.  See Tr. 82:20-24 (Court).

        **4.**        **Supplemental Authority.**

The First Community Defendants filed a notice of supplemental authority on November 12, 2014.  See Notice of Supplemental Authority, filed November 12, 2014 (Doc. 45)("Notice 2").  In the Notice 2, the First Community Defendants provided the Court with citations and copies of three opinions that they discussed at the November 5, 2014, Hearing: Leon v. Kelly, FDIC v. Loudermilk, and Sims v. Sims.  See Notice 2 at 1.  The FDIC responded to the Notice 2 on November 19, 2014.   See Plaintiff's Response to Defendants' Notice of Supplemental Authority (Document 45), filed November 19, 2014 (Doc. 47)("Notice 2 Response").  The FDIC states:

> In their Notice, Defendants rely on Sims v. Sims and Leon v. Kelly for the proposition that a "statute won't be construed as supplanting the common-law unless the legislature specifically says it is."

> This conclusion is broader than the actual holdings.  Sims, for instance, merely holds that preexisting common-law that does not conflict with statutory law remains to "fill in gaps not addressed by [the] statute."  Similarly, Leon holds that both the New Mexico Uniform Partnership Act ("UPA") and common-law could apply to the formation of a partnership unless "some provision of the [UPA] displaces [the common-law.]"  Furthermore, the UPA is distinguishable from the statutory business judgment rule that applies in this case because the UPA explicitly allows for common-law to supplement its provisions.

> Neither case, therefore, contradicts this Court's recent holding in FDIC v. Wertheim.  In holding that "if the director violates the first sentence of Section 53-11-35(B), then the New Mexico common-law business judgment rule does not apply, the Wertheim Order correctly applied the statutory standard first, allowing the common-law to "fill in gaps not addressed by the statute."

> The third case cited by the Defendants is FDIC v. Loudermilk, which interprets the Georgia business judgment rule.  Defendants rely on this case for their argument that the FDIC-R must show the Defendants acted with a negligent

decision making process.  This Court, however, has already resolved this issue by finding that "a director must first comply with the statutory mandate to act as an ordinarily prudent person before the process by which he came to a decision can be protected by the business judgment rule."

Notice 2 Response ¶¶ 1-4, at 1-2 (footnotes and internal numbering omitted).

### 5.     The Court Granted MTD 1 and MTD 2, and Dismissed the Complaint Without Prejudice.

The Court issued its Memorandum Opinion and Order on the Defendants' MTD 1 and MTD on March 3, 2015.  See Memorandum Opinion and Order at 1 (Doc. 66)("MOO").  The Court concluded that the FDIC failed to allege constitutional standing to assert its claims against any of the Defendants in the Complaint.  See MOO at 1.  The Court granted the MTD 1 and the MTD 2, and dismissed the Complaint without prejudice to the FDIC moving to amend the Complaint to properly allege Article III's injury-in-fact and causation requirements.  See MOO at 1.  The Court did not conclude that the FDIC cannot demonstrate standing, but that the FDIC had failed to do so.  See MOO at 1.  Thus, the Court did not decide, at that time, either the MTD 1's merits or MTD's 2 merits.  See MOO at 1.

The Court held

To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted). The Complaint fails to establish injury in fact and causation.

MOO at 53.  The Court elaborated further on the original Complaint's deficiencies and stated that "the Complaint provides no information, about what, if any, injuries, the FDIC suffered." MOO at 53.  Furthermore, "[t]he Complaint does not include the phrase "the FDIC was injured," or anything similar to it. Instead, it explains for which transactions the FDIC seeks damages and the minimum amount of damages it hopes to obtain from this case."  MOO at 54.

The Court also concluded that the original Complaint "does not explain how the Defendants "conduct in approving the subject transactions caused the FDIC an injury." MOO at 54. The Court relied on the Tenth Circuit's decision in Habecker v. Town of Estes Park, Colo., which states that "Article III does require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." 518 F.3d 1217, 1225 (10th Cir. 2008). The Court concluded, that, "[a]side from repeating the conclusory phrase," "[a]s a direct and proximate result of the Approving Defendants' tortious conduct . . ." six times, the Complaint includes no facts from which the Court can reasonably infer causation. MOO at 55 (quoting Complaint ¶ 35, at 10; id. ¶ 43, at 13; id. ¶ 48, at 14; id. ¶ 53, at 17; id. ¶ 59, at 18; id. ¶ 63, at 20).

**6.     The FDIC's Motion for Leave to Amend its Complaint.**

The FDIC filed Plaintiff's Motion for Leave to Amend its Complaint in Accordance with the Court's March 3, 2015 Order, on March 10, 2015. See Motion for Leave to Amend Complaint at 1. In addition to filing its Motion for Leave to Amend Complaint, the FDIC also filed its Amended Complaint, on March 10, 2015. See Amended Complaint at 1.

The FDIC stated as grounds for its Motion for Leave to Amend Complaint that it contacted Defendants in good faith requesting concurrence in the Motion to Amend and that Defendant Nafus advised the FDIC that he does not oppose the Motion to Amend. See Motion for Leave to Amend Complaint ¶ 4, at 2. The FDIC states that the remaining Defendants advised that "'[i]f the amended complaint contains matters beyond those permitted by the terms of Judge Browning's Order (inclusion of new parties or claims, futility of amendment, etc.), we may wish to oppose the filing."' See Motion for Leave to Amend Complaint ¶ 4, at 2 (quoting Exhibit 3, March 5, 2015, Email Communication).

The FDIC relies on Walker v. THI of New Mexico at Hobbs Center, 262 F.R.D. 599, 603-04 (D.N.M)(Browning, J.), and asserts that the Tenth Circuit has advised the district courts that they "should grant leave to amend when doing so would yield a meritorious claim."  See Motion for Leave to Amend Complaint at 3 (quoting Walker v. THI of New Mexico at Hobbs Center, 262 F.R.D. at 603-04 (internal citations omitted)).  The FDIC argues:

> The Court should grant Plaintiff leave to amend its Complaint because the proposed amendment addresses the issues raised by the Court in the March 3 order and the Amended Complaint states legally sufficient claims for negligence, gross negligence and breach of fiduciary duty.  In addition, the FDIC-R has also included clarifying language concerning the Defendants' activities relating to each loan, as well as specific dates and information documenting injury to the FDIC-R.

Motion for Leave to Amend Complaint at 3.

### 7.       The FDIC's Motion to Stay Deadlines in the Court's Scheduling Order.

The FDIC filed its Motion to Stay Deadlines on March 10, 2015.  The FDIC asserts that, "[a]s the FDIC-R's Complaint is currently dismissed without prejudice, staying deadlines in the Scheduling Order is appropriate until such other time as this Court determines is appropriate." Motion to Stay Deadlines at 1.

### 8.       The Defendants' Response to Motion for Leave to Amend.

Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith filed their Response to Motion for Leave to Amend on March 24, 2015.  Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith assert that the Motion to Stay Deadlines should be denied and that case should be dismissed with prejudice, because: (i) the FDIC's Motion for Leave to Amend does not explain how a proposed amendment would cure the deficiencies that the Court identified; and (ii) analysis of the proposed Amended Complaint shows that it does not cure the original Complaint's defects that the Court identified in its March 3, 2015, Order because the Amended

Complaint does not allege an injury-in-fact, and does not explain how Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith's alleged errors or omissions caused any claimed injury.  See Response to Motion for Leave to Amend at 1-2.

Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith assert that the FDIC continues to rely upon conclusory statements, and that the Motion for Leave to Amend fails to provide a "factual showing of perceptible harm."  Response to Motion for Leave to Amend at 3. Furthermore, Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith assert that the FDIC failed to explain how it has an interest in the loans that First Community transferred to it that would give rise to a claim that Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith injured the FDIC.  See Response to Motion for Leave to Amend at 7-8.  Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith then argue that the FDIC's new allegations do not demonstrate how its alleged injury-in-fact is fairly traceable to the Defendants.  See Response to Motion for Leave to Amend at 8.  Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith rely on Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62 (1992), in their argument that the FDIC fails to demonstrate either a substantial likelihood apparent from the pleadings that Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez, and Smith's conduct caused the FDIC's injury-in-fact and that the injury is not the result of the independent action of some third party not before the Court.  See Response to Motion for Leave to Amend at 9.

**9.      The Defendants' Response to the Motion to Stay.**

Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez and Smith filed their Joint Response to Motion to Stay on March 24, 2015.  See Joint Response to Motion to Stay, filed March 24, 2015 (Doc. 71)("Joint Response to Motion to Stay").  In their Joint Response to Motion to Stay, Dee, DiPaola, Dolan, Fanning, Martin, Nafus, Sanchez and Smith assert that on

March 3, 2015, the Court granted Defendants' Motion to Dismiss for lack of subject matter jurisdiction, and that the dismissal of the case vitiated the Scheduling Order and all of the dates it contained.  See Joint Response to Motion to Stay at 1.  They further contend that the FDIC's Motion to Stay Deadline is moot, and that to enter an order staying the dates in the Scheduling Order would be to imply that the Scheduling Order is still operative.  See Joint Response to Motion to Stay at 1-2.

**10.  The FDIC's Reply in Support of its Motion for Leave to Amend.**

The FDIC filed Plaintiff's Reply in Support of its Motion for Leave to Amend the Complaint on April 7, 2015.  See Plaintiff's Reply in Support of its Motion for Leave to Amend the Complaint (ECD No. 67) at 1 (Doc. 72)("Reply Motion for Leave").  The FDIC argues that the "opposition attempts to hold the FDIC-R to a standard of pleading inappropriate for a complaint" under [T]enth [C]ircuit law, Reply Motion for Leave at 3, and cites Burleson v. ENMR-Plateau Tel. Co-op., for the proposition that "district courts should grant leave to amend when doing so would yield a meritorious claim," 2005 WL 3664299 at *1 (D.N.M 2005)(Browning, J.).  The FDIC argues that when a motion for leave to amend a complaint is opposed on the basis that the proposed amendments would be futile, "the standard for showing futility is establishing that the amended complaint would be subject to a motion to dismiss." Reply Motion for Leave at 3 (quoting Lane v. Page, 272 F. Supp. 2d. 1214, 1218 (D.N.M. 2010)(Browning, J.)).  The FDIC asserts that the Court should "assume [the plaintiff's] well-pleaded factual allegations are true, just as it would do if it were reviewing a motion to dismiss." Reply Motion for Leave at 3 (quoting Lane v. Page, 272 F. Supp. 2d. at 1218).  The FDIC asserts that like in Lane v. Page, the deficiencies which the Court identified in the original Complaint are easily remedied and are better suited for the motion-for-summary-judgment stage.  See Reply

Motion for Leave at 4.  The FDIC asserts that the other issues it raised in the Amended Complaint can only be resolved through full discovery.  See Reply Motion for Leave at 5.

The FDIC asserts that the Amended Complaint sufficiently pleads injury-in-fact and causation.  See Reply Motion for Leave at 7.  The FDIC asserts that after First Community Bank failed, the FDIC was appointed receiver, and the six subject loans of the Complaint were transferred to U.S. Bank, National Association ("U.S. Bank") pursuant to a purchase and assumption agreement, at their reduced, charged-off values.  The FDIC argues that, because, the six subject loan transactions were not transferred subject to a loss share agreement, U.S. Bank assumed full interest in the loans and that the FDIC suffered an injury equivalent to the difference between the loan amounts when approved and their reduced value when transferred to U.S. Bank.  See Reply Motion for Leave at 7-8.

The FDIC also asserts that the Amended Complaint also sufficiently pleads causation. See Reply Motion for Leave at 9.  The FDIC argues that the Amended Complaint alleges that the Defendants' tortious conduct resulted in First Community funding loans to the borrowers, who subsequently defaulted, and that each of these loans was ultimately charged off.  See Reply Motion for Leave at 9-10.

### 11.    The May 5, 2015, Hearing.

The Court held a hearing on May 5, 2015.  See Transcript of Hearing (taken May 5, 2015), filed May 13, 2015 (Doc. 85)("May Tr.").  At the hearing, the parties largely reiterated the arguments from the briefing.  See May Tr. at 2:1-24:16 (Court, Klein, Wihl, Carroll).  The FDIC first reiterated its support for its Motion for Leave.  See May Tr. 3:25-4:3.  The FDIC informed the Court that it followed the guidance given by the Court to cure the standing deficiencies.  See May Tr. 4:4-7 (Klein).  The FDIC asserted that it included specific allegations

that: (i) the subject loans in the case had defaulted, were charged off, either by the bank, or the FDIC; (ii) as a direct of the breach of fiduciary duty and negligence in making the subject loans, the loans were funded; and (iii) the FDIC suffered an injury when the FDIC closed First Community and subsequently sold the loans to the acquiring bank.  See May Tr. 4:18-5:5 (Klein).

Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith then asserted that the Court concluded that the original Complaint does not explain how the Defendants' conduct caused the FDIC an injury, or how the Defendants' tortious conduct affected the FDIC.  See May Tr. 5:19-25.  Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith argued that the Amended Complaint adds only two new allegations.  See May Tr. 6:1-9 (Carroll).  The FDIC's first allegation is that Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith's tortious conduct resulted in First Community funding loans which subsequently defaulted."  May Tr. 6:1-9 (Carroll).  Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith then asserted that the FDIC's second addition to the in the Amended Complaint was to state that First Community funded the subject transactions, but that First Community was not repaid in full, and that the FDIC now seeks damages.  See May Tr. 6:10-14 (Carroll).  Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith then asserted that these additions to the Amended Complaint still do not cure the original Complaint's deficiencies.  See May Tr. 6:15-31 (Carroll).  Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith then argued that the allegations in the Amended Complaint do not demonstrate how Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith's conduct caused the loan to default.  See May Tr. 7:21-8:19 (Carroll).

Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith then argued that the FDIC's damages computations were incorrect and that there is a distinction between the charge-off of a

loan and damages.  See May Tr. 9:9-10:7 (Carroll).  Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith argued that a theoretical loan charge-off to zero is incorrect because even if a loan is charged off to a zero value, there is still some value to the loan greater than zero.  See May Tr. 10:8-18 (Carroll).

Nafus then argued that the FDIC did little to amend the complaint in this case, and that the amendments it made did not cure the defects that the Court identified in its MOO.  See May Tr. 11:16-23 (Wihl).  Nafus then stated that the FDIC's allegations about Nafus' tortious conduct are insufficient and inaccurate and do not allege with sufficient particularity that Nafus' tortious conduct affected the FDIC.  See May Tr. 12:20-13:20 (Wihl).  Nafus then argued that in the Amended Complaint, Nafus is not named in connection with the subject loans, sold in connection with the FDIC closing First Community, and therefore the FDIC did not establish that Nafus' tortious conduct harmed the FDIC.  See May Tr. 14:6-14.  Nafus stated that he was not on the board of directors and that he was a loan officer, even though the Amended Complaint refers to all defendants and does not note the distinction between the roles.  See May Tr. 15-21 (Wihl).  Nafus stated that the FDIC seeks damages for the losses it incurred on the subject loans, yet included no allegations that he was involved with the subject loans.  See May Tr. 15:5-16:3.

The FDIC then responded to Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, Nafus, and Smith's arguments.  See May Tr. 16:24-17:2 (Klein).  The FDIC stated that the hearing before the Court was for the FDIC's Motion for Leave, not summary judgment, and that the FDIC is not appearing before the Court to prove its case.  See May Tr. 17:3-7 (Klein).  The FDIC asserted that Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith's issues are factual summary judgment issues that can be addressed with future motions, if necessary.  See May Tr. 8:8-19. The FDIC argued that First Community failed because Dee, DiPaola, Dolan, Fanning, Martin,

Sanchez, and Smith approved the loans with the deficiencies the FDIC identified and that the subject loans defaulted, and the FDIC was not repaid.  See May Tr. 18:2-12 (Klein).  The Court then advised the parties that it would take the pending motions under advisement, but indicated that the Court was inclined to grant the FDIC's Motion for Leave to Amend so the Court could retain jurisdiction to deal with the pending Motions to Dismiss.  See May. Tr. 19:18-20:15 (Court).

> **12.**   **The Court Grants the FDIC's Motion for Leave to Amend its Complaint and the Plaintiff's Motion to Stay Deadlines in this Court's Scheduling Order.**

On March 11, 2016, the Court issued an order granting the FDIC's Motion for Leave to Amend its Complaint in Accordance with the Court's March 3, 2015 Order.  See Order at 1, filed March 11, 2016 (Doc. 94)("Order Granting Leave to Amend Complaint").  The Court also granted the Plaintiff's Motion to Stay Deadlines in this Court's Scheduling Order, filed March 10, 2015 (Doc 68), on March 11, 2016.  See Order at 1, filed March 11, 2016 (Doc. 95)("Order Granting Motion to Stay Deadlines").

> **13.**   **Notice of Adoption of Previously Filed Certain Defendants' Motion to Dismiss and Defendants' Joint Response in Opposition to Plaintiff's Motion for Leave to Amend.**

First Community Defendants then filed the Notice of Adoption of Previously Filed Certain Defendants' Motion to Dismiss and Defendants' Joint Response in Opposition to Plaintiff's Motion for Leave to Amend, filed March 31, 2016 (Doc. 97)("Notice of Adoption of Previously Filed Motion to Dismiss").  In it, the First Community Defendants adopt as their response to the Amended Complaint the previously filed Certain Defendants' Motion to Dismiss (Doc. 15); Motion to Dismiss for Failure to State a Claim and Notice of Joinder (Doc. 18); Reply in Support of Certain Defendants' Motion to Dismiss (Doc. 28); Reply to Response to Motion to Dismiss for Failure to State a Claim (Doc. 32); and Defendants' Joint Response in Opposition to

Plaintiff's Motion for Leave to Amend (Doc. 70).  See Notice of Adoption of Previously Filed Motion to Dismiss at 4.

        **14.**    **Nafus' Renewed Motion to Dismiss.**

     Nafus filed Defendant Nafus's Renewed Motion to Dismiss on March 31, 2016.  See Defendant Nafus's Renewed Motion to Dismiss (Doc. 98)("Nafus' Renewed Motion to Dismiss").  Nafus moves the Court to dismiss the FDIC's Amended Complaint for the reasons set forth in the Defendants' March 2014 motions to dismiss that the Court has not ruled upon yet. See Nafus' Renewed Motion to Dismiss at 2.

        **15.**    **The FDIC's Response and Opposition to Nafus' Renewed Motion to Dismiss.**

     The FDIC responded to Nafus' Renewed Motion to Dismiss by filing Plaintiff's Response and Opposition to Defendant Nafus's Renewed Motion to Dismiss (DKT. No. 98). See Plaintiff's Response and Opposition to Defendant Nafus's Renewed Motion to Dismiss (DKT. No. 98) at 1, filed April 13, 2016 (Doc. 99)("Plaintiff's Response to Nafus Renewed Motion to Dismiss").  In response to Defendant Nafus's Renewed Motion, the FDIC detailed the procedural history of the case leading to Nafus' Renewed Motion to Dismiss, and then renewed the following previously filed briefs: (i) the Plaintiff's Opposition to Certain Defendants' Motion to Dismiss (Dkt. No. 23); (ii) the Plaintiff's Opposition to Defendant Bobby J. Nafus' Motion to Dismiss (Dkt. No. 25); (iii) the Plaintiff's Response to Defendants' Notice of Supplemental Authority (Dkt. No. 41); (iv) the Plaintiff's Motion for Leave to Amend its Complaint in Accordance with the Court's March 3, 2015 Order (Dkt. No. 67); and (v) the Plaintiff's Reply in Support of its Motion for Leave to Amend the Complaint (Dkt. No. 72) (collectively, the "FDIC-R's Adopted Briefs").  See Plaintiff's Response to Nafus Renewed Motion to Dismiss at 3.

16.     **The FDIC's Notice of Adoption of Plaintiff's Previously Filed Opposition to Certain Defendants' Motion to Dismiss, Response to Defendants' Notice of Supplemental Authority, Motion for Leave to Amend the Complaint, and Reply in Support of its Motion for Leave to Amend the Complaint in Opposition to Certain Defendants' Notice of Adoption Filed March 31, 2016 (Dkt. No. 97)**.

The FDIC filed a Notice of Adoption of Plaintiff's Previously Filed Opposition to Certain Defendants' Motion to Dismiss, Response to Defendants' Notice of Supplemental Authority, Motion for Leave to Amend the Complaint, and Reply in Support of its Motion for Leave to Amend the Complaint in Opposition to Certain Defendants' Notice of Adoption Filed March 31, 2016 (Dkt. No. 97). See Notice of Adoption of Plaintiff's Previously Filed Opposition to Certain Defendants' Motion to Dismiss, Response to Defendants' Notice of Supplemental Authority, Motion for Leave to Amend the Complaint, and Reply in Support of its Motion for Leave to Amend the Complaint in Opposition to Certain Defendants' Notice of Adoption Filed March 31, 2016 (Dkt. No. 97) at 1, filed April 13, 2016 (Doc. 100)("Notice of Adoption"). The FDIC described the procedural history of the case thus far and then stated that

> the FDIC-R hereby adopts the following previously filed briefs: (1) Plaintiff's Opposition to Certain Defendants' Motion to Dismiss (Dkt. No. 23); (2) Plaintiff's Opposition to Defendant Bobby J. Nafus' Motion to Dismiss (Dkt. No. 25); (3) Plaintiff's Response to Defendants' Notice of Supplemental Authority (Dkt. No. 41); (4) Plaintiff's Motion for Leave to Amend its Complaint in Accordance with the Court's March 3, 2015 Order (Dkt. No. 67); and (5) Plaintiff's Reply in support of its Motion for Leave to Amend the Complaint (Dkt. No. 72) (the "FDIC-R's Adopted Briefs").

Notice of Adoption at 3.

17.     **Nafus' Reply in Support of Renewed Motion to Dismiss**.

Nafus filed Defendant Nafus' Reply in Support of His Renewed Motion to Dismiss (Doc. 98) on April 27, 2016. See Defendant Nafus' Reply in Support of His Renewed Motion to Dismiss (Doc. 98), filed April 27, 2016 (Doc. 101)("Nafus' Reply in Support of Motion to Dismiss"). Nafus incorporates by reference the arguments that he made in the reply brief he

filed on May 23, 2014 (Doc. 32) in support of his March 3, 2014, Motion to Dismiss (Doc 18).

See Nafus Reply in Support of Motion to Dismiss at 1.

## LAW REGARDING MOTIONS TO AMEND

"While Rule 15 governs amendments to pleadings generally, rule 16 of the Federal Rules of Civil Procedure governs amendments to scheduling orders."  Bylin v. Billings, 568 F.3d 1224, 1231 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)).  When a court has not entered a scheduling order in a particular case, rule 15 governs amendments to a plaintiff's complaint.  See Fed. R. Civ. P. 15.  When a scheduling order governs the pace of the case, however, amending the complaint after the deadline for such amendments implicitly requires an amendment to the scheduling order, and rule 16(b)(4) governs changes to the scheduling order. See Bylin v. Billings, 568 F.3d at 1231.

**1.  Amendments Under Rule 15(a)**

Rule 15(a) of the Federal Rules of Civil Procedure provides:

> **(1) *Amending as a Matter of Course.***  A party may amend its pleading once as a matter of course within:
>
> > **(A)** 21 days after serving it, or
> >
> > **(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under rule 12(b), (e), or (f), whichever is earlier.
>
> **(2) Other Amendments.** In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(bold and italics in original).

> Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993)(citing Foman v. Davis, 371 U.S. 178, 182, (1962)).  It is well settled in this

circuit that untimeliness alone is a sufficient reason to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no adequate explanation for the delay, Woolsey v. Marion Laboratories, Inc., 934 F.2d at 1462. Furthermore, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d at 1185.

Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993). See Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc., 3 F.3d at 1365-66 and stating that resolving the issue whether to allow a plaintiff to file a supplement to his complaint is "well within the discretion of the district court"). "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub. Schs., 2007 WL 1306814, at *2 (D.N.M. 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)). "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim." Burleson v. ENMR-Plateau Tel. Co-op., 2005 WL 3664299 at *2 (D.N.M. 2005)(Browning, J.)(citing Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)).

Although rule 15(a) provides that leave to amend shall be freely given, "the district court may deny leave to amend where amendment would be futile." Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d 848, 859 (10th Cir. 1999). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." Bradley v. Val-Mejias, 379 F.3d 892, 901 (10th Cir. 2004)(citing Jefferson Cnty. Sch. Dist. v. Moody's Investor's Servs., 175 F.3d at 859 (10th Cir. 1999)).

It is "well settled" in the Tenth Circuit "that untimeliness alone is a sufficient reason to deny leave to amend, especially when the party filing the motion has no adequate explanation for the delay." Frank v. U.S. West, Inc., 3 F.3d at 1365-66 (internal citations omitted).[11]  The longer the delay, "the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." Minter v. Prime Equip. Co., 451 F.3d at 1205 (citing Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)).   Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'" Minter v. Prime Equip. Co., 451 F.3d at 1206 (quoting Viernow v. Euripides Dev. Corp., 157 F.3d 785, 799-800 (10th Cir. 1998)).  "[P]rejudice to the opposing party need not also be shown." Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 at 1185.   "Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185 (quoting State Distribs., Inc. v. Glenmore Distilleries Co., 738 F.2d 405 (10th Cir. 1984)).   Along the same vein, the court will deny amendment if the party learned of the facts upon which its proposed amendment is based and nevertheless unreasonably delayed in moving to amend its complaint.  See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

---

[11]The Court notes that there is authority in the Tenth Circuit that seems to be to the contrary.  See R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir. 1975)("Lateness does not of itself justify the denial of the amendment.").  Minter v. Prime Equipment Co. seems to clarify that the distinction is between "delay" and "undue delay." Minter v. Prime Equipment Co., 451 F.3d at 1205-06.  Delay is undue "when the party filing the motion has no adequate explanation for the delay." Minter v. Prime Equipment Co., 451 F.3d at 1206.

**LAW REGARDING STAYS**

A court has broad discretion in managing its docket, which includes decisions regarding issuing stays for all or part of a proceeding. See Clinton v. Jones, 520 U.S. 681, 706 (1997)("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." (citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936))).

> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

Landis v. N. Am. Co., 299 U.S. at 254-55. Recognizing that district courts must exercise moderation in issuing stays, the Supreme Court has noted that there are no strict rules for the district court to apply, because "[s]uch a formula . . . is too mechanical and narrow." Landis v. N. Am. Co., 299 U.S. at 255.

The party seeking a stay generally faces a difficult burden. See Clinton v. Jones, 520 U.S. at 708 ("The proponent of a stay bears the burden of establishing its need."); S2 Automation LLC v. Micron Tech., Inc., No. CIV 11-0884 JB/WDS, 2012 WL 3150412, at *2 (D.N.M. July 23, 2012)(Browning, J.)(citing Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir. 1983)). "In particular, where a movant seeks relief that would delay court proceedings by other litigants he must make a strong showing of necessity because the relief would severely affect the rights of others." Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484. "The underlying principle clearly is that 'the right to proceed in court should not be denied except under the most extreme circumstances.'" Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484 (alterations omitted)(quoting Klein v. Adams & Peck, 436 F.2d 337, 339 (2d Cir.

1971)).

The United States Court of Appeals for the Tenth Circuit has acknowledged a district court's discretion in issuing discovery stays.  In Cole v. Ruidoso Municipal Schools, 43 F.3d 1373 (10th Cir. 1994), the defendants argued "that they had an absolute right to a stay of discovery" after they filed a motion for qualified immunity and appealed to the Tenth Circuit, because the district court imposed conditions on the stay.  43 F.3d at 1386.  The Tenth Circuit rebuffed the strict rules that the defendants suggested:

> As a general rule, discovery rulings are within the broad discretion of the trial court.  The trial court's decision on discovery matters will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.

Cole v. Ruidoso Mun. Sch., 43 F.3d at 1386 (citations omitted)(internal quotation marks omitted).

Whether to issue a discovery stay depends greatly on the facts and progress in each case. In S2 Automation LLC v. Micron Technology, Inc., the Court granted in part and denied in part a motion to stay discovery, to extend pretrial deadlines, to vacate the trial setting, and to issue a protective order.  See 2012 WL 3150412, at *1.  The Court denied the motion to the extent it requested a discovery stay, because, "[u]ltimately, a stay is unnecessary."  2012 WL 3150412, at *3.  The parties had made "significant progress on the disputed matters," and the Court had "issued rulings on many of the motions that Micron Technology contended needed to be resolved before the case proceeded."  2012 WL 3150412, at *3.  Instead of granting the discovery stay, the Court extended deadlines that it had previously set in the case based on the case's increasing complexity.  See 2012 WL 3150412, at *3.  In Walker v. THI of New Mexico at Hobbs Center, No. CIV 09-0060 JB/KBM, 2011 WL 2728326 (D.N.M. June 28, 2011)(Browning, J.), the Court

evaluated whether to stay deposition discovery until thirty days after it ruled on the motions to

dismiss two of the defendants, which would determine whether those defendants would remain

in the suit and participate in discovery.  See 2011 WL 2728326, at *1.  The plaintiffs argued that

the Court had already extended discovery deadlines and that issuing a stay would require

rescheduling deadlines.  See 2011 WL 2728326, at *1.  The Court denied the motion to stay,

because it did "not see a benefit to staying discovery."  2011 WL 2728326, at *2.  The Court

noted that counsel for the two defendants who were subject to the motions to dismiss had already

indicated that they would not participate in deposition discovery.  See 2011 WL 2728326, at *2.

The Court stated: "There is thus no benefit to staying deposition discovery, and staying

deposition discovery would further delay the case."  2011 WL 2728326, at *2.  See also Martin

v. City of Albuquerque, ___ F. Supp. 3d ___, 2015 WL 7803616, at *5 (D.N.M., Nov. 9,

2015)(Browning, J.); Fabara v. GoFit, LLC, 2015 WL 3544296, at *3-5 (D.N.M., May 13,

2015).

### LAW REGARDING MODIFICATION OF SCHEDULING ORDERS

"The District Court has wide discretion in its regulation of pretrial matters." Si-Flo, Inc.

v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990).  Scheduling orders, however, "may be

modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Accord

Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6 (D.N.M. 2008)(Browning, J.).

The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot
> reasonably be met despite the diligence of the party seeking the extension. Since
> the scheduling order is entered early in the litigation, this standard seems more
> appropriate than a "manifest injustice" or "substantial hardship" test. Otherwise, a
> fear that extensions will not be granted may encourage counsel to request the
> longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and diligence are related. "The Tenth Circuit . . . has recognized the interrelation between 'excusable neglect' and 'good cause.'" Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(Rushfelt, J.)(citing In re Kirkland, 86 F.3d 172, 175 (10th Cir. 1996)). "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." Street v. Curry Bd. of Cnty. Comm'rs, 2008 WL 2397671, at *6. See Advanced Optics Electronics, Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order."). In In re Kirkland, the Tenth Circuit dealt with the definition of "good cause" in the context of a predecessor to modern rule 4(m) of the Federal Rules of Civil Procedure, and noted:

> [W]ithout attempting a rigid or all-encompassing definition of 'good cause,' it would appear to require *at least as much* as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of 'good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified' is normally required.

86 F.3d at 175 (emphasis in original)(quoting Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987))(internal quotation marks omitted). The Tenth Circuit explained that Putnam v. Morris "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'" In re Kirkland, 86 F.3d at 175. Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request. In Advanced Optics Electronics, Inc. v. Robins, the Court found that, where the defendant did not conduct discovery or make any good-

faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling order. 769 F. Supp. 2d at 1313 n.8.  In Street v. Curry Bd. Of Cnty. Comm'rs, however, the Court found that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery."  2008 WL 2397671, at *11.  In Montoya v. Sheldon, 2012 WL 5353493 (D.N.M. 2012)(Browning, J.), the Court did not find good cause to modify the scheduling order and reopen discovery, and refused to grant the plaintiffs' request do so, where the plaintiffs' excuse for not disclosing their expert before the close of discovery was that they thought that the case would settle and they would thus not require expert testimony.  See 2012 WL 5353493, at *14. The Court noted:

> The [plaintiffs] filed this case on April 15, 2010.  Because [Plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

2012 WL 5353493, at *14.

In Scull v. Management & Training Corp., 2012 WL 1596962 (D.N.M. 2012)(Browning, J.), the Court denied a plaintiff's request for an extension of time to name an expert witness against a defendant.  The plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, but a scheduling order was in effect before the second defendant entered the case.  The Court found that the plaintiff should have known that he would need to name an expert witness against the defendant already in the case.  See 2012 WL 1596962, at *8.  The Court determined that the plaintiff was seeking "relief from his own

disregard" for the deadline.  2012 WL 1596962, at *8.  "Despite his knowledge that [Defendant] PNA had yet to enter the case, [Plaintiff] Scull chose to allow the deadline to pass without naming expert witnesses against [Defendant] MTC."  2012 WL 1596962, at *8.  Regarding the defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, because it "was not unreasonable for Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he had not yet had the opportunity to engage in discovery against PNA as he had against MTC."  2012 WL 1596962, at *9.  The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," as Scull could not have determined the need for an expert witness until after PNA entered the case.  2012 WL 1596962, at *9.

In Stark-Romero v. National Railroad Passenger Co (AMTRAK), 275 F.R.D. 544 (D.N.M. 2011)(Browning, J.), the Court found that a lawyer had shown excusable neglect when he missed a scheduling deadline because, soon after his son's wedding, his father-in-law developed a tumor in his chest and the lawyer arranged his father-in-law's medical care, and only after the lawyer returned to his work did he realize that a deadline passed.  See 275 F.R.D. 549-550. The Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but found that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not because of his inadvertence.  275 F.R.D. 549-550.  In West v. New Mexico Taxation and Revenue Department, 2010 WL 3834341 (D.N.M. 2010)(Browning, J.), the Court allowed a plaintiff extended time to file a response to a defendant's motion for summary judgment, in part because of the difficulty the plaintiff's counsel experienced attempting to obtain depositions with certain defense

witnesses, and thus it was not her fault, and in part because cross-motions on summary judgment are particularly helpful for the Court:

> [C]ross-motions tend to narrow the factual issues that would proceed to trial and promote reasonable settlements.  In some cases, it allows the Court to determine that there are no genuine issues for trial and thereby avoid the expenses associated with trial.  The Court prefers to reach the merits of motions for summary judgment when possible.

2010 WL 3834341, at *4-5.  On the other hand, in Liles v. Washington Tru Solutions, LLC, 2007 WL 2298440 (D.N.M. 2007)(Browning, J.), the Court denied a plaintiff's request for additional time to respond to a defendant's motion for summary judgment, when the only rationale the plaintiff provided was that its counsel's "family and medical emergencies" precluded the plaintiff from timely responding.  2007 WL 2298440, at *2.

## LAW REGARDING RULE 12(B)(6) MOTIONS

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. at 677-78 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 570).  Under rule 12(b)(6), the Court accepts as true all well-pled factual allegations in the complaint and draws all reasonable inferences from those facts in the Plaintiffs' favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006).  "The allegations must be enough that, if assumed to be true, the Plaintiffs plausibly (not just speculatively) ha[ve] a claim for relief." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).

A complaint fails to state a claim when it makes conclusory allegations of liability without supporting factual content.  See Bell Atlantic Corp. v. Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. at 678-79. A complaint must set forth sufficient facts to raise a plausible inference that the defendant is liable for the misconduct alleged.  See Ashcroft v. Iqbal,

556 U.S. at 677-78. "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp. v. Twombly, 550 U.S. at 555-56. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 555-56).

Furthermore, while the court must accept all the factual allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. at 678. A court should not grant dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." GFF Corp. v. Associated Wholesale Grocers, 130 F.3d 1381, 1384 (10th Cir. 1997)(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact of the plaintiff's damages. See Coffey v. United States, 870 F.

Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86.  "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." <u>Ramirez v. Armstrong</u>, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, <u>overruled on other grounds by</u> <u>Folz v. State</u>, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249.  Generally, negligence is a question of fact for the jury.  <u>See</u> <u>Schear v. Bd. of Cty Comm'rs</u>, 1984-NMSC-079, ¶ 4, 672, 687 P.2d 728, 729.  "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant."  <u>Schear v. Bd. of Cty Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at 729. "Whether a duty exists is a question of law for the courts to decide."  <u>Schear v. Bd. of Cty Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons."  <u>Baxter v. Noce</u>, 1988-NMSC-024, ¶ 11, 51, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owed a duty to the plaintiff.  <u>See</u> <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 7, 73 P.3d at 186.  New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect."  <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted).  To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. <u>See</u> <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm."  <u>Grover v. Stechel</u>, 2002-NMCA-049, ¶ 11, 143, 45 P.3d 80, 84.  "[C]ertain relationships, however, that

give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84. "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'" Reichert v. Atler, 1994-NMSC-056, ¶ 11, 626, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause[12] of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It need not be the only cause, nor the last nor nearest cause." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It is sufficient if it occurs with some other cause acting

---

[12]The 2004 amendments to Uniform Jury Instruction 13-305 eliminated the word "proximate" within the instruction. See Use Note, N.M. Rul. Amend. Civ. UJI 13-305. The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause." Editor's Notes, N.M. Rul. Amend. Civ. UJI 13-305.

at the same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac,
2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## NEW MEXICO LAW REGARDING CORPORATE GOVERNANCE AND THE BUSINESS JUDGMENT RULE

The business judgment rule's protection is, essentially, a presumption that in making a
business decision the directors and officers of a corporation acted on an informed basis, in good
faith and in the honest belief that the action taken was in the best interests of the company.  See,
e.g., Gimbel v. Signal Cos., 316 A.2d 599, 608 (Del. Ch. 1974).  N.M. Stat. Ann. § 53-11-
35(B)(1967, as amended through 1987), defines the basic standard of conduct for corporate
governance, in relevant part as follows:

> A director shall perform his duties as a director, including his duties as a member
> of any committee of the board upon which the director may serve, in good faith,
> in a manner the director believes to be in or not opposed to the best interests of
> the corporation, and with such care as an ordinarily prudent person would use
> under similar circumstances in a like position.

N.M. Stat. Ann. § 53-11-35(B).  By its plain language, § 53-11-35(B) applies only to directors,
and not the officers, of a corporation.  See § 53-11-35(B).  Section 53-11-35(D) further provides:

> For purposes of Subsection B of this section, a director, in determining what he
> reasonably believes to be in or not opposed to the best interests of the corporation,
> shall consider the interests of the corporation's shareholders and, in his discretion,
> may consider any of the following:
>
> (1)     the interests of the corporation's employees, suppliers, creditors and
>         customers;
>
> (2)     the economy of the state and nation;
>
> (3)     the impact of any action upon the communities in or near which the
>         corporation's facilities or operations are located; and
>
> (4)     the long-term interests of the corporation and its shareholders, including
>         the possibility that those interests may be best served by the continued
>         independence of the corporation.

N.M. Stat. Ann. § 53-11-35(D).

New Mexico courts have also adopted the following common-law business judgment rule:

> If in the course of management, directors arrive at a decision, within the corporation's powers (intra vires) and their authority, for which there is a reasonable basis, and they act in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be the best interests of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or to surcharge the directors for any resulting loss.

White v. Banes Co., 1993-NMSC-078, ¶ 13, 866 P.2d 339 (quoting DiIaconi v. New Cal Corp., 1982-NMCA-064, ¶ 29, 643 P.2d 1234, 1240 (quoting Henn, Law of Corporations, 482-83, § 242 (1979))).   In contrast to § 53-11-35(B), for the purposes of the common-law business judgment rule, "[a]lthough the 'business judgment' rule is usually stated in terms of director functions, it is no less applicable to officers in the exercise of their authority and may be applicable to controlling shareholders when they exercise their more extraordinary management functions."  DiIaconi v. New Cal Corp., 1982-NMCA-064, ¶ 29, 643 P.2d at 1240.

Because New Mexico Courts have yet to fully analyze the interplay between § 53-11-35(B) and the common-law business judgment rule, the Court must interpret whether corporate directors are entitled to the common-law business judgment rule's protections when they are alleged, in the language of § 53-11-35(B), to have failed to act "with such care as an ordinarily prudent person would use under similar circumstances in a like position."  N.M. Stat. Ann. § 53-11-35(B).

Other state and federal courts have addressed the relationship between statutory provisions with language that is similar to § 53-11-35(B) and New Mexico's common-law business judgment rule.  In FDIC v. Loudermilk, 761 S.E.2d 332 (Ga. 2014), for example, the

Supreme Court of Georgia examined such a relationship using a Georgia statute that is nearly

identical to § 53-11-35(B):

> Directors and officers of a bank or trust company shall discharge the duties of
> their respective positions in good faith and with that diligence, care, and skill
> which ordinarily prudent men would exercise under similar circumstances in like
> positions.   In discharging his duties, a director or officer, when acting in good
> faith, shall be entitled to rely upon information, opinions, reports, or statements,
> including financial statements and other financial data, in each case prepared or
> presented by:
>
> > (1)    One or more officers or employees of the bank or trust
> > company whom the director or officer reasonably believes
> > to be reliable and competent in the matters presented;
> >
> > (2)    Counsel, public accountants, or other persons as to matters
> > which the director or officer reasonably believes to be
> > within such person's professional or expert competence; or
> >
> > (3)    A committee of the board upon which the director or
> > officer does not serve, duly designated in accordance with a
> > provision of the articles of incorporation or the by laws, as
> > to matters within that committee's designated authority,
> > which committee the director or officer reasonably believes
> > to merit confidence;
>
> but such director or officer shall not be considered to be acting in good faith if he
> has knowledge concerning the matter in question that would cause such reliance
> to be unwarranted.   A director or officer who so performs his duties shall have no
> liability by reason of being or having been a director or officer of the bank or trust
> company.

O.C.G.A. § 7-1-490(a).

The Supreme Court of Georgia began its analysis by discussion two prior Georgia Court

of Appeals decisions.  In the first, <u>Flexible Products Co. v. Ervast</u>, 643 S.E.2d 650 (Ga. Ct. App.

2007), the Georgia Court of Appeals said that the common-law business judgment rule

"forecloses liability in officers and directors for ordinary negligence in discharging their duties."

643 S.E.2d at 653.  In the second, <u>Brock Built, LLC v. Blake</u>, 686 S.E.2d 425 (Ga. Ct. App.

2009), the Georgia Court of Appeals said that "allegations amounting to mere negligence,

carelessness, or lackadaisical performance are insufficient as a matter of law [to overcome the business judgment rule]."  686 S.E.2d at 430.  Justice Blackwell, in <u>Brock Built, LLC v. Blake</u>, noted that the absolute rule that these cases dictate -- <u>i.e.</u>, a rule that the business judgment rule bars all claims for ordinary negligence, leaving room for only gross negligence claims against officers and directors -- "does not fare well in the face of the statute." 761 S.E.2d at 343.  Justice Blackwell explained that O.C.G.A. § 7-1-490(a)'s first sentence indicates that bank officers and directors may be liable for "a failure to exercise ordinary care with respect to the way in which business decisions are made."  761 S.E.2d at 343.

Justice Blackwell clarified that the duty of ordinary care for bank officers and directors is less demanding than the "ordinary diligence" standard that courts use in typical negligence cases. 761 S.E.2d at 343.  Justice Blackwell stated:

> [A bank director] is not bound to exercise the same degree of care which a prudent man would exercise in his own business.  This is too high a standard.  To expect a director under such circumstances to give the affairs of the bank the same care that he takes of his own business is unreasonable, and few responsible men would be willing to serve upon such terms.  In the case of a city bank doing a large business, he would be obliged to abandon his own affairs entirely.  A businessman generally understands the details of his own business, but a bank director cannot grasp the details of a large bank without devoting all his time to it, to the utter neglect of his own affairs.  A director is expected to attend the meetings of the board with reasonable regularity, and to exercise a general supervision and control.
>
> The same limitation appears in the statutory law concerning bank officers and directors, which does not demand the "care which is exercised by ordinary prudent persons under the same or similar circumstances," but instead requires only the "diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances *in like positions*." OCGA § 7-1-490(a).  In other words, bank officers and directors are only expected to exercise the same diligence and care as would be exercised by "ordinarily prudent" officers and directors of a similarly situated bank.

<u>FDIC v. Loudermilk</u>, 761 S.E.2d at 344 (emphasis in original)(citations and internal quotation marks omitted).  Justice Blackwell concluded that such an interpretation of O.G.C.A. § 7-1-

490(a) did not conflict with or supplant the common-law business judgment rule.  See 761 S.E.2d at 344.  Justice Blackwell reasoned that, although the business judgment rule generally precludes claims against officers and directors that sound in ordinary negligence, it does not apply to the extent that those decisions were made without deliberation, without the requisite diligence to ascertain and assess the facts and circumstances upon which the decisions are based, or in bad faith.  See 761 S.E.2d at 338.  In Justice Blackwell's view, therefore, a director or officer must first satisfy OGCA § 7-1-490(a) before obtaining the common-law business judgment rule's protections.  See 761 S.E.2d at 338.[13]

Similarly, in FDIC v. Stahl, 89 F.3d 1510 (11th Cir. 1996), the United States Court of Appeals for the Eleventh Circuit analyzed Fla. Stat. § 607.111(4)'s relationship with the Florida common-law business judgment rule.  See 89 F.3d at 1516.  Section § 607.111(4) provides that directors must perform their duties "in good faith, . . . in a manner . . . reasonably believed to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances."  89 F.3d at 1516 (quoting Fla. Stat. § 607.111(4)).  In an opinion that the Honorable Susan H. Black, United States Circuit Judge for the Eleventh Circuit authored, and Judges Hatchett and Clark joined, the Eleventh Circuit rejected the defendants' argument that the common-law business judgment rule established a gross negligence standard for corporate directors.  See 89 F.3d at 1517.  Quoting Casey v. Woodruff, 49 N.Y.S.2d 625 (N.Y. Sup. Ct. 1944), Judge Black stated:

---

[13]Further, in Justice Blackwell's view, a prudent director in a Georgia corporation seemingly need not act with "the same degree of care which a prudent man would exercise in his own business," and thereby the negligence standard is lower than it might typically be.  FDIC v. Loudermilk, 761 S.E.2d at 344.  While the Court finds the balance of Justice Blackwell's analysis regarding when the business judgment rule kicks in to protect director conduct persuasive, the Court does not explicitly adopt that component of the Justice's analysis.  The distinction does not bear any practical significance, particularly in a state -- like New Mexico -- which has blurred the legal and factual distinction between negligence and gross negligence.

> The question is frequently asked, how does the operation of the so-called "business judgment rule" tie in with the concept of negligence?  There is no conflict between the two.  When courts say that they will not interfere in matters of business judgment, it is presupposed that judgment -- reasonable diligence -- has in fact been exercised.  A d[i]rector cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment.  Courts have properly decided to give directors a wide latitude in the management of the affairs of a corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonabl[y] exercised by them.

FDIC v. Stahl, 89 F.3d at 1517 (quoting Casey v. Woodruff, 49 N.Y.S.2d at 643).  Judge Black explained that, accordingly, under § 607.111(4), directors must act with ordinary care before earning the business judgment rule's protections.  See 89 F.3d at 1517.  Where directors act with due care, Judge Black stated, the business judgment rule protects them from liability unless they acted fraudulently, illegally, oppressively, or in bad faith.  See 89 F.3d at 1517.

Although there are minor differences between O.C.G.A. § 7-1-490(a), Fla. Stat. § 607.111(4), and N.M. Stat. Ann. § 53-11-35(B), the Supreme Court of Georgia's reasoning in FDIC v. Loudermilk, and the Eleventh Circuit's reasoning in FDIC v. Stahl apply with equal force here: the common-law business judgment rule compliments rather than abrogates § 53-11-35(B).  Applying the business judgment rule's protections to directors who act negligently would render meaningless § 53-11-35(B)'s statement that "[a] director shall perform his duties . . . with such care as an ordinarily prudent person would use under similar circumstances in a like position."  N.M. Stat. Ann. § 53-11-35(B).  See United States v. Menasche, 348 U.S. 528, 538-39 (1995)(rejecting the concurrence's construction of a statute as "violat[ing] the cardinal rule of statutory interpretation that no provision should be constructed as entirely redundant").  The better interpretation is one that uses the common law to "fill in the gaps not addressed by the statute" rather than supplant the statute altogether.  Sims v. Sims, 1996-NMSC-078, ¶ 23, 930 P.2d 153.  Cf. Leon v. Kelly, 618 F. Supp. 2d at 1340 (explaining that, "unless displaced by the

particular provisions of the UPA, the principles of law and equity supplement the UPA"). Consequently, directors must comply with § 53-11-35(B) to obtain the business judgment rule's protections.

The Honorable Kenneth J. Gonzales, United States District Judge for the District of New Mexico, reached the same result in FDIC v. Wertheim.  See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *3-4 (D.N.M. 2014)(Gonzales, J.).  Judge Gonzales stated:

> [A] director in New Mexico must initially comply with the first sentence of Section 53-11-35(B).  Then, if the director's decision has a reasonable basis and the director acted in good faith and in the best interest of the corporation, the New Mexico common law business judgment rule will protect the director from liability arising from his decision.  Conversely, if the director violates the first sentence of Section 53-11-35(B), then the New Mexico common law business judgment rule does not apply . . . .

Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *3-4.  In other words, a corporate director must first comply with § 53-11-35(B)'s mandate to act as an ordinarily prudent person before the business judgment rule can protect the process by which he came to a decision.  See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *5.  See also Federal Deposit Ins. Corp. v. Stahl, 89 F.3d at 1517 (holding directors must act with ordinary care under Florida statute before business judgment rule applies).

FDIC v. Schuchmann does not dictate a different result.  There, in an opinion that the Honorable Carlos F. Lucero, United States Circuit Judge for the Tenth Circuit, authored, and Judges Brorby and Anderson joined, the Tenth Circuit held that the New Mexico district court, applying New Mexico law, did not abuse its discretion by instructing the jury that directors must "arrive at their decisions . . . with a reasonable basis, and while acting in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be in the best interests of the corporation."  235 F.3d at 1228.  If

the jury found lack of a reasonable basis, then the rest of the instruction was largely inapplicable; the good faith and honesty only comes into play if the director is found to have acted "with a reasonable basis." Judge Lucero's opinion does not indicate, however, whether the district court instructed the jury that a director must comply with § 53-11-35(B) before obtaining the business judgment rule's protections or whether such an instruction -- or lack thereof -- would be an abuse of discretion.[14] In fact, Judge Lucero did not address the relationship between § 53-11-35(B) and the common-law business judgment rule in any way. FDIC v. Schuchmann does not, therefore, fully answer the question that the Court must address, and does not facilitate the conclusion that the Court reaches, although this Court might have written the instruction at issue in that case differently to more clearly indicate when the business judgment rule applies.

Thus, because § 53-11-35(B) requires, as a conjunctive prerequisite, that directors "serve, in good faith, in a manner the director believes to be in or not opposed to the best interests of the corporation, and with such care as an ordinarily prudent person would use under similar circumstances in a like position," before they are entitled to the protections of the common-law business judgment rule, a plaintiff need only plead that one of those requirements is not satisfied to garner judicial scrutiny of the director's conduct and avoid the business judgment rule at the pleading stage. N.M. Stat. Ann. § 53-11-35(B). See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *5. The pleading standard must differ, though, for corporate officers, as opposed to corporate directors, given § 53-11-35(B)'s plain language. See Fed. Deposit Ins.

---

[14]The Tenth Circuit also held that the New Mexico district court did not abuse its discretion when it instructed the jury that the plaintiff must prove that the New Mexico common law business judgment rule does not apply. See FDIC v. Schuchmann, 235 F.3d at 1228-29. "The Tenth Circuit reasoned that this was the appropriate result considering that New Mexico courts had not decided whether the burden of proving the common law business judgment rule should be shifted to the defendant. New Mexico law on the issue of burden shifting remains unsettled." Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *4. The Court, though, is convinced that the plaintiff bears the burden throughout.

Corp. v. Wertheim, 2014 WL 11619166, at *5. New Mexico courts addressing the common-law business judgment rule's protections in the case of a defendant corporate officer, consequently, must look beyond § 53-11-35(B), focusing exclusively on the application of the common-law business judgment rule. See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *5.

In the officer context, then, the Court agrees with Fed. Deposit Ins. Corp. v. Wertheim, which provides:

> The first sentence of Section 53-11-35(B) only applies to directors, not to corporate officers. The New Mexico common law business judgment rule, however, applies equally to the Officer Defendants. . . . [T]he plaintiff has the burden of showing that the New Mexico common law business judgment rule does not apply to the Officer Defendants. Since the New Mexico common law business judgment rule requires, in the conjunctive, that officers have a reasonable basis for their actions, act in good faith, and honestly believe that they acted in the best interests of the corporation, as with Section 53-11-35(B), Plaintiff need only plead that the Officer Defendants did not meet one of those requirements.

Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *5. Thus, while semantically different, a similar objective standard to that for directors under § 53-11-35(B) arises under the common-law business judgment rule with respect to officers -- that being that an officer must have an objectively reasonable basis for the conduct under scrutiny to be afforded the business judgment rule's protections. See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *5.

Last, the Court notes that, once a court has discerned whether a corporate officer defendant has acted upon a reasonable basis, the analysis is not yet complete. The Court must further discern whether the subjective elements of the conjunctive prerequisites to the business judgment rule's protections have been met. Only upon a positive outcome of that additional analysis, then, will the corporate officer enjoy the business judgment rule's protections.

<u>ANALYSIS</u>

The Court grants the FDIC's Motion for Leave to Amend.  The FDIC's Amended Complaint cures deficiencies in the original Complaint by including sufficient causation and injury-in-fact allegations to establish the Court's jurisdiction over the case.  The Court also grants the FDIC's Motion to Stay Deadlines in the case.  The FDIC establishes its need for a stay to conduct thorough discovery in light of the Court's prior decision to dismiss the original Complaint, and staying discovery deadlines will not unduly delay the proceeding and will benefit the parties.  As well, the Court denies the First Community Defendants' Notice of Adoption of Previously Filed Motion to Dismiss because the Amended Complaint makes sufficient allegations of negligence, gross negligence, and breach of fiduciary duty.  Finally, the Court denies Nafus' Motion to Dismiss.  The FDIC includes sufficient factual allegations that Nafus lacked a reasonable basis for his conduct to afford him protection under New Mexico's common-law business judgment rule.

**I.      THE COURT GRANTS THE FDIC'S MOTION FOR LEAVE TO AMEND, BECAUSE THE AMENDED COMPLAINT SUFFICIENTLY CURES DEFECTS IN THE ORIGINAL COMPLAINT TO SATISFY ARTICLE III'S STANDING <u>REQUIREMENTS</u>.**

The Court grants the FDIC's Motion for Leave to Amend the Complaint.  A party may amend its pleading only with the opposing party's written consent or the court's leave if twenty-one days have transpired after serving the complaint, after service of a responsive pleading, or after service of a motion under rule 12(b), (e), or (f), whichever is earlier.  <u>See</u> Fed. R. Civ. P. 15(a).  The court should freely give leave when justice so requires.  <u>See</u> Fed. R. Civ. P. 15(a).  Refusing leave to amend is generally justified only upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.  <u>See</u> <u>Castleglen, Inc. v. Resolution</u>

Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993)(citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

First Community Defendants argue against granting the FDIC's Motion for Leave to Amend. See Response to Motion for Leave to Amend at 1. First Community Defendants assert that the Court should deny the Motion to Stay Deadlines dismiss the case with prejudice, because: (i) the FDIC's Motion for Leave to Amend does not explain how a proposed amendment would cure the deficiencies that the Court identified; and (ii) analysis of the proposed Amended Complaint shows that it does not cure the original Complaint's defects that the Court identified in its March 3 Order, because the Amended Complaint does not allege an injury-in-fact, and does not explain how First Community Defendants' alleged errors or omissions caused any claimed injury. See Response to Motion for Leave to Amend at 1-2.

The Court disagrees with First Community Defendants' characterization of the Amended Complaint. In dismissing the FDIC's original Complaint, the Court concluded that the FDIC did not allege that First Community Defendants' tortious conduct harmed the FDIC. See MOO at 53. The Court concluded:

> The Tenth Circuit has said that "[e]stablishing injury in fact requires a factual showing of perceptible harm." Bear Lodge Multiple Use Ass'n v. Babbitt, 175 F.3d 814, 821 (10th Cir. 1999)(citations omitted)(internal quotation marks omitted). The original Complaint contains no such allegations. The [original] Complaint does not contend, for example, that (i) any of the loans that the Defendants approved are in default; (ii) any of the loans that the Defendants approved have been restructured on terms unfavorable to the FDIC; (iii) any of the debtors have had problems servicing their debt or that such problems have not been adequately resolved by resorting to those loans' guarantors; or (iv) FDIC has had to reimburse or guarantee the loans that the Defendants approved.

MOO at 53-54. In the original Complaint, the FDIC relied on conclusory statements in alleging that First Community Defendants' tortious conduct in approving the six subject loans harmed it. For example, the FDIC alleged in the original Complaint that, "[a]s a direct and proximate result

of the Approving Defendants' tortious conduct, the FDIC-R seeks damages in excess of $1.14 million" for the loan First Community made to Kitts Development.  Complaint ¶ 35, at 10.  The Court reiterates its conclusion from the MOO that this formulaic allegation in the original Complaint, which varies in amount for each subject loan, but uses identical language for each subject loan, fails to provide a "factual showing of perceptible harm."  Bear Lodge Multiple Use Ass'n v. Babbitt, 175 F.3d at 821.  See Complaint ¶ 43, at 13; id. ¶ 48; at 14, id. ¶ 55, at 17; id. ¶ 59, at 18; id. ¶ 63, at 20.

The FDIC cured this deficiency, however, with updated language in the Amended Complaint.  See Amended Complaint ¶ 35, at 10.  Instead of the conclusory statement used to allege the harm -- First Community Defendants' tortious conduct caused harm to the FDIC, see original Complaint ¶ 35 at 10, with the loan First Community made to Kitts Development -- the FDIC now alleges:

> As a result of the tortious conduct of Defendants Dee, DiPaola, Dolan, and Smith, the Bank funded the loan to the borrower, which subsequently defaulted. Thereafter, the Bank placed the loan on non-accrual status on November 28, 2008 and ultimately charged-off the loan.  The loan was transferred pursuant to the P&A Agreement. Defendants Dee, DiPaola, Dolan, and Smith, therefore, injured the FDIC-R by causing direct and substantial damages of approximately $1.14 million, the exact amount to be proven at trial.

Amended Complaint ¶ 35, at 10.  The FDIC, again, uses formulaic language in its allegations, with varying amounts for the different loans, but identical language.  See Amended Complaint ¶ 35, at 10; id. ¶ 43, at 13; id. ¶ 48, at 15; id. ¶ 55, at 18; id. ¶ 59, at 19-20; id. ¶ 63, at 21.  In the Amended Complaint, the FDIC alleges that specific Defendants' tortious conduct caused the FDIC harm.  See Amended Complaint ¶ 35, at 10; id. ¶ 43, at 13; id. ¶ 48, at 15; id. ¶ 55; id. at 18; id. ¶ 59, at 19-20; id. ¶ 63, at 21.  While not providing every detail about the Defendants' actions or the FDIC's injury, the Amended Complaint alleges that it has suffered a perceptible

harm.  Alleging that certain Defendants' tortious conduct caused direct and substantial damages to the FDIC satisfies the Tenth Circuit's requirement in Bear Lodge Multiple Use Ass'n v. Babbitt, for a plaintiff to provide "a factual showing of perceptible harm" to establish an injury in fact.  175 F.3d at 821.

Moreover, the Amended Complaint's changes address some of the Court's critiques of the original Complaint in the MOO. [15]  The Amended Complaint alleges that the subject loans which the Defendants approved were in default with its allegation that "the Bank placed the loan on non-accrual status on November 28, 2008 and ultimately charged-off the loan."  Amended Complaint ¶ 35, at 10.  Alleging that First Community placed the subject loan on non-accrual status addresses the Court's concern in the MOO that the Complaint does not contend "that [] any of the loans that the Defendants approved are in default."  MOO at 53.  The Court therefore concludes that the FDIC sufficiently cures defects in the original Complaint for the Court to grant its Motion for Leave to Amend.

## II.   **THE COURT WILL GRANT THE FDIC'S MOTION TO STAY DEADLINES.**

The Court will grant the FDIC's Motion to Stay Deadlines.  A court has broad discretion in managing its docket, which includes decisions regarding issuing stays for all or part of a

---

[15]The Court concluded in the MOO that the original Complaint does not contend:

(i) any of the loans that the Defendants approved are in default; (ii) any of the loans that the Defendants approved have been restructured on terms unfavorable to the FDIC; (iii) any of the debtors have had problems servicing their debt or that such problems have not been adequately resolved by resorting to those loans" guarantors; or (iv) FDIC has had to reimburse or guarantee the loans that the Defendants approved.

MOO at 53.  The Amended Complaint addresses whether any of the subject loans that the Defendants approved are in default, but does not address whether any of the loans were restructured on terms unfavorable to the FDIC, if any of the the of the debtors had problems servicing their debts, or if the FDIC had to reimburse or guarantee the loans that the Defendants approved.

proceeding.  See Clinton v. Jones, 520 U.S. at 706 ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." (citing Landis v. N. Am. Co., 299 U.S. at 254)).  The party seeking a stay generally faces a difficult burden.  See Clinton v. Jones, 520 U.S. at 708 ("The proponent of a stay bears the burden of establishing its need."); S2 Automation LLC v. Micron Tech., Inc., 2012 WL 3150412, at *2 (citing Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484)).  "In particular, where a movant seeks relief that would delay court proceedings by other litigants he must make a strong showing of necessity because the relief would severely affect the rights of others."  Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484.

The Court issued an Amended Scheduling Order for this case on February 4, 2015.  See Amended Scheduling Order, filed on February 4, 2015 (Doc. 62)("Amended Scheduling Order").  In the Amended Scheduling Order, the Court set a discovery termination date of August 3, 2015, and an August 24, 2015, deadline for filing with the Court and serving opposing parties motions relating to discovery.  See Amended Scheduling Order at 1.  Approximately one month later, on March 3, 2015, the Court issued its MOO dismissing the original Complaint.  See MOO at 1.  One week after the Court issued its MOO dismissing the FDIC's original Complaint, the FDIC filed its Motion to Stay Deadlines on March 10, 2015.  See Motion to Stay Deadlines at 1.  The parties completed their briefing regarding the FDIC's Motion for Leave to Amend on April 7, 2015.  See Notice of Completion of Briefing, filed April 7, 2015 (Doc. 73)("Notice of Completion of Motion for Leave to Amend Briefing").  The Court conducted a hearing on the FDIC's Motion for Leave to Amend on May 5, 2015, see May Tr. at 1:13, at which point the Court indicated that it was inclined to grant the FDIC's Motion for Leave to Amend, approximately three months before the discovery termination date see May Tr. at 19:18-21.

This case involves complex allegations of negligence, gross negligence, and breach of fiduciary duties.  See Amended Complaint ¶ 67, at 22; id. ¶ 74, at 24; id. ¶ 78, at 25.  The allegations involve the tortious conduct of numerous defendants with at least six multimillion dollar loans.  See Amended Complaint ¶ 67, at 22; id. ¶ 74, at 24; id. ¶ 78, at 25.  There is extensive loan documentation, financial projections and analysis that accompany, or should accompany, each loan funding decision.  See Amended Complaint ¶ 26, at 6.  Even though the Court issues this opinion after the discovery termination date, and after the deadline to file with the Court and serve opposition parties motions relating to discovery have passed, at the time the Court indicated that it would grant the FDIC's Motion for Leave to Amend, the parties did not have sufficient time to thoroughly conduct discovery on the case with the deadlines in place.

The Court in the past has denied motions to stay discovery in instances where there would be "no benefit for staying . . . discovery, and [where] staying . . . discovery would further delay the case."  Walker v. THI of New Mexico at Hobbs Center, 2011 WL 2728326 at *5.   In Walker v. THI of New Mexico at Hobbs Center, the Court noted that counsel for the two defendants who were subject to the motions to dismiss had already indicated that they would participate in deposition discovery.  See 2011 WL 2728326 at *5.  Here, there is no indication that a stay of discovery would be an unnecessary delay to the case.  The parties, in their briefing, have also not indicated that discovery would further delay the case or provide no benefit to the parties.  The Defendants did not raise a concern that staying discovery would further delay the case or would provide no benefit to either party.  See Joint Response to Motion to Stay at 1-2. Instead, The Defendants argue only that the Court's decision to dismiss the original Complaint vitiated the Scheduling Order, and do not address whether delays resulting from a stay of

discovery would be an unnecessary burden to them.  See Joint Response to Motion to Stay at 1-

2.  The Court, therefore, concludes that it is appropriate to stay deadlines in this case.

III.    **THE COURT WILL DENY THE REQUESTS IN THE FIRST COMMUNITY DEFNDANTS' NOTICE OF ADOPTION OF PREVIOUSLY FILED MOTION TO DISMISS BECAUSE THE AMENDED COMPLAINT CONTAINS SUFFICIENT FACTUAL ALLEGATIONS TO PLEAD NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF FIDUCIARY DUTY.**

The Court will deny the requests in the First Community Defendants' Notice of Adoption

of Previously Filed Motion to Dismiss -- thus denying the adopted motion to dismiss -- because

the FDIC has included sufficient factual allegations in the Amended Complaint to plead

negligence, gross negligence, breach of fiduciary duty -- thus further meaning that neither New

Mexico statute nor New Mexico's common-law business judgment rule protects the First

Community Defendants' actions at this pleading stage.   To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that

is plausible on its face." Ashcroft v. Iqbal, 556 U.S. at 677-78 (quoting Bell Atlantic Corp. v.

Twombly, 550 U.S. at 570).  Under rule 12(b)(6), the Court accepts as true all well-pled factual

allegations in the complaint and draws all reasonable inferences from those facts in the FDIC's

favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006).  "The allegations must be

enough that, if assumed to be true, the Plaintiffs plausibly (not just speculatively) ha[ve] a claim

for relief." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).  A complaint must set

forth sufficient facts to raise a plausible inference that the defendant is liable for the misconduct

alleged.

N.M. Stat. Ann. § 53-11-35(B)(1967, as amended through 1987), defines the basic

standard of conduct for corporate governance, in relevant part, as follows:

> A director shall perform his duties as a director, including his duties as a member
> of any committee of the board upon which the director may serve, in good faith,

in a manner the director believes to be in or not opposed to the best interests of the corporation, and with such care as an ordinarily prudent person would use under similar circumstances in a like position.

N.M. Stat. Ann. § 53-11-35(B).  By its plain language, § 53-11-35(B) applies only to directors

and not to the officers.  See § 53-11-35(B).  Section 53-11-35(D) further provides:

> For purposes of Subsection B of this section, a director, in determining what he reasonably believes to be in or not opposed to the best interests of the corporation, shall consider the interests of the corporation's shareholders and, in his discretion, may consider any of the following:
>
> (1)    the interests of the corporation's employees, suppliers, creditors and customers;
>
> (2)    the economy of the state and nation;
>
> (3)    the impact of any action upon the communities in or near which the corporation's facilities or operations are located; and
>
> (4)    the long-term interests of the corporation and its shareholders, including the possibility that those interests may be best served by the continued independence of the corporation.

N.M. Stat. Ann. § 53-11-35(D).

New Mexico courts have also adopted the following common-law business judgment

rule:

> If in the course of management, directors arrive at a decision, within the corporation's powers (intra vires) and their authority, for which there is a reasonable basis, and they act in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be the best interests of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or to surcharge the directors for any resulting loss.

White v. Banes Co., 1993-NMSC-078, ¶ 13, 866 P.2d 339 (quoting DiIaconi v. New Cal Corp.,

1982-NMCA-064, ¶ 29, 643 P.2d 1234 (quoting Henn, Law of Corporations, 482-83, § 242

(1979))).  In contrast to § 53-11-35(B), for the purposes of the common-law business judgment

rule, "[a]lthough the 'business judgment' rule is usually stated in terms of director functions, it is no less applicable to officers in the exercise of their authority and may be applicable to controlling shareholders when they exercise their more extraordinary management functions."

DiIaconi v. New Cal Corp., 1982-NMCA-064, ¶ 29, 643 P.2d 1234.  Accordingly:

> [A] director in New Mexico must initially comply with the first sentence of Section 53-11-35(B).  Then, if the director's decision has a reasonable basis and the director acted in good faith and in the best interest of the corporation, the New Mexico common law business judgment rule will protect the director from liability arising from his decision.  Conversely, if the director violates the first sentence of Section 53-11-35(B), then the New Mexico common law business judgment rule does not apply . . . .

Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166, at *3-4.  An officer, on the other hand, does not need to meet that initial threshold -- i.e., act "with such care as an ordinarily prudent person would use under similar circumstances in a like position" -- and must meet only the initial threshold of the common-law business judgment rule's conjunctive prerequisites, requiring that the actor have a reasonable basis for his actions, and act in good faith and in the best interest of corporation.  The Court notes, however, that failing to act upon a reasonable basis for the purposes of the business judgment rule and failing to act  "with such care as an ordinarily prudent person would use under similar circumstances in a like position," under § 53-11-35(B), results in essentially the same analytical standard.  The Court acknowledges that Justice Blackwell -- and maybe Judge Gonzales -- have tried to draw a distinction between the two, but the Court is not convinced that the Supreme Court of New Mexico would draw such a distinction.  Both are objective standards.  The difference between "reasonable basis" and "such care as an ordinary prudent person would use" escapes the Court and would likely escape the jury.  The distinction smells more of the scholars' language, and less like a working standard that practicing lawyers in courts and lay people can use in the real world.  The distinction is an

attempt to slice the meat thinner than is necessary or workable.  Accordingly, if a director or officer acts negligently, he or she is not going to enjoy the benefits of the business judgment rule in New Mexico.  It may or may not be good public policy to eviscerate the business judgment rule and lower the protection of the rule to almost nonexistence, and it may scare off directors and officers of corporations when locating a business here or, in some cases, doing business here. But, that is a decision for the New Mexico Legislature and the Supreme Court of New Mexico to address, and not a federal court in New Mexico.  The Court, then, does not break apart the movants by their status as officer or director -- as it could have  done -- but instead addresses the parties' motions in accordance with their filing choices.

## A. THE AMENDED COMPLAINT CONTAINS SUFFICIENT FACTUAL ALLEGATIONS TO PLEAD NEGLIGENCE.

The Amended Complaint contains sufficient factual allegations to plead negligence under § 53-11-35(B).  Section 53-11-35(B) establishes a floor for the standard of care that must be met by those whom the statute protects.  That standard includes both an objective ("an ordinarily prudent person would use under similar circumstances in a like position," § 53-11-35(B)), and subjective element ("in a manner the director believes to be in or not to the best interests of the corporation," § 53-11-35(B)),[16] that is individual to each director, as the reference to what "the director believes" demonstrates.   The existence of this subjective, individual element is confirmed by the language of § 53-11-35(D), which addresses "a director" and "what he reasonably believes."  N.M. Stat. Ann. § 53-11-35(D).

For comprehensive clarity, regarding the subjective element, a director acts in "good

_____

[16]See, e.g., Model Business Corporations Act, § 8.30, Official Comments, stating: "The phrase 'reasonably believes' is both subjective and objective in character.  Its first level of analysis is geared to what the particular director, acting in good faith, actually believes -- not what objective analysis would lead another director (in a like position and acting in similar circumstances) to conclude."

faith" when he or she acts for the purpose of advancing the corporation's interests.   ABA Comm'n on Corporate Laws, Corporate Director's Guidebook, at 11 (4th ed. 2004).  By contrast, "bad faith," the corollary concept to the "good faith" described by § 53-11-35, denotes knowledge of, or at least reckless disregard for, an act's wrongfulness in conjunction with intent to take the action in spite of such recognition.   See Black's Law Dictionary, "bad faith" (9th ed. 2009).  Insurers act in "bad faith" when their action toward insureds are "unfounded," a term that "means essentially the same thing as 'reckless disregard' . . ."   Am. Nat. Prop. & Cas. Co. v. Cleveland, 2013-NMCA-013 ¶ 12, 293 P.3d 954 (quoting Jackson Nat'l Life Ins. Co. v. Receconi, 1992-NMSC-019, ¶ 56, 827 P.2d 118).

Here, the FDIC has included sufficient factual allegations that Dee, DiPaola, Dolan, Fanning, Martin, Sanchez, and Smith were negligent -- i.e., did not act "with such care as an ordinarily prudent person would use under similar circumstances in a like position" -- individually, and in their capacity as First Community Directors.   First, Dee, see Amended Complaint ¶ 54, at 17;  DiPaola, see Amended Complaint ¶ 51, at 17; id. ¶ 54, at 17; id. ¶ 54, at 17;   Dolan, see Amended Complaint ¶ 51, at 16-17; id. ¶ 62, at 21; Fanning, see Amended Complaint ¶ 51, at 16-17; id. ¶ 54, at 17; and Martin, see Amended Complaint ¶ 51, at 16-17; id. ¶ 54, at 17, disregarded the Loan Policy and the procedures and policies First Community implemented to ensure that First Community was fully repaid for the loans that it originated. Second, Dee, see Amended Complaint ¶ 33, at 9; DiPaola, see Amended Complaint ¶ 33, at 9; id. ¶ 51, at 16-17; Dolan, see Amended Complaint ¶ 33, at 9; id. ¶ 51, at 16-17; Fanning, see Amended Complaint ¶ 51, at 16-17; Martin, see Amended Complaint ¶ 51, at 16-17; and Smith, see Amended Complaint ¶ 33, at 9, overlooked discrepancies in reported financial information pertaining to borrowers' creditworthiness.   Third, Dee, see Amended Complaint ¶ 33, at 9;

DiPaola, see Amended Complaint ¶ 33, at 9; Dolan, see Amended Complaint ¶ 33, at 9; Fanning, see Amended Complaint ¶ 33, at 9; id. ¶ 42, at 13; and Martin, see Amended Complaint ¶ 42, at 13, overlooked key financial data from borrowers and guarantors demonstrating that they were not creditworthy.   Fourth, Dolan, see Amended Complaint ¶ 38, at 11-12; id. ¶ 42, at 13, and Fanning, see Amended Complaint ¶ 42, at 13, authorized the funding of loans for projects where the required construction and development permits for funding had not been obtained at the time of approval.   Fifth, Dolan, see Amended Complaint ¶ 38, at 11-12; id. ¶ 42, at 13; id. ¶ 62, at 20-21; and Fanning, see Amended Complaint ¶ 42, at 13, approved loans that were characterized as "undesirable" under the Loan Policy, which reflected their poor credit worthiness and repayment risk profile to First Community.   Sixth, Dolan, see Amended Complaint ¶ 37, at 10-11; id. ¶ 50, at 16; id. ¶ 57, at 18-19; id. ¶ 61, at 20; DiPaola see Amended Complaint ¶ 50, at 16; Fanning, see Amended Complaint ¶ 50, at 16; Martin, see Amended Complaint ¶ 50, at 16; Sanchez, see Amended Complaint ¶ 50, at 16; and Smith, see Amended Complaint ¶ 50, at 16, in contravention of the Loan Policy, approved a loan to Empire at Estrella, with no verification of the financial information the borrower provided.   Seventh, Dee, see Amended Complaint ¶ 34, at 10; id. ¶ 54, at 17-18; DiPaola, see Amended Complaint ¶ 34, at 10; id. ¶ 52, at 17; id. ¶ 54, at 17-18; Dolan, see Amended Complaint ¶ 34, at 10; id. ¶ 38, at 11-12; id. ¶ 52, at 17; id. ¶ 58, at 19; Fanning, see Amended Complaint ¶ 52, at 17; Martin, see Amended Complaint ¶ 52, at 17; id. ¶ 54, at 17-18; Sanchez, see Amended Complaint ¶ 52, at 17; and Smith, see Amended Complaint ¶ 34, at 10; id. ¶ 52, at 17, in contravention of First Community's Loan Policy, approved loans, for which the amount approved exceeded First Community's limits for loan-to-value and loan-to-coast ratios.   Eighth, DiPaola, see Amended Complaint ¶ 52, at 17; Dolan, see Amended Complaint ¶ 38, at 11-12; id. ¶ 52, at 17; Fanning, see Amended Complaint ¶ 52, at 17;

Martin, <u>see</u> Amended Complaint ¶ 52, at 17; Sanchez, <u>see</u> Amended Complaint ¶ 52, at 17; and Smith, <u>see</u> Amended Complaint ¶ 52, at 17, approved loans in contravention of First Community's Loan Policy with deficient appraisals.  Ninth, Dolan, <u>see</u> Amended Complaint ¶ 46, at 14-15; <u>id.</u> ¶ 61, at 20; Fanning, <u>see</u> Amended Complaint ¶ 46, at 14-15; Martin, <u>see</u> Amended Complaint ¶ 46, at 14-15; Sanchez, <u>see</u> Amended Complaint ¶ 46, at 14-15; and Smith, <u>see</u> Amended Complaint ¶ 46, at 14-15, in contravention of First Community's Loan Policy approved loans that did not have an independent appraisal review of the collateral property. Tenth, DiPaola, <u>see</u> Amended Complaint ¶ 50, at 16; Dolan, <u>see</u> Amended Complaint ¶ 37, at 10-11; <u>id.</u> ¶ 41, at 12-13; <u>id.</u> ¶ 45, at 14; <u>id.</u> ¶ 50, at 16; <u>id.</u> ¶ 57, at 18-19; <u>id.</u> ¶ 61, at 20; Fanning, <u>see</u> Amended Complaint ¶ 41, at 12-13; <u>id.</u> ¶ 45, at 14; <u>id.</u> ¶ 50, at 16; Martin, <u>see</u> Amended Complaint ¶ 45, at 14; <u>id.</u> ¶ 50, at 16; Sanchez, <u>see</u> Amended Complaint ¶ 45, at 14; <u>id.</u> ¶ 50, at 16; Smith, <u>see</u> Amended Complaint ¶ 45, at 14; <u>id.</u> ¶ 50, at 16, in contravention of First Community's Loan Policy approved loans without tax returns from the year the loans were approved.  Eleventh, DiPaola, <u>see</u> Amended Complaint ¶ 50, at 16; Dolan, <u>see</u> Amended Complaint ¶ 37, at 10-11; <u>id.</u> ¶ 50, at 16; Fanning, <u>see</u> Amended Complaint ¶ 50, at 16; Martin, <u>see</u> Amended Complaint ¶ 50, at 16; Sanchez, <u>see</u> Amended Complaint ¶ 50, at 16; and Smith, <u>see</u> Amended Complaint ¶ 50, at 16, in contravention of First Community's Loan Policy, approved loans without the required credit and background checks.  Finally, DiPaola, <u>see</u> Amended Complaint ¶ 50, at 16; Dolan, <u>see</u> Amended Complaint ¶ 10-11, at 4; <u>id.</u> ¶ 50, at 16; <u>id.</u> ¶ 57, at 18-19; <u>id.</u> ¶¶ 61-62, at 20-21; Fanning, <u>see</u> Amended Complaint ¶ 50, at 16; Martin, <u>see</u> Amended Complaint ¶ 50, at 16; Sanchez, <u>see</u> Amended Complaint ¶ 50, at 16; and Smith, <u>see</u> Amended Complaint ¶ 50, at 16, in contravention of First Community's Loan Policy, approved

loans with inadequate or nonexistent analysis of financial information from borrowers and guarantors.

In assessing all of these allegations, the Court concludes that First Community Defendants repeatedly deviated from the Loan Policy and the policies and procedures they agreed to follow.  By not collecting required information, conducting necessary analysis about the feasibility or financial strength of a loan, or requiring borrowers and guarantors to provide current information about their financial positions and capabilities, the FDIC includes sufficient factual allegations to plead that First Community Defendants did not fulfill their duties to First Community "with such care as an ordinarily prudent person would use under similar circumstances in a like position."  N.M. Stat. Ann. § 53-11-35(B).

Additionally, here, the Court concludes that there is no reasonable basis to support the First Community Defendants' decisions to contravene First Community's Loan Policy.  The Loan Policy was put in place to safeguard First Community's capital.  Instead, the First Community Defendants individually approved loans despite: (i) discrepancies in reported financial information pertaining to borrowers' creditworthiness; (ii) financial data and indicators demonstrating that borrowers and guarantors were not creditworthy; (iii) missing required permits at the time of approval; (iv)  being characterized as "undesirable" per the Loan Policy; (v) no verification of the financial information the borrower provided; (vi) the loan-to-value and loan-to-cost ratios of the properties exceeding the Loan Policy limits; (vii) deficient appraisals that did not meet the Loan Policy requirements; (viii) no independent appraisal review of the collateral property as required under the Loan Policy; (ix) no credit and background checks as required under the Loan Policy; and (x) no or inadequate analysis of the financial information provided by borrowers and guarantors as required under the Loan Policy.

The FDIC alleges that First Community Defendants repeatedly flouted First Community's Loan Policy and approved loans to borrowers' without execution capabilities or the financial wherewithal to complete projects, with missing financial information and out-of-date tax returns.  First Community Defendants do not provide justification for these actions, or that they had a reasonable basis to do so.  First Community Defendants' decisions to approve the subject loans represent a substantial departure from First Community's Loan Policy.  The Court, again, fails to finds a "reasonable basis" underlying First Community Defendants' decisions to approve loans to borrowers with missing, inconsistent, or stale financial data.  The Court also fails to find a "reasonable basis" for First Community Defendants' decision to approve loans where the loan-to-cost and loan-to-value ratios exceeded the Loan Policy limit and placed the bank at a higher risk of loss.  The Court, therefore, concludes that the factual allegations in the Amended Complaint plead negligence, gross negligence, and breach of fiduciary duty that is also not protected under New Mexico's common-law business judgment law.

In sum, therefore, First Community Defendants -- regardless of their status as officers or directors -- are not entitled to the protections of the business judgment rule at statutory or common law.  Additionally, the Court does not see how lending in excess of stated loan limits in a weakening real estate market would "advance the corporation's interests."  ABA Comm'n on Corporate Laws, Corporate Director's Guidebook, at 11 (4th ed. 2004).  In approving the subject loans, First Community Defendants demonstrated a disregard for warning signs that borrowers lacked the capabilities to execute on their developments, did not have the financial resources to complete the transactions, or even that the borrowers and guarantors were who they purported to be.  In sum, the FDIC includes sufficient factual allegations to plead that First Community Defendants failed to perform their duties and obligations the Loan Policy required for its

directors or officers when approving loans.  The Court, therefore, concludes that the Amended Complaint contains sufficient factual allegations to plead ordinary negligence against First Community Defendants.

### B. THE AMENDED COMPLAINT CONTAINS SUFFICIENT FACTUAL ALLEGATIONS TO PLEAD GROSS NEGLIGENCE.

The Amended Complaint therefore also contains sufficient factual allegations that First Community Defendants were grossly negligent in approving the subject loans in the Amended Complaint.  Under New Mexico law, proof of gross negligence requires the plaintiff to plead and prove negligence's elements, and that the Defendant committed "an act or omission . . . with conscious indifference to harmful consequences," and failed "to exercise even slight care." Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1251 (10th Cir. 2000)(emphasis in original).  See Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 29, 880 P.2d 300.  However, with respect to duty, the Supreme Court of New Mexico has "formally abolished the distinction between ordinary and gross negligence" because "the concept of gross negligence" is "so nebulous" as to have "no generally accepted meaning."  Paiz v. State Farm Fire & Casualty Co., 1994-NMSC-079, ¶ 29, 880 P.2d 300.  See also Govich v. N. Am. Sys., 1991-NMSC-061, ¶ 9, 814 P.2d 94 ("[T]he standard in all cases has been 'ordinary care under the circumstances.'"); Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1251 (10th Cir. 2000).  The Amended Complaint contains numerous factual allegations that First Community Defendants not only behaved negligently, but behaved with "conscious indifference to harmful consequences" and failed "to exercise even slight care."  Smith v. Ingersoll-Rand Co., 214 F.3d at 1251.  Moreover, the Amended Complaint contains sufficient factual allegations that First Community Defendants did not act with "ordinary care under the circumstances."  Govich v. N. Am. Sys., 1991-NMSC-061, ¶ 9, 814 P.2d 94.  The Amended Complaint, despite the lessened distinction between gross and

ordinary negligence at New Mexico law, nonetheless contains sufficient factual allegations to plead what would be akin to gross negligence against First Community Defendants.

## C. THE AMENDED COMPLAINT CONTAINS SUFFICIENT FACTUAL ALLEGATIONS TO PLEAD BREACH OF FIDUCIARY DUTY.

The FDIC included sufficient factual allegations in the Amended Complaint to plead that First Community Defendants breached their fiduciary duty to First Community.  Under New Mexico law, directors, officers and shareholders owe a duty of loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of the corporation.  See Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 41, 40 P.3d 449.  A director acts in "good faith" when he or she acts for the purpose of advancing the corporation's interests.  ABA Comm'n on Corporate Laws, Corporate Director's Guidebook, at 11 (4th ed. 2004).  By contrast, "bad faith," the corollary concept to the "good faith" that § 53-11-35 describes, denotes knowledge of, or at least reckless disregard for, an act's wrongfulness in conjunction with intent to take the action in spite of such recognition.  See Black's Law Dictionary, "bad faith" (9th ed. 2009).  Insurers act in "bad faith" when their action toward insureds are "unfounded," a term that "means essentially the same thing as 'reckless disregard' . . ."  American Nat. Prop. & Cas. Co. v. Cleveland, 2012-NMCA-013 ¶ 12, 293 P.3d 954 (quoting Jackson Nat'l Life Ins. Co. v. Receconi, 1992-NMSC-019, ¶ 56, 827 P.2d 118).

Here, the Amended Complaint contains numerous factual allegations that First Community Defendants did not act in good faith.  By approving loans in excess of First Community's Loan Policy, Dee, see Amended Complaint ¶ 34, at 10; id. ¶ 54, at 17-18; DiPaola, see Amended Complaint ¶ 34, at 10; id. ¶ 52, at 17; id. ¶ 54, at 17-18; Dolan, see Amended Complaint ¶ 34, at 10; id. ¶ 38, at 11-12; id. ¶ 52, at 17; id. ¶ 58, at 19; Fanning see Amended Complaint ¶ 52, at 17; Martin, see Amended Complaint ¶ 52, at 17; id. ¶ 54, at 17-18; Sanchez,

see Amended Complaint ¶ 52, at 17; and Smith, see Amended Complaint ¶ 34, at 10; id. ¶ 52, at 17, placed First Community at risk that loans it originated would not be repaid fully if the underlying collateral depreciated in value slightly to the point where the loan exceeded the value. Moreover, Dee, see Amended Complaint ¶ 33, at 9; DiPaola, see Amended Complaint ¶ 33, at 9; Dolan, see Amended Complaint ¶ 33, at 9; Fanning, see Amended Complaint ¶ 33, at 9; id. ¶ 42, at 13; and Martin, see Amended Complaint ¶ 42, at 13, overlooked key financial data from borrowers and guarantors demonstrating that they were not creditworthy.   These factual allegations in the Amended Complaint plead that First Community Defendants were not "advancing" First Community's interests, but rather, subjected it to heightened risk for loan failures and losses.   ABA Comm'n on Corporate Laws, Corporate Director's Guidebook, at 11 (4th ed. 2004).   First Community Defendants provided no rationale or justification for deviating from First Community's Loan Policy, or how such deviations were made in "good faith."   Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 41, 40 P.3d 449.   The Court, therefore, concludes that the Amended Complaint contains sufficient factual allegations to plead breach of fiduciary duty.

**IV.     THE COURT WILL DENY NAFUS' RENEWED MOTION TO DISMISS BECAUSE THE AMENDED COMPLAINT CONTAINS SUFFICIENT FACTUAL ALLEGATIONS TO PLEAD NEGLIGENCE, GROSS NEGLIGENCE, BREACH OF FIDUCIARY DUTY, AND THAT NAFUS IS NOT ENTITLED TO PROTECTION UNDER NEW MEXICO'S COMMON-LAW BUSINESS JUDGMENT RULE.**

Nafus' Renewed Motion to Dismiss, similarly, must fail because the FDIC has included sufficient factual allegations in the Amended Complaint to plead negligence, breach of fiduciary duty, and that Nafus thus lacked a reasonable basis for his conduct and does not, therefore, enjoy the New Mexico common-law business judgment rule's protections.   To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for

relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. at 677-78 (quoting Bell Atlantic

Corp. v. Twombly, 550 U.S. at 570).  Under rule 12(b)(6), the Court accepts as true all well-pled

factual allegations in the complaint and draws all reasonable inferences from those facts in the

FDIC's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006).  "The allegations

must be enough that, if assumed to be true, the Plaintiffs plausibly (not just speculatively) ha[ve]

a claim for relief."  Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).  A complaint

must set forth sufficient facts to raise a plausible inference that the defendant is liable for the

misconduct alleged.

### A. THE AMENDED COMPLAINT CONTAINS SUFFICIENT FACTUAL ALLEGATIONS TO PLEAD NEGLIGENCE AND GROSS NEGLIGENCE.

The Amended Complaint contains sufficient factual allegations to plead that Nafus was

negligent and grossly negligent in underwriting and originating three of the subject loans.  As the

Court has provided, the New Mexico Business Corporation Act establishes the standard of care

for corporate directors:

> A director shall perform his duties as a director, including his duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner the director believes to be in or not opposed to the best interests of the corporation, and with such care as an ordinarily prudent person would use under similar circumstances in a like position.

N.M. Stat. Ann. § 53-11-35(B).  New Mexico courts have also adopted the following common-

law business judgment rule:

> If in the course of management, directors arrive at a decision, within the corporation's powers (intra vires) and their authority, for which there is a reasonable basis, and they act in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be the best interests of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or to surcharge the directors for any resulting loss.

White v. Banes Co., 1993-NMSC-078, ¶ 13, 866 P.2d 339 (quoting DiIaconi v. New Cal Corp.,

1982-NMCA-064, ¶ 29, 643 P.2d 1234 (quoting Henn, Law of Corporations, 482-83, § 242 (1979))).  In contrast to § 53-11-35(B), for the purposes of the common-law business judgment rule, "[a]lthough the 'business judgment' rule is usually stated in terms of director functions, it is no less applicable to officers in the exercise of their authority and may be applicable to controlling shareholders when they exercise their more extraordinary management functions." DiIaconi v. New Cal Corp., 1982-NMCA-064, ¶ 29, 643 P.2d 1234.  Nafus, as a First Community Officer, and not a First Community Director, is therefore not subject to the § 53-11-35(B) provision, and thus, to garner the protections of the common-law business judgment rule, he is held to the standard announced by that common law -- which includes, in part, only acting upon a "reasonable basis."

The Supreme Court of New Mexico has "formally abolished the distinction between ordinary and gross negligence" because, in its opinion, "the concept of gross negligence is "so nebulous" as to have "no generally accepted meaning." Paiz v. State Farm Fire & Casualty Co., 1994-NMSC-079, ¶ 29, 880 P.2d 300.  See Govich v. N. Am. Sys., 1991-NMSC-061, ¶ 9, 814 P.2d 94  ("[T]he standard in all cases has been 'ordinary care under the circumstances.'"); Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1251 (10th Cir. 2000).  Nafus, as a corporate officer responsible for originating loans, was responsible for following First Community's Loan Policy. See Amended Complaint ¶ 30, at 8; id. ¶ 37, at 10; id. ¶ 57, at 19.  Instead, the FDIC alleges, Nafus repeatedly did not follow the loan policy for several of the subject loans listed in the Amended Complaint.  See Amended Complaint ¶ 30, at 8; id. ¶ 37, at 10; id. ¶ 57, at 19. Specifically, the FDIC alleges that Nafus failed to analyze the financial strength of the borrower entity alone.  See Amended Complaint ¶ 30, at 8.  Nafus overlooked that the guarantor's debts exceeded its assets by a ratio of twenty-five to one.  See Amended Complaint ¶ 31, at 8.  Nafus,

who originated the loan in 2007, collected only the guarantor's 2004 tax returns and then did not

analyze the guarantor's financial information.  See Amended Complaint ¶ 37, at 10.  The FDIC

alleges that, even though the real estate markets were vastly different in 2007 than in 2004,

Nafus did not attempt to collect any current information from the borrower, even though First

Community's Loan Policy required tax returns from the current year.  See Amended Complaint ¶

37, at 10.  The FDIC further alleges that Nafus, in contravention of the Loan Policy, did not

conduct any due diligence on the guarantor's background or experience.   See Amended

Complaint ¶ 37, at 10.  The FDIC alleges that, had Nafus examined the guarantor's background,

he would have discovered that she had virtually no commercial real estate development

experience.  See Amended Complaint ¶ 37, at 10.  Even though First Community's Loan Policy

required the loan officer to analyze the contractor's capabilities both in terms of finances and

past performance, Dolan and Nafus failed to analyze the contractor's capabilities for the project.

See Amended Complaint ¶ 57, at 19.  In sum, Nafus knowingly recommended loans to be

approved without completing required financial analysis to determine whether the loan complied

with First Community's Loan Policy.

A "finder of fact must determine whether Defendant breached the duty of ordinary care

by considering what a reasonably prudent individual would foresee, what an unreasonable risk of

injury would be, and what would constitute an exercise of ordinary care in light of all

surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 2003-NMSC-

018, ¶ 33, 73 P.3d at 195.  Here, under the Loan Policy, Nafus was responsible for ensuring that

the subject loans complied with First Community's Loan Policy, banking regulations, and

prudent lending standards.   See Amended Complaint ¶¶ 25-26.  The Amended Complaint

contains sufficient factual allegations to sufficiently plead that Nafus failed to follow First

Community's Loan Policy and that, as a result of his failure to comply with the Loan Policy, did not meet his obligations to ensure that the subject loans complied with banking regulations and prudent lending standards.  See Amended Complaint ¶¶ 25-26.  Nafus' actions did not comply with obligations under First Community's written Loan Policy.  See Amended Complaint ¶¶ 25-26.  As a result of his failure to comply with First Community's written Loan Policy, the loans he approved were "undesirable" under the Loan Policy, suggesting a higher degree of risk for repayment and ultimately were charged off after the FDIC seized First Community.  See Amended Complaint ¶ 37, at 11.  The Court therefore concludes that the Amended Complaint contains sufficient factual allegations to plead negligence and gross negligence, and that the conduct was not undertaken upon a "reasonable basis," excluding Nafus from the protections of the common-law business judgment rule.

## B. THE AMENDED COMPLAINT CONTAINS SUFFICIENT FACTUAL ALLEGATIONS TO PLEAD BREACH OF FIDUCIARY DUTY.

The Amended Complaint contains sufficient factual allegations to plead that Nafus breached his fiduciary duty to First Community.  Under New Mexico law, directors, officers and shareholders owe a duty of loyalty, good faith, inherent fairness, and the obligation not to profit at the corporation's expense.  See Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 41, 40 P.3d 449.  In the Amended Complaint, the factual allegations do not touch on whether Nafus was loyal to First Community, inherently fair to First Community, or profiting at the expense of First Community.  The Court's inquiry, therefore, is whether Nafus breached his fiduciary duty of good faith to First Community.  A director acts in "good faith" for purposes of the business judgment rule when he or she acts for the purpose of advancing the corporation's interests. ABA Comm'n on Corporate Laws, Corporate Director's Guidebook, at 11 (4th ed. 2004).  By contrast, "bad faith," the corollary concept to the "good faith" that § 53-11-35 describes, denotes

knowledge of, or at least reckless disregard for, an act's wrongfulness in conjunction with intent to take the action in spite of such recognition.  See Black's Law Dictionary, "bad faith" (9th ed. 2009).  Insurers act in "bad faith" when their action toward insureds are "unfounded," a term that "means essentially the same thing as 'reckless disregard' . . . ."  Am. Nat. Prop. & Cas. Co. v. Cleveland, 2013-NMCA-013 ¶ 12, 293 P.3d 954 (quoting Jackson Nat'l Life Ins. Co. v. Receconi, 1992-NMSC-019, ¶ 56, 827 P.2d 118).

Here, there are ample factual allegations in the Amended Complaint for the FDIC to sufficiently plead that Nafus breached his fiduciary duty of good faith to First Community.  First, Nafus disregarded First Community's Loan Policy to ensure borrowers' credit strength and ability to repay the loans.  See Amended Complaint ¶ 30, at 8; id. ¶ 37, at 10; id. ¶ 57, at 19.  For the Kitts Loan, the FDIC alleges that Nafus failed to analyze the financial strength of the borrower entity by itself and took into consideration other entities when analyzing whether the borrower would be able to fully repay the loan.  See Amended Complaint ¶ 31, at 8.  The FDIC further alleges that in contravention of stated policy to collect the most recent tax returns available from a guarantor, Nafus collected 2004 tax returns for a loan under consideration in 2007 and did not analyze any financial information for the guarantor.  See Amended Complaint ¶ 37, at 10.  In a further example of Nafus disregarding the repayment risk for the loans he originated, the FDIC alleges that Nafus did not examine a loan guarantor's background and experience with completing real estate development projects.  According to the FDIC, had Nafus examined the guarantor's background, he would have discovered that she lacked experience in developing real estate and listed herself only as a "Principal" in her ex-husband's construction company.  See Amended Complaint ¶ 37, at 10.

Said differently, the FDIC alleges that Nafus "recklessly disregarded" the repayment risk

for the subject loans he originated.  Am. Nat. Prop. & Cas. Co. v. Cleveland, 2013-NMCA-013 ¶ 12, 293 P.3d 954 (quoting Jackson Nat'l Life Ins. Co. v. Receconi, 1992-NMSC-019, ¶ 56, 827 P.2d 118).  The FDIC presents sufficient allegations that, as late as 2007, despite numerous warning signs that the real estate market, nationally, was cooling, Nafus failed to conduct even the most basic due diligence into the guarantor's credit strength, project cash flows for repayment, and the borrowers' execution capabilities.  The FDIC alleges that, in the face of market conditions ripe for bank losses, Nafus failed to follow First Community's Loan Policy. Now, almost ten years after the alleged conduct took place, the FDIC alleges that the subject loans were "charged off."  Amended Complaint ¶ 35 at 10.  The Court, therefore, concludes that the FDIC has included sufficient factual allegations in the Amended Complaint that Nafus breached his fiduciary duty.

### C. NAFUS LACKED A REASONABLE BASIS FOR HIS BEHAVIOR TO BE PROTECTED BY NEW MEXICO'S COMMON-LAW BUSINESS JUDGMENT RULE.

Again, Nafus argues that the Court must dismiss FDIC's Amended Complaint's first claim for relief for negligence, because Nafus cannot be held liable for ordinary negligence under New Mexico law.  See MTD 2 at 4.  The Court, though, has concluded that the Amended Complaint pleads sufficient facts to state a claim for negligence, and thus reiterates its conclusion that the threshold standards to enjoy the statutory or common-law protections of the business judgment rule have not been met.  Nafus first asserts:

> Under § 53-11-35, FDIC must plead sufficient facts to demonstrate that Nafus acted in (1) bad faith, (2) in a manner that he did not reasonable believe to be in the best interest of FCB, and (3) that he failed to use such care as an ordinarily prudent person would use under similar circumstances.

MTD 2 at 6.  Nafus then argues:

- 101 -

> Under the standards set forth in the business judgment rule, FDIC must plead facts showing that Nafus acted (1) outside FCB's powers and his authority, (2) without a reasonable basis, (3) in bad faith, (4) without independent judgment, and (5) under the influence of improper considerations (i.e., other than what he honestly believed to be in the best interests of FCB).

MTD 2 at 6. Nafus argues that the FDIC levels no allegations of bad faith, lack of subjective reasonable belief, or conflict of interest, and, therefore, that the FDIC has failed to plead sufficient facts to support a claim of ordinary negligence under the standard of either § 53-11-35 or the common-law business judgment rule in the original Complaint. MTD 2 at 6. Nafus argues that the FDIC has "not pled facts which can plausibly attach liability to Nafus for the three subject loans under either the business judgment rule or § 53-11-35." MTD 2 at 7. Nafus incorporates his arguments for dismissing the original Complaint in his Renewed Motion to Dismiss the Amended Complaint. See Renewed Motion to Dismiss at 1-2.

Nafus' arguments fail, because the FDIC's Amended Complaint pleads sufficient facts that can plausibly attach liability to Nafus for three subject loans. In assessing the Amended Complaint's allegations involving Nafus' actions with the subject loans, the Court concludes that there are sufficient factual allegations that Nafus lacked a "reasonable basis" for New Mexico's common-law business judgment rule to protect him from liability. White v. Banes Co., 1993-NMSC-078, ¶ 13, 866 P.2d 339 (quoting DiIaconi v. New Cal Corp., 1982-NMCA-064, ¶ 29, 643 P.2d 1234, 1240 (quoting Henn, Law of Corporations, 482-83, § 242 (1979))). Nafus failed to collect and analyze required information to make loans under the Loan Policy, and approved loans without forecasting future cash flows for the project to determine whether First Community would be repaid under the borrower's assumptions. See Amended Complaint ¶ 30, at 8. Nafus did not do what was required of him under First Community's Loan Policy in originating the three subject loans. See Amended Complaint ¶ 30, at 8. Given Nafus' duty to

engage in safe and sound banking practices, see Amended Complaint ¶ 2, at 2, the FDIC sufficiently pleads that Nafus lacked a reasonable basis for contravening First Community's Loan Policy.  Moreover, the Court concludes that lending amounts in excess of the maximum allowed under the Loan Policy could not have been in First Community's "best interest," especially coupled with Nafus' failure to conduct thorough due diligence to ensure that a complying loan amount fully complied with First Community's lending standards.  White v. Banes Co., 1993-NMSC-078, ¶ 13, 866 P.2d 339 (quoting DiIaconi v. New Cal Corp., 1982-NMCA-064, ¶ 29, 643 P.2d 1234, 1240 (quoting Henn, Law of Corporations, 482-83, § 242 (1979))).

The FDIC's allegations against Nafus are analogous to the allegations leveled against the officer defendants in Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166.  In Fed. Deposit Ins. Corp. v. Wertheim, the FDIC alleged that the former directors and officers of the Charter Bank of Santa Fe, New Mexico, were negligent, grossly negligent, and breached their fiduciary duties.  The FDIC alleged that Charter Bank of Santa Fe's Directors and Officers committed seventy-two percent of the bank's core capital to fund high risk subprime mortgage lending as the real estate market began to cool in 2006.  See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166 at *1.  The FDIC alleged that the defendants knew or should have known of the risks involved with subprime lending, failed to consider information about the falling real estate market when approving Charter Bank of Santa Fe's loan policy, and disregarded information describing risky lending practices.  See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166 at *1.  After the officer and director defendants moved to dismiss the entire complaint on the grounds the complaint insufficiently pled facts supporting claims of negligence and breach of fiduciary, the Honorable Kenneth Gonzales, District Court Judge for the District of

New Mexico, concluded that New Mexico's common-law business judgment law did not protect the officer defendants.  See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166 at *5. Judge Gonzales held that the New Mexico common-law business judgment rule requires, in the conjunctive, that officers have a reasonable basis for their actions, act in good faith, and honestly believe that they acted in the corporation's best interests, and as with § 53-11-35(B), a plaintiff need plead only that the officer defendants did not meet one of those requirements.  See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166 at *5.  Judge Gonzales concluded that the FDIC sufficiently pleaded that the officer defendants ignored subprime loan risks outlined in government documents as well as in the Wall Street Journal, and sufficiently alleged that the office defendants knew that there was no market for the subprime loans, such that viewing the complaint as a whole, and in the light most favorable to the plaintiff, the plaintiff plausibly pled that the officer defendants did not have a reasonable basis for their actions, and that therefore, the officer defendants were not entitled to protection under the New Mexico common-law business judgment rule.  See Fed. Deposit Ins. Corp. v. Wertheim, 2014 WL 11619166 at *5.  Like the allegations against the office defendants in Fed. Deposit Ins. Corp. v. Wertheim, the FDIC has included sufficient factual allegations in the Amended Complaint, such that Nafus is not entitled to protection under the New Mexico common-law business judgment rule.  Like the officer defendants in Fed. Deposit Ins. Corp. v. Wertheim, Nafus disregarded obvious risks to First Community by failing to conduct due diligence on the loans he originated and did not adhere to First Community's Loan Policy.  See Amended Complaint ¶ 30, at 8.  The Court, therefore, concludes that Nafus is not entitled to protection under New Mexico's common-law business judgment rule.

**IT IS ORDERED** that: (i) the Plaintiff's Motion for Leave to Amend its Complaint in Accordance with the Court's March 3, 2015, filed March 10, 2015 (Doc. 67) is granted; (ii) the Plaintiff's Motion to Stay Deadlines in this Court's Scheduling Order, filed March 10, 2015 (Doc 68) is granted; (iii) the Notice of Adoption of Previously Filed Certain Defendants' Motion to Dismiss and Defendants' Joint Response in Opposition to Plaintiff's Motion for Leave to Amend, filed March 31, 2016 (Doc. 97), is denied; and (iv) Defendant Nafus's Renewed Motion to Dismiss, filed March 31, 2016 (Doc. 98), is denied.  Accordingly, the FDIC has an Amended Complaint before the Court, and the First Community Defendants and Nafus have failed in their attempt to dismiss the Amended Complaint because the Amended Complaint has sufficiently plead negligence, meaning that neither the director or officer Defendants acted with a "reasonable basis" entitling them to the common-law business judgment rule's protections.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Mary T. Torres
Beall & Biehler Law Firm
Albuquerque, New Mexico

--and--

Dennis S. Klein
Hughes Hubbard
Miami, Florida

*Attorneys for the Plaintiff*

Andrew G. Schultz
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

William Frank Carroll
Thomas B. Alleman
Aubrey Colvard Labanowski
Dykema Cox Smith
Dallas, Texas

     *Attorneys for Defendants H. Patrick Dee, Paul D. DiPaola, V. William Dolan, Jr., John E. Fanning, Marshall G. Martin, Ronald R. Sanchez, and Pamela J. Smith*

Phil Krehbiel
Marian B. Hand
Nicholas L. Pino
Keleher & McLeod
Albuquerque, New Mexico

     *Attorneys for Defendant Bobby J. Nafus*